IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| THE STATE OF NORTH CAROLINA; THE NORTH CAROLINA STATE BOARD OF ELECTIONS; and KIM W. STRACH, in her official capacity as Executive Director of the North Carolina State Board of Elections, | Civil Action No. 13-cv-861 |
| Defendants. | |

## COMPLAINT

The United States of America, plaintiff herein, alleges:

1.     The Attorney General files this action pursuant to Sections 2 and 12(d) of the Voting Rights Act, 42 U.S.C. §§ 1973 & 1973j(d), to enforce the voting rights guaranteed by the Fourteenth and Fifteenth Amendments to the United States Constitution.

2.     In this action, the Attorney General challenges portions of North Carolina House Bill 589 (2013) ("HB 589"), which was signed into law on August 12, 2013, and is designated as Session Law 2013-381.  HB 589 makes significant changes to North Carolina's election laws.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 2201 and 42 U.S.C. § 1973j(f).

4.      Venue is proper in this court under 28 U.S.C. §§ 113(b) and 1391(b).

## PARTIES

5.      The Voting Rights Act authorizes the Attorney General to file a civil action on behalf of the United States of America seeking injunctive, preventive, and permanent relief for violations of Section 2 of the Act.  42 U.S.C. § 1973j(d).

6.      Defendant North Carolina is one of the states of the United States of America.

7.      The North Carolina State Board of Elections ("SBOE") is the state agency responsible for overall administration of elections in North Carolina.  The Board of Elections consists of five members appointed by the governor to four-year terms.

8.      Defendant Kim W. Strach is the Executive Director of the North Carolina State Board of Elections, the State's chief election officer, and is sued in her official capacity.

## ALLEGATIONS

### The State of North Carolina

9.      According to the 2010 Census, the State of North Carolina had a total population of 9,535,483.  Of those individuals, 6,223,995 (65.3%) were non-Hispanic white, and 2,076,800 (21.8%) were non-Hispanic black.

10.     According to the 2010 Census, the voting-age population of North Carolina was 7,253,848, of whom 4,964,325 (68.4%) were non-Hispanic white, and 1,495,360 (20.6%) were non-Hispanic black.

11.     According to the 2010 American Community Survey 1-Year Estimates, North Carolina had 6,833,011 voting-age citizens, of whom 4,920,857 (72%) were non-Hispanic white, and 1,473,682 (21.6%) were black.

12.     According to data from the SBOE, as of August 31, 2013, North Carolina had 6,464,175 registered voters, of whom 4,588,491 (71%) were white, and 1,452,508 (22%) were African-American.  Hispanic voters—who may be reported as white, black, or a member of another racial category—totaled 115,272 (1.8%).

13.     The turnout rate among African-American voters in North Carolina, which has significantly lagged behind that of white voters as recently as the 2004 general election, surpassed that of white voters in the 2008 and 2012 general elections.

14.     According to the 2010 American Community Survey 1-Year Estimates, non-Hispanic black residents of North Carolina had higher rates of poverty than non-Hispanic white residents:  27.7 percent of all non-Hispanic black residents compared to 11.8 percent of all non-Hispanic white residents live in poverty.

15.     According to the 2010 American Community Survey 1-Year Estimates, non-Hispanic black households in North Carolina were three times as likely as non-Hispanic white households to lack access to a vehicle: 14.3 percent of non-Hispanic black households, compared to 4.3 percent of non-Hispanic white households.

16.     According to the 2010 American Community Survey 1-Year Estimates, the unemployment rate for non-Hispanic black residents in North Carolina was almost twice the rate for non-Hispanic white residents (19.2% compared to 10.5%).

17.     According to the 2010 American Community Survey 1-Year Estimates, non-Hispanic black residents in North Carolina were far more likely to lack a high school diploma than non-Hispanic white residents (19.5% of non-Hispanic black residents lack high school diplomas compared to 11.3% of non-Hispanic white residents).

**The State of North Carolina's History of Discrimination**

18.     The history of official racial discrimination against African-American citizens in North Carolina with regard to voting is longstanding and well-documented. For example, in multiple reported decisions, courts have found, in the words of one, that "the State of North Carolina . . . officially and effectively discriminated against black citizens in matters touching their exercise of the voting franchise . . . from ca. 1900 to ca. 1970[,]" *Gingles v. Edmisten*, 590 F. Supp. 345, 359 (E.D.N.C. 1984), *aff'd in part, rev'd in part sub nom. Thornburg v. Gingles*, 478 U.S. 30 (1986), and that this history has impeded African Americans' ability to effectively participate in the political process, *see* 590 F. Supp. at 361. *See also Ward v. Columbus Cnty.*, 782 F. Supp 1097, 1103 (E.D.N.C. 1991) ("[T]he legacy of discrimination continues to handicap black citizens in [Columbus County] in their ability to participate effectively in the political process."); *Johnson v. Halifax Cnty.*, 594 F. Supp. 161, 169 (E.D.N.C. 1984) ("Blacks in Halifax

County and North Carolina have been subjected to a long history of official racial discrimination concerning their right to vote and participate in the political process.").

19.     Based on a history of racial discrimination, 41 of North Carolina's 100 counties were subject to the preclearance requirement of Section 5 of the Voting Rights Act by virtue of being covered under the formula set forth in Section 4(b) of the Voting Rights Act. 28 C.F.R. pt. 51 App. Forty counties were originally made subject to Section 5 based on coverage determinations made after the 1965 enactment of the Voting Rights Act, and one county was made subject to Section 5 after the 1975 amendments to the Voting Rights Act. Under Section 5, covered jurisdictions were required to obtain preclearance from the United States Attorney General or from a three-judge court of the United States District Court for the District of Columbia prior to implementing any voting change. 42 U.S.C. § 1973c(a). With the exception of one county and one city that bailed out of coverage, the covered counties in North Carolina remained subject to Section 5 until the decision of the Supreme Court in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013).

20.     To obtain preclearance under Section 5, covered jurisdictions in North Carolina were required to demonstrate that voting changes "neither ha[d] the purpose nor w[ould] have the effect of denying or abridging the right to vote on account of race[,] color," or "member[ship] [in] a language minority group." 42 U.S.C. §§ 1973c(a), 1973b(f)(2).

21.     From 1980 to 2013, the Attorney General interposed objections under Section 5 of the Voting Rights Act to at least 60 submissions consisting of some 155 discrete voting changes in North Carolina, finding that either the State or one of the covered political subdivisions within the State had failed to show that the proposed changes would not have the purpose or effect of denying or abridging the right to vote on account of race or color or membership in a language minority group.

22.     Between 1982 and 2006, plaintiffs secured favorable outcomes in 55 lawsuits brought against governmental units in North Carolina under Section 2 of the Voting Rights Act.  Ten of these lawsuits resulted in reported judicial decisions; 45 were settled favorably without a reported decision.

**Provisions of HB 589**

23.     HB 589 makes several significant changes to North Carolina's election law. Among other changes, HB 589 alters existing law by reducing the number of early voting days available to voters, eliminating same-day voter registration during the early voting period, and prohibiting the counting of provisional ballots cast by voters who attempt to vote in their county, but outside their home precinct.  HB 589 also imposes a new photo identification requirement for in-person voters.

**A.     Early Voting**

24.     From 2001 until the enactment of HB 589 in 2013, North Carolina provided 17 days of early voting during each election.  Early voting began on the third Thursday before Election Day and ended on the last Saturday before the election.

25.     HB 589 reduces the total number of days of early voting to ten days, starting on the second Thursday before an election.  In addition, the law eliminates each county's option of offering four additional hours of early voting, from 1 p.m. to 5 p.m., on the last Saturday before the election.  The new law requires jurisdictions to offer the same overall number of hours of early voting in presidential general elections as were offered in 2012, and the same overall number of early voting hours in non-presidential federal general elections as were offered in 2010, unless the county and state boards unanimously agree to change the number of hours.

26.     Under HB 589, all early voting locations in a county, except the county board of elections office, must be open on the same days and during the same hours as every other location in the county.

27.     North Carolina has experienced a substantial rise in voter turnout rates in recent years.  The turnout rate among African-American voters in North Carolina, as a percentage of registered voters, significantly lagged behind that of white voters as recently as the 2004 general election, but surpassed that of white voters in the 2008 and 2012 general elections.  SBOE data demonstrate that this trend is due, in part, to the availability and use of early voting.

28.     In-person early voting (often referred to as "one-stop" voting in the State), has been a popular choice for many North Carolina voters.  The SBOE reports that 2,402,394 voters cast one-stop ballots (out of 4,347,936 total votes cast) during the November 2008 election cycle; 901,457 voters cast one-stop ballots (out of 2,708,216

total votes cast) during the November 2010 election cycle; and 2,556,228 voters cast one-stop ballots (out of 4,540,838 total votes cast) during the November 2012 election cycle.

29.     African Americans disproportionately utilized early voting during the November 2008 and November 2012 general elections in North Carolina.  African Americans also disproportionately used the—now eliminated—first seven days of early voting during these elections.  At the time of the November 2008 general election, African Americans constituted about 22 percent of all registered voters in North Carolina.  However, for the November 2008 election in North Carolina, African-American voters were about 29 percent of all early voters and an even greater percentage—about 32 percent—of all individuals who cast votes during the first week of early voting.  Overall, about 71 percent of all African Americans who cast ballots during the November 2008 election in North Carolina did so during the early voting period, and about 23 percent of all African-American voters who cast ballots in this election cast their ballots during the first week of early voting.  In contrast, white voters constituted about 73 percent of registered voters in North Carolina at the time of the November 2008 general election.  However, for the November 2008 election in North Carolina, white voters were about 67 percent of all early voters and about 64 percent of all individuals who cast early votes during the first week.  About 51 percent of white voters who voted in the November 2008 election in North Carolina cast early votes, and about 14 percent of all white voters who voted in this election cast ballots during the first week of early voting.

30.     Similarly, at the time of the November 2012 general election, African Americans constituted about 22 percent of all registered voters in North Carolina. However, for the November 2012 election in North Carolina, African-American voters cast about 29 percent of all the early votes, and about 33 percent of the early votes cast during the first week.  About 71 percent of all African American voters who cast ballots during the November 2012 election in North Carolina cast them during the early voting period, and about 28 percent of all African-American voters who cast ballots in this election cast their ballots during the first week of early voting.  In contrast, white voters were about 71 percent of registered voters in North Carolina at the time of the November 2012 election.  However, for the November 2012 election in North Carolina, white voters cast only about 66 percent of the early votes and about 62 percent of the early votes cast during the first week.  About 52 percent of white voters who voted in the November 2012 election in North Carolina cast ballots during early voting, and about 17 percent of white voters who voted in this election cast early voting ballots during the first week.

31.     Dramatically cutting the number of days of early voting, the method of voting that African Americans disproportionately used in recent elections in North Carolina, is not ameliorated by retaining the same overall number of hours of early voting over a shorter period of days.  The State of Florida's legislature reduced the number of early voting days available in that State prior to the November 2012 election in a manner similar to the early vote changes contained in North Carolina's HB 589.  For example, in Florida, many counties continued to offer the same overall number of hours of early

voting over a shortened period of eight days. According to well-publicized reports of the voting experience in Florida in November 2012, voters waited in extraordinarily long lines both during early voting and on Election Day. Overall, Florida voters experienced the longest wait times of voters in any state during the November 2012 election, with reports of voters leaving the long lines because of family and work obligations and ultimately not casting a ballot.

32. As a result of the problems experienced in the November 2012 election, in 2013, the Florida legislature reversed itself, and restored the full number of days of early voting (up to 14 days), and even expanded the number of hours that counties could offer early voting.

33. During consideration of HB 589, North Carolina's House Elections Committee heard testimony about Florida's 2012 early voting experience at a hearing that focused primarily on the voter photo identification requirement.

34. A memorandum prepared by the executive director of the SBOE in May 2011, in response to a proposal in 2011 to cut early voting in North Carolina, states that cutting early voting would increase county election expenses because of the cost, among other things, of increasing the number of Election Day polling places, equipment, and staff.

**B.** **Same-Day Registration**

35. In 2007, North Carolina authorized same-day registration during the early voting period (while not authorizing it on Election Day itself). Qualified applicants could

register to vote by producing a driver's license, government photo identification, utility bill, bank statement, government check, paycheck, or other government document. The voter could cast a ballot at the early voting site, and local election officials would verify the registration within two business days; officials would count the ballot if the voter's registration was determined valid and would cancel the ballot if the registration was determined not valid.

36.    HB 589 eliminates same-day voter registration.

37.    African Americans disproportionately used same-day registration during the November 2008 and November 2012 general elections. During the 2008 general election, although African Americans comprised only about 22 percent of North Carolina's total registered voters, they were about 35 percent of same-day registrants. White voters, who were about 73 percent of the total registered voters in 2008, were only 55 percent of same-day registrants. During the 2012 general election, although African Americans comprised about 22 percent of North Carolina's total registered voters, they were 34 percent of same-day registrants. White voters, who were about 71 percent of the total registered voters in 2012, were only 55 percent of same-day registrants.

38.    In the November 2008 and November 2012 general elections, African Americans were about twice as likely as white voters to use same-day registration. During the 2008 general election, about 3.8 percent (37,075) of North Carolina's African-American voters who cast ballots used same-day registration, compared to about 1.8 percent (57,452) of white registered voters. During the 2012 general election, about 3.1

percent (32,952) of North Carolina's African-American voters who cast ballots used same-day registration, compared to about 1.6 percent (53,331) of white registered voters.

### C. Out of Precinct Provisional Ballots

39.     Prior to the enactment of HB 589, a voter could cast a provisional ballot at any precinct located in the county in which the voter was registered to vote, and the votes cast on such a ballot were counted for all contests in which the voter would have been eligible to vote if he or she had cast a regular ballot at his or her home precinct.

40.     HB 589 prevents counties from counting provisional ballots if the voter casts the ballot in a precinct other than the voter's home precinct.

41.     In 2005, in response to a disputed state election, the North Carolina legislature clarified the meaning of the statute governing the counting of provisional ballots and adopted a finding that "of those registered voters who happened to vote provisional ballots outside their resident precincts on the day of the November 2004 General Election, a disproportionately high percentage were African-American."  N.C. Session Law 2005-2 § 1(9).

42.     Data from past elections indicate that prohibiting the counting of provisional ballots cast in the voter's county, but outside the voter's home precinct, will likely mean the rejection of several thousand votes that would have been counted in prior elections, and indicate that African-American voters can be expected to cast disproportionately more of these rejected ballots than white voters.

**D.**    **Voter Photo Identification**

43.    Prior to the enactment of HB 589, there was no state-law requirement for duly registered voters in North Carolina to present identification in order to vote.  Voters were required, however, to confirm their registration status by stating their name and current address, and then signing their name.  Prior to HB 589, the federal Help America Vote Act of 2002 ("HAVA") required—and still requires—an individual who registered to vote by mail for the first time in the state and who did not provide a driver's license number or the last four digits of his or her social security number on the voter registration application to provide identification, but only the first time he or she votes in a federal election.  *See* 42 U.S.C. § 15483(b).  Under HAVA, acceptable identification is much broader than under HB 589; it includes not only a driver's license or government photo identification but also a utility bill, bank statement, paycheck, or other government document showing the voter's name and address.  *See id.*

44.    Except as set forth below, HB 589 requires, beginning in 2016, in-person voters in North Carolina to present one of several forms of government-issued photo identification in order to vote (which, with limited exceptions, must be unexpired and include a printed expiration date):  (1) A North Carolina driver's license; (2) a Division of Motor Vehicles ("DMV")-issued "special identification card" for non-operators; (3) a United States passport; (4) a United States military identification card; (5) a Veteran's identification card issued by the United States Department of Veterans Affairs; (6) a tribal enrollment card issued by a federally- or State-recognized tribe; or (7) a driver's

license or non-operator's photo identification card issued by another state, the District of

Columbia, or a territory or commonwealth of the United States, but only if the voter's

voter registration was within 90 days of the election.  Neither United States military nor

Veteran's identification cards require a printed expiration or issuance date in order to be

accepted.  Voters who are 70 years of age and older are exempted from the requirement

that the photo identification be unexpired; however, the photo identification they present

must have been unexpired on the voter's 70th birthday.

45.     Three classes of registered voters are exempted from the voter photo

identification requirement: (1) registered voters who have a religious objection to being

photographed and who filed a declaration to that effect; (2) registered voters who are

victims of a natural disaster occurring within 60 days before the election; and (3)

registered voters who qualify to cast a ballot curbside because of age or physical

disability.  The voters in at least the last category must show one of the forms of

identification approved by the HAVA for first-time voters who register by mail.

46.     Otherwise qualified voters who do not possess the required photo

identification are permitted to vote a provisional ballot under HB 589.  For a provisional

ballot cast under these circumstances to be counted, however, the voter must present one

of the forms of photo identification valid under HB 589 to the county board of elections

no later than noon of the day prior to the scheduled canvassing of ballots.  There are no

curative measures available in HB 589 for voters who cast provisional ballots under this

provision and who do not possess photo identification.  For example, the bill does not

provide an exception to the photo identification requirement for voters who face barriers to obtaining the State's specific, approved forms of photo identification due to poverty, lack of transportation, or other reasons.

47.     HB 589 amends North Carolina law regarding the issuance of a DMV-issued special identification card for non-operators.  The new law waives the fee associated with the issuance of a DMV-issued special identification card for voters who otherwise lack the requisite photo identification, but it does not waive the documentation required from an applicant to obtain a DMV-issued special identification card.  Further, although HB 589 requires a North Carolina register of deeds to issue without charge a certified copy of a birth certificate or marriage license to any registered voter who declares that he or she needs the document to obtain a photo identification in order to vote, it does not address any fees that will be imposed on voters who will have to obtain the requisite underlying documentation from out-of-state agencies.  In addition, even if a voter can obtain a free in-state birth certificate or marriage license, he or she will still need to provide proof of residency and proof of a Social Security number.

48.     Voters who need a special identification card to meet HB 589's voter photo identification requirement will have to travel to a DMV office to obtain the card.  In 10 North Carolina counties, the only DMV office is open only once per month.  Four of these counties are among the 10 North Carolina counties that have the highest percentage of African-American voting-age populations in the State, including Bertie County, which has the highest at 60.7 percent.  Four counties' DMV offices are open only two or three

days per month, and in five counties, the DMV office is open only one or two days per week. Only 18 of North Carolina's 100 counties have DMV sites that offer weekend hours.

49. Prior to the enactment of HB 589, in April 2013, the North Carolina SBOE released a report detailing the number of registered voters who have a North Carolina driver's license or other DMV-issued identification card, which would allow persons to cast a valid ballot under the new law. According to the SBOE's analysis of the list of 6,425,820 persons registered to vote as of March 2013, there were 318,643 voters (5.0%) who could not be matched with a record in the DMV database. This report was published before the North Carolina Senate adopted its strict photo identification requirements in July 2013.

50. Although African-American voters comprised 22.5 percent of total registered voters in the State at the time of the analysis, 33.8 percent (107,681) of the registered voters on the no-match list were African-American. In contrast, white voters constituted 71.0 percent of the total registered voter population in the State, but were only 54.2 percent (172,613) of the registered voters on the no-match list. Further, of the 4,562,097 white registered voters in the State, 3.8 percent appeared to not have DMV-issued identification, whereas of the 1,445,799 African-American registered voters, 7.4 percent appeared not to have DMV-issued identification.

**Legislative History and Enactment of HB 589**

51.     On April 4, 2013, HB 589 was filed in the North Carolina House of Representatives.

52.     Voter photo identification requirements were the subject of hearings held by the House Committee on Elections, including public hearings on March 12, 2013 and April 10, 2013.  During these hearings, witnesses testifying in opposition to strict identification requirements noted, among other things, the statistical disparity in the rate at which African Americans and white voters in North Carolina possess photo identification, the discriminatory impact of photo identification requirements on minority voters, and the challenges people encounter in obtaining the underlying documentation needed to acquire the types of photo identification that would be required by the proposed law.

53.     On April 24, 2013, during the floor debate, the North Carolina House of Representatives rejected Amendment A8 to HB 589 that would have permitted voters with a reasonable impediment preventing them from obtaining photo identification—such as a lack of transportation to obtain photo identification or the lack of a birth certificate— to cast a ballot without showing photo identification.  The House also rejected Amendment A7, which would have allowed a registered voter "who at least two election officials personally identify" and who signs a declaration form, to vote without photo identification.

54.     On April 24, 2013, HB 589 passed the North Carolina House of Representatives in an 81-36 vote.  No African-American member of the North Carolina House voted in favor of the bill.

55.     As passed by the North Carolina House of Representatives, HB 589 included proposed changes to North Carolina's election laws that were limited to voter identification requirements, procedures regarding challenging voters, and absentee ballot procedures.

56.     The House version of HB 589 included, as acceptable forms of voter photo identification, the photo identification cards issued by the University of North Carolina and its constituent institutions (some of which are historically black universities), by North Carolina community colleges, and by units of local government, and identification cards issued for government programs of public assistance.

57.     On April 25, 2013, the North Carolina Senate received HB 589, but no further formal action was taken on HB 589 by the North Carolina General Assembly until July 23, 2013, when the North Carolina Senate's Committee on Rules and Operations ("Rules Committee") reported and adopted a committee substitute bill.

58.     On June 25, 2013, the United States Supreme Court issued its decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), in which the Court struck down the coverage formula used to determine which jurisdictions, including 40 counties in North Carolina, were required to obtain preclearance before implementing voting changes pursuant to Section 5 of the Voting Rights Act.

59. Following the *Shelby County* decision, the Senate's committee substitute bill greatly expanded the number and type of changes HB 589 made to North Carolina's election laws. The committee substitute bill, among other things, added provisions that reduced the number of days in the early voting period, eliminated same-day voter registration during early voting, and prohibited the counting of provisional ballots cast outside the voter's home precinct.

60. The Senate's committee substitute bill also significantly narrowed the forms of allowable voter photo identification from the bill that initially passed the House by eliminating the following forms of allowable photo identification: identification cards issued by the University of North Carolina and its constituent institutions, by North Carolina community colleges, and by units of local government, and identification cards issued for government programs of public assistance.

61. During a July 23, 2013, Senate Rules Committee hearing adopting the committee substitute bill, a Senate sponsor of the bill stated that the changes in early voting were intended to achieve consistency in the early voting process and to treat early voting facilities in a uniform manner throughout the state.

62. During the Rules Committee hearing, a legislator who opposed the bill noted the potential for long lines and increased costs in future elections, given the combined effect of the reduction in the number of available early voting days and other changes in the Senate version of the bill.

63.     On July 24, 2013, and July 25, 2013, the full North Carolina Senate considered and rejected several amendments to the committee substitute bill.  For example, the Senate rejected Amendment A2, which would have kept 17 days of early voting in November presidential general elections, when turn out is highest.  The Senate also tabled Amendment A8, which would, among other things, have permitted identification cards issued by any accredited college or university in North Carolina to be used as acceptable forms of photo identification.  The Senate also rejected Amendment A9, which would have allowed voters without photo identification to sign a declaration of identity and vote a provisional ballot that would be counted if "the voter's signature on the declaration of identity matche[d] the signature on the voter's registration."

64.     On July 25, 2013, two days after the substitute bill was reported out of committee, the North Carolina Senate passed its greatly expanded version of the HB 589 by a vote of 32 to 14.  No African-American member of the North Carolina Senate voted for the bill.

65.     Although changes similar to the provisions added to HB 589 by the Senate had been introduced in other bills earlier in the legislative session, many of those bills had not advanced very far through the legislative process and were never considered in committee or debated on the floor.  Thus, there was little opportunity for public debate or input regarding much of the enacted bill.

66.     Despite the Senate's version of HB 589 differing markedly from the previously-passed House version, the North Carolina House approved the Senate's

version of HB 589 by a vote of 73 to 41, on July 25, 2013, without further amendment. The bill was ratified the next day and presented to the governor on July 29, 2013. The governor signed the legislation on August 12, 2013.

67.    Before the governor signed HB 589, North Carolina Attorney General Roy Cooper publicly urged the governor in a letter to veto the legislation, saying that the bill was "regressive" and would make it harder for working people to vote during the early voting period. Attorney General Cooper also criticized the provision prohibiting the counting of provisional ballots cast outside of the voter's home precinct, and he described the new voter photo identification requirements as "unnecessary, expensive, and burdensome."

### Implementation of HB 589 Will Have a Discriminatory Result

68.    Several provisions of HB 589, both individually and collectively, will have the result of denying or abridging the right of African Americans to participate equally in the political process.

69.    The reduction of early voting days will have a disparate impact on African-American voters in North Carolina resulting in unequal access to the political process.

70.    African-American voters disproportionately use early voting, and specifically made greater use than white voters of the first seven days of early voting during the 2008 and 2012 general elections in North Carolina.

71.     The reduction of the number of days of early voting and elimination of the first seven days of early voting, including the first weekend days of early voting, will have a discriminatory impact on African-American voters in North Carolina.

72.     African-American voters use same-day registration during early voting at a higher rate than white voters in North Carolina.  They will be disproportionately impacted by the elimination of same-day voter registration during early voting.

73.     African-American voters are more likely than white voters to cast out-of-precinct provisional ballots in North Carolina.  They will be disproportionately impacted by the prohibition on counting provisional ballots cast in the voter's county, but in a precinct other than the voter's home precinct.

74.     The voter photo identification requirement in HB 589, which lacks reasonable safeguards for voters who face barriers to obtaining such identification, will have a disparate impact on African-American voters in North Carolina resulting in unequal access for African-American voters to the political process.

75.     African-American voters in North Carolina, as compared to white voters, disproportionately lack the forms of photo identification required by HB 589.

76.     The process of obtaining valid photo identification under HB 589 will impose a substantial and disproportionate burden on thousands of African-American voters in North Carolina who are disproportionately poor and disproportionately lack access to transportation.

77.     In considering HB 589, the legislature rejected offered amendments that could have ameliorated the obstacles that voters face in obtaining the specific forms of photo identification required by the statute.

78.     Several changes mandated by HB 589—including, among others, the reduction in the number of early voting days, the elimination of same-day registration, the prohibition on counting out-of-precinct provisional ballots, and the imposition of a voter photo identification requirement—will act in combination to produce an even greater discriminatory impact on African-American voters than would each individual change standing alone.  These provisions will operate in concert, resulting in unequal access for African-American voters to the political process.

79.     As outlined previously in this Complaint, including Paragraphs 18 to 22, race continues to be a significant and, oftentimes, decisive factor in the State of North Carolina's electoral process in that:

a.     North Carolina's history of voting-related discrimination against African-American voters is long-standing, well-documented, and judicially recognized;

b.     North Carolina has an extensive, judicially recognized history of racially polarized voting, which continues to the present day;

c.     HB 589 compounds the discriminatory effects of racially polarized voting on racial minorities in North Carolina by disproportionately reducing the

probability that African Americans in North Carolina will meet the prerequisites for casting legally valid votes;

d.    North Carolina has used voting practices or procedures that enhance the opportunity for discrimination against African-American voters;

e.    African Americans in North Carolina continue to suffer the effects of official discrimination, including a history of discrimination in voting-related activities. The continued effects of discrimination on African-American citizens in North Carolina, including their markedly lower socioeconomic conditions relative to white citizens, continue to hinder their ability to participate effectively in the political process in North Carolina;

f.    Racial appeals have characterized certain political campaigns in North Carolina;

g.    Many elected officials in North Carolina have not been responsive to the particularized needs of African Americans;

h.    The policy reasons proffered by supporters of these provisions in HB 589 are tenuous and unsupported in the legislative record or by other evidence. To the extent the legislature provided reasons for its rejection of numerous ameliorative amendments to HB 589, those reasons are equally tenuous;

i.    Reports and statements issued by the State and its agencies tend to undermine the justifications proffered by proponents of HB 589 and provide evidence that the proffered rationales for several provisions of the

bill are tenuous, particularly as they relate to changes regarding the reduction of the early voting period, the elimination of same-day registration, the prohibition on counting out-of-precinct provisional ballots, and the requirement for voter photo identification without appropriate exceptions.

### Passage of HB 589 was Motivated by Discriminatory Purpose

80.     HB 589 was enacted with the purpose of denying or abridging the right of African Americans to vote on account of their race or color.

81.     Against a backdrop of the State's history of voting discrimination against African Americans and a dramatic increase in the State's African-American voter turnout rates during the November general elections in 2008 and 2012, North Carolina enacted HB 589 with knowledge of the disproportionate effect that numerous provisions, both singly and together, would have on the equal political participation of minority voters. These provisions include the reduction of the early voting period, the elimination of same-day voter registration, and the imposition of voter photo identification requirements without reasonable safeguards for voters who face barriers to obtaining such identification.  In addition, the North Carolina legislature previously acknowledged in 2005 that the failure to count out-of-precinct provisional ballots would disproportionately impact African-American voters.

82.     The impact of HB 589's changes to North Carolina's election laws, including the reduction of available early voting days, the elimination of same-day voter

registration, the prohibition on counting out-of-precinct provisional ballots, and the imposition of voter photo identification requirements, will weigh more heavily on African-American voters, who, in previous elections, disproportionately voted during the first week of early voting, disproportionately made use of same-day voter registration, and disproportionately cast out-of-precinct provisional ballots, and who disproportionately lack the forms of photo identification required by HB 589.

83.     Upon information and belief, the North Carolina legislature voted to enact HB 589 with the knowledge of North Carolina's history of voting discrimination and socioeconomic discrimination against African-American citizens.

84.     Prior to voting to enact HB 589, members of the North Carolina legislature knew of the disproportionate effect certain changes would have on the ability of African-American voters to participate equally in the franchise, including the reduction of the early voting period, the elimination of same-day voter registration, and the implementation of voter photo identification requirements, and it failed to address its prior finding that the failure to count out-of-precinct provisional ballots would disproportionately harm African-American voters.

85.     The sequence of events leading to the enactment of HB 589 provides additional evidence that racial discrimination was a factor in passing HB 589.  First, in the November 2008 and November 2012 elections, the African-American turnout rate among registered voters surpassed the white turnout rate, after many years of lower participation rates among African-American voters.  Then, following passage by the

North Carolina House in April 2013, HB 589 lay dormant for several months while Section 5 of the Voting Rights Act was still operable and changes to North Carolina's voting laws were subject to preclearance for the covered counties of the State. And, within a month of the Supreme Court's decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), the State Senate revived HB 589, made the voter photo identification provisions of the bill more stringent, added numerous new restrictive voting provisions, and pushed the bill through the legislative process with unusual speed and with minimal debate in either chamber.

86.     The chairman of the Senate Rules Committee admitted publicly that his committee was waiting to act until after the Supreme Court's decision in *Shelby County* before it pursued a dramatically expanded version of HB 589.

87.     Despite the significance of the changes to existing election laws contained in HB 589, the bill was adopted by the Senate Rules Committee, and voted on by the North Carolina Senate and House, in a span of a mere three days, severely limiting opportunities for consideration and comment by other members of the legislature and by interested members of the public.

88.     The North Carolina General Assembly rejected amendments that would have mitigated the burden of HB 589 on African-American voters. For example, the North Carolina House rejected measures to count ballots from voters who faced barriers to obtaining one of the permitted forms of photo identification. Likewise, the Senate substitute bill significantly narrowed the types of allowable photo identification, and the

full Senate later rejected an amendment that would have expanded the types of permissible voter photo identification.

89.    The legislative history of HB 589 indicates that the North Carolina General Assembly departed from its normal procedural practice in passing the bill.

90.    North Carolina has an extensive, judicially recognized history of racially polarized voting, which continues to the present.

91.    Extensive demographic and socioeconomic data show that African Americans continue to experience the consequences of past discrimination, which impede their political participation.

92.    Reports and statements issued by the State and its agencies tend to undermine the justifications proffered by proponents of HB 589, providing evidence that the proffered rationales for the bill's provisions regarding early voting, same-day registration, out-of-precinct provisional ballots, and voter photo identification are tenuous.

**The Need for Section 3(c) Relief**

93.    Over time, the State of North Carolina has employed a variety of devices to restrict minority voters' access to the franchise, up to and including the recent enactment of HB 589.

94.    In the absence of relief under Section 3(c) of the Voting Rights Act, 42 U.S.C. 1973a(c), North Carolina will continue to violate the Voting Rights Act and the voting guarantees of the Fourteenth and Fifteenth Amendments in the future.

**CAUSE OF ACTION**

**Section 2 of the Voting Rights Act**

95.     The United States re-alleges and incorporates by reference the allegations set forth in all prior paragraphs of this Complaint.

96.     Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has either the purpose or the result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

97.     Due to social and economic conditions caused by historical and ongoing discrimination, including poverty, unemployment, lower educational attainment, and lack of access to transportation, minority voters will be disproportionately burdened by provisions of HB 589.  For example, African-American voters in North Carolina disproportionately utilize the first week of early voting, same-day voter registration during early voting, and out-of-precinct provisional ballots, as compared to white voters, and HB 589's reduction or elimination of these practices will interact with social and economic conditions caused by historical and ongoing discrimination in North Carolina to result in an adverse discriminatory impact on African-American voters.  Likewise, African-American voters disproportionately lack the requisite photo identification and will be disproportionately burdened by the provision of the law imposing a strict voter photo identification requirement, resulting in an adverse discriminatory impact on African-American voters.  Further, the legislature knew of the harms these provisions

would cause to African-American voters, yet rejected several ameliorative measures that would have lessened the disparate impact of these provisions.

98.     Viewed in the totality of circumstances, North Carolina's implementation and enforcement of these and other provisions of HB 589 will individually and collectively interact with economic, historical, and on-going social conditions in North Carolina—including poverty, unemployment, lower educational attainment, and lack of access to transportation—to result in a denial or abridgement of equal opportunities for African-American voters to participate in the political process, in violation of Section 2.

99.     The provisions of HB 589, including those requiring the reduction of available early voting days and the implementation of voter photo identification requirements, as well as the elimination of same-day voter registration and the prohibition on counting out-of-precinct provisional ballots, were adopted by the North Carolina General Assembly with the purpose of denying or abridging African Americans' equal access to the political process, in violation of Section 2.

100.    Unless enjoined by order of this Court, Defendants will continue to violate Section 2 by implementing and enforcing the challenged provisions of HB 589.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that this Court enter an order:

1)  Declaring that provisions of HB 589 (including parts 2, 16, 25, and 49) were adopted and are being enforced with the purpose of denying or abridging the right to vote on account of race, color, or membership in a

language minority group in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution;

2) Declaring that provisions of HB 589 (including parts 2, 16, 25, 49) would have the result of denying or abridging the right to vote on account of race, color, or membership in a language minority group in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973;

3) Enjoining the Defendants, their agents and successors in office, and all persons acting in concert with them, from enforcing the requirements of provisions of HB 589 (including parts 2, 16, 25, 49);

4) Authorizing the appointment of Federal observers, pursuant to Section 3(a) of the Voting Rights Act, 42 U.S.C. § 1973a(a), to observe elections in North Carolina;

5) Retaining jurisdiction and subjecting North Carolina to a preclearance requirement pursuant to Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c); and

6) Ordering such additional relief as the interests of justice may require, together with the costs and disbursements in maintaining this action.

Dated: September 30, 2013


RIPLEY RAND                                    JOCELYN SAMUELS
United States Attorney                         Acting Assistant Attorney General
Middle District of North Carolina              Civil Rights Division


/s/ Gill P. Beck                               /s/ Catherine Meza
_____                        _____
GILL P. BECK                                   T. CHRISTIAN HERREN, JR.
NCSB # 13175                                   JOHN A. RUSS IV
Special Assistant United States Attorney       CATHERINE MEZA
Office of the United States Attorney           DAVID G. COOPER
United States Courthouse                       SPENCER R. FISHER
100 Otis Street                                ELIZABETH M. RYAN
Asheville, NC  28801                           Attorneys, Voting Section
Phone: (828) 259-0645                          Civil Rights Division
gill.beck@usdoj.gov                            U.S. Department of Justice
                                               Room 7254-NWB
                                               950 Pennsylvania Avenue, N.W.
                                               Washington, D.C. 20530
                                               Phone: (800) 253-3931
                                               Fax: (202) 307-3961
                                               john.russ@usdoj.gov
                                               catherine.meza@usdoj.gov