## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PATRICK LLOYD MCCRORY, in his official capacity as the Governor of North Carolina, et al., <br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) **Case No.: 1:13-CV-658** |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE STATE OF NORTH CAROLINA, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) **Case No.: 1:13-CV-660** |
| UNITED STATES OF AMERICA, <br><br> Plaintiffs, <br><br> v. <br><br> THE STATE OF NORTH CAROLINA, et al, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) **Case No.: 1:13-CV-861** |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE DECLARATIONS OF SEAN TRENDE AND MOTION IN LIMINE TO EXCLUDE HIS TESTIMONY AT PRELIMINARY INJUNCTION HEARING

# TABLE OF CONTENTS

**Page**

I.  LEGAL STANDARD ....................................................................................... 2

    A.    The Expert Must Be Qualified .................................................... 2

    B.    The Methodology Must Be Reliable ............................................ 4

    C.    The Opinion Must Be Relevant ................................................... 5

II.  ARGUMENT ................................................................................................ 5

    A.    Trende is Not Qualified to Render An Opinion Concerning the
           Effects of the Challenged Provisions .......................................... 5

    B.    Trende's Underlying Methodology Is Fundamentally Flawed ................... 7

    C.    Trende Omits and Fails to Address the Substantial Weight of
           Scholarly Authority that Contradicts His Findings .................................. 14

    D.    Trende Fails to Account for the Known Rate of Error in the Data
           Upon Which He Relies ............................................................. 16

III. CONCLUSION .............................................................................................. 20

Case 1:13-cv-00861-TDS-JEP   Document 147   Filed 06/30/14   Page 2 of 31

# TABLE OF AUTHORITIES

## CASES

*Ancho v. Pentek Corp.*,
157 F.3d 512 (7th Cir. 1998) ............................................................... 3

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
214 F. Supp. 2d 530 (D. Md. 2002) ..................................................... 7

*Bone Shirt v. Hazeltine*,
461 F.3d 1011 (8th Cir. 2006) ............................................................ 20

*Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co.*,
189 F. Supp. 2d 482 (S.D.W.Va. 2002) ............................................... 5

*Coleman v. Union Carbide Corp.*,
No. 2:11-0366, 2013 WL 5461855 (S.D.W.Va. Sept. 30, 2013) ................. 19

*Coles v. Perry*,
217 F.R.D. 1 (D.D.C. 2003) ................................................................ 11

*Cooper v. Smith & Nephew, Inc.*,
259 F.3d 194 (4th Cir. 2001) ..................................................... 2, 4, 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .................................................................... passim

*Doe v. Ortho-Clinical Diagnostics, Inc.*,
440 F. Supp. 2d 465 (M.D.N.C. 2006) ........................................ 3, 7, 15

*Estate of Richard Myers ex rel. Myers v. Wal-Mart Stores, Inc.*,
No. 5:09–CV–549–FL, 2011 WL 1366459 (E.D.N.C. Apr. 11, 2011) ......... 3

*Florida v. United States*,
885 F. Supp. 2d 299 (D.D.C. 2012) ............................................... 8, 12

*Gallagher v. S. Source Packaging, LLC*,
568 F. Supp. 2d 624 (E.D.N.C. 2008) ................................................ 11

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .......................................................................... 13

*In re Titanium Dioxide Antitrust Litig.*,
No. RDB-10-0318, 2013 WL 1855980 (D. Md. May 1, 2013) ................... 5

*Koppell v. N.Y. State Bd. of Elections*,
97 F. Supp. 2d 477 (S.D.N.Y. 2000) ........................................... 3, 7, 14

*Kumho Tire Co v. Carmichael*, 526 U.S. 137, 152 (1999) ................................. 4

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
874 F. Supp. 2d 169 (S.D.N.Y. 2012) .................................................. 5

*Main Street Am. Grp. v. Sears, Roebuck, & Co.*,
No. JFM 08-3292, 2010 WL 956178 (D. Md. Mar. 11, 2010) .................................... 11

*Marsh v. W.R. Grace & Co.*,
80 F. App'x 883 (4th Cir. 2003) ................................................................. 15

*Oglesby v. Gen. Motors Corp.*,
190 F.3d 244 (4th Cir. 1999) ...................................................................... 4

*Reliastar Life Ins. Co. v. Laschkewitsch*,
No. 5:13–CV–210–BO, 2014 WL 1430729 (E.D.N.C. Apr. 14, 2014) ...................... 3

*Ruffin v. Shaw Indus., Inc.*,
149 F.3d 294 (4th Cir. 1998) ..................................................................... 16

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
318 F.3d 592 (4th Cir. 2003) ..................................................................... 11

*Shreve v. Sears, Roebuck & Co.*,
166 F. Supp. 2d 378 (D. Md. 2001) ......................................................... 2, 3

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
878 F.2d 791 (4th Cir. 1989) ....................................................................... 7

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999) ...................................................................... 4

RULES AND REGULATIONS

Fed. R. Civ. P. 26(a) ................................................................................... 11

Fed. R. Civ. P. 26(A)(2)(B) .......................................................................... 8

Fed. R. Civ. P. 26(e) ................................................................................... 11

Fed. R. Civ. P. 37(c)(1) ............................................................................... 11

Fed. R. Evid. 702 ................................................................................. passim

OTHER AUTHORITIES

Aram Hur & Christopher H. Achen, "Coding Voter Turnout Responses in the
Current Population Survey," 77(4), *Public Opinion Quarterly* 985 (2013) ............... 19

Michael P. McDonald, "2012 Turnout: Race, Ethnicity and the Youth Vote,"
Huffington Post, May 8, 2013 ................................................................... 16

Robert A. Bernstein, *et al.*, "Cross-Bias in Voting and Registration Overreporting
in the Current Population Surveys," 3(4) *State Politics & Policy Quarterly* 367
(2003) ................................................................................................ 18

Sean Trende, "How Much Did Demographics Matter in Va. Race?" .............................. 17

Sean Trende, "Sweeping Conclusions From Census Data Are a Mistake," .................... 18

# TABLE OF AUTHORITIES
(continued)

Seth C. McKee, *et al.*, "Achieving Validation: Barack Obama and Black Turnout
in 2008," 12(1) *State Politics & Policy Quarterly* 3 (2012) ....................................... 18

Pursuant to Federal Rule of Evidence 702, Plaintiffs in *League of Women Voters of N.C., et al. v. North Carolina*, Plaintiffs in *N.C. State Conference of the NAACP, et al. v. McCrory, et al.*, and the Duke Intervenor Plaintiffs (collectively, the "Plaintiffs")[1] respectfully move for an order to strike the Declarations of Sean P. Trende, Docs. 138-5, 138-6, 138-7 ("Trende Rep."); and 142-1 at p. 278 ("Supplement"), submitted by Defendants in support of their opposition to the pending motions for preliminary injunction, and to exclude his testimony at the upcoming hearing to be held on the same.[2]

In order to rebut the testimony of Plaintiffs' experts—renowned political scientists who are widely published and respected in their field, *see infra* notes 4, 5, 8—Defendants offer the testimony of Sean Trende, "a senior elections analyst" who "write[s] articles covering elections" for a website called Real Clear Politics ("RCP"). Deposition of Sean P. Trende, attached hereto as Ex. A ("Trende Dep."), at 16:3-21. Trende offers two opinions in his declaration:

- Opinion 1: "The voting reforms contained in HB 589 place the state within the mainstream of American voting laws." Trende Rep. at 4.

- Opinion 2: "The data do not consistently support the turnout effects predicted by Plaintiffs." *Id.* at 15.

---

[1] Plaintiff the United States of America joins this motion.

[2] Before offering expert testimony on any subject, the court must be satisfied that the witness meets the requirements set forth in Federal Rule of Evidence 702. Defendants' Opposition to Plaintiffs' Motions for Preliminary Injunction, Doc. 138, seeks to rely on Trende's Declaration; therefore a *Daubert* motion is appropriate at this time to prevent Defendants from presenting purported expert testimony that fails to meet the standards set forth in Rule 702.

More specifically, he opines that the practices eliminated by HB 589 have "no effect on African American turnout period." Ex. A, Trende Dep., at 142:17-18.

As explained below, Trende's declaration should be stricken and his testimony excluded because: (i) he is not qualified to offer the opinions proffered in his report; (ii) his methodology is fatally flawed and riddled with material factual errors; (iii) he omits the fact that his conclusions are contrary to the weight of scholarly opinion; and (iv) he fails to address significant rates of error in his underlying data.

## I.       LEGAL STANDARD

The introduction of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Pursuant to these authorities, expert testimony must be qualified, reliable, and relevant to be admissible. The proponent of the testimony bears the burden of establishing its admissibility by a preponderance of proof. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

### A.       The Expert Must Be Qualified

"[T]hat a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) (citing cases). "[A]n expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, 'only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply

an opinion broached by a purported expert.'" *Id.* at 393 (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998)) (emphasis added). In addition, to be qualified, the expert must possess "some special skill, knowledge or experience . . . concerning the particular issue before the court." *Id.* at 392 (internal quotation marks and citation omitted). Courts in election law cases have thus excluded opinion testimony where the proffered expert lacked experience analyzing the *specific* election practices at issue. *See Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 481-82 (S.D.N.Y. 2000) (excluding testimony of political scientist who had "significant political experience," but "lack[ed] any particular expertise" on the election practices at issue, and whose work in the area had "neither been tested nor subject to peer review"); *see also Reliastar Life Ins. Co. v. Laschkewitsch*, No. 5:13–CV–210–BO, 2014 WL 1430729, at *1-2 (E.D.N.C. Apr. 14, 2014) (excluding testimony from proffered expert who, despite having vast experience in the insurance industry, did not have any underwriting experience specifically); *Estate of Richard Myers ex rel. Myers v. Wal-Mart Stores, Inc.*, No. 5:09–CV–549–FL, 2011 WL 1366459, at *3 (E.D.N.C. Apr. 11, 2011) (excluding testimony of architect who had no specific experience in parking lot design). Finally, also relevant to the question of admissibility is whether a proposed expert would "testify about matters 'growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 470

3

(M.D.N.C. 2006) (quoting *Daubert*, 43 F.3d 1311, 1317 (9th Cir. 1995)); *see also* Fed. R. Evid. 702 Advisory Comm. Note (same).

**B.    The Methodology Must Be Reliable**

The reliability prong requires the court to determine "whether the reasoning or methodology underlying the expert's proffered opinion is . . . supported by adequate validation to render it trustworthy."  *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999). To this end, the testimony must be "based on sufficient facts or data," and be "the product of reliable principles and methods."  Fed. R. Evid. 702. Factors that guide this inquiry include: "(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community."  *Cooper*, 259 F.3d at 199 (citing *Daubert*, 509 U.S. at 592-94). These factors, which are "neither definitive, nor exhaustive," serve "the objective of *Daubert*'s gatekeeping requirement . . . to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Id.* at 199, 200 (quoting *Kumho Tire Co v. Carmichael*, 526 U.S. 137, 152 (1999)). Thus, "[a] reliable expert opinion" may not be based on mere "belief or speculation, and inferences must be derived using scientific or other valid methods."  *Oglesby v. Gen. Motors Corp*., 190 F.3d 244, 250 (4th Cir. 1999); *see also Kumho Tire*, 526 U.S. at 137-38 (affirming expert

4

testimony as inadmissible where based on subjective conjecture and there was no evidence that any other expert accepted proffered subjective methodology).

## C. The Opinion Must Be Relevant

The relevance prong asks whether the proffered expert testimony is "sufficiently tied to the facts of the case [such] that it will be of assistance to the factfinder in resolving a disputed fact." *Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co.*, 189 F. Supp. 2d 482, 495 (S.D.W.Va. 2002). In other words, there must be a "valid scientific connection to the pertinent inquiry" before the testimony is admissible. *Daubert*, 509 U.S. at 591-92. Finally, because the proffered testimony must also "be of assistance to the factfinder," *Bourne*, 189 F. Supp. 2d at 495, testimony that "'addresses lay matters which [the trier of fact] is capable of understanding without the expert's help'" is also inadmissible, *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 WL 1855980, at *7 (D. Md. May 1, 2013) (quoting *Liberty Media Corp. v. Vivendi Universal, S.A.,* 874 F. Supp. 2d 169, 172 (S.D.N.Y. 2012)).

## II. ARGUMENT

## A. Trende is Not Qualified to Render An Opinion Concerning the Effects of the Challenged Provisions

Trende is not qualified to render an opinion concerning the effects of the challenged provisions. Although he completed two semesters of statistics coursework and

a master's degree,[3] *see* Ex. A, Trende Dep., at 27:16-18, he does not hold a Ph.D. and is not a political scientist. Instead, Trende describes himself as a "recognized expert" in "psephology," Trende Rep. ¶ 2, but he acknowledged in his deposition that there are no degrees or professional certifications in psephology; that no university has a department of psephology; and that there are no professional associations or peer-reviewed journals of psephology, Ex. A, Trende Dep., at 26:22 – 27:9.

Trende has authored *no* peer-reviewed articles in the area of political science or elections, let alone on the specific voting practices at issue in this case. *Id.* at 31:11-20; 32:17-21. He has *no* prior experience analyzing the effects of these voting practices, *id.* at 44:7-24, other than some "back-and-forths" about early voting "on Twitter," *id.* at 44:24 – 45:10. He purports to be an expert on early voting and same-day registration ("SDR") simply because he "carefully stud[ied] the literature" on these topics. *Id.* at 30:2-3; *see also id. at* 30:13-14. But, prior to this case, he had never even *examined* any state's laws with respect to SDR, out-of-precinct voting, or pre-registration. *Id.* at 279:1 – 280:5. He bases his conclusions largely on a regression analysis that purports to measure the relationship between the challenged provisions and African-American turnout, but could not think of a single previous instance in which he had conducted a similar analysis. *See id.* at 281:9-19.

In sum, Trende lacks any of hallmarks of a qualified expert under *Daubert*, such

---

[3] Notably, the subject of Trende's Master's thesis was the U.S. Supreme Court, not elections or voting patterns. *See* Trende Rep. Ex. 1 (CV of Sean P. Trende).

as: (i) a sufficient educational and professional background, *see Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799-800 (4th Cir. 1989) (lower court abused its discretion by permitting testimony concerning credit practices from proffered expert who was not an economist and had only a general business education); (ii) peer-reviewed publications; (iii) relevant experience analyzing the specific practices at issue in this case, *see Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 537 (D. Md. 2002) (excluding testimony of expert whose experience was in the newspaper industry, and who had "never performed a relevant market analysis for antitrust purposes"); *Koppell*, 97 F. Supp. 2d at 481-82 (excluding testimony of political scientist who "lack[ed] any particular expertise" on the election practices at issue); or (iv) a body of work concerning his opinions that pre-dates this litigation and grows naturally out of the his independent research, *see Ortho-Clinical Diagnostics*, 440 F. Supp. 2d at 470.

## B.    Trende's Underlying Methodology Is Fundamentally Flawed

Not surprisingly, given his lack of experience, the methodology underlying Trende's quantitative turnout analysis—in which he attempts to use a regression analysis to compare African-American turnout in various states based on the number of voting reforms (namely, early voting, SDR, the counting of out-of-precinct ballots, and pre-registration) implemented in each state, *see* Trende Rep. ¶¶ 117-25—is fundamentally flawed. Indeed, Trende began his deposition by disclosing that, after reviewing criticisms lodged by Plaintiffs' experts, he had found numerous factual errors in his report and that he would like to discuss those errors. *See* Ex. A, Trende Dep., 11:23 – 12:4. But even

7

leaving those errors (discussed below) aside, his report is riddled with methodological defects that render it unreliable under *Daubert*.

*First*, Trende attempts but fails to conduct a valid time series analysis. The standard practice in political science is to "measure the presence of laws and turnout levels at the same point in time." Surrebuttal of Charles Stewart III, Ph.D., Doc. 117-2 at JA0992 ("Stewart Surrebuttal") ¶ 79.[4] But Trende does not examine elections data contemporaneous with the enactment of the reforms whose impact he attempts to measure. For example, Trende's regression analysis omits years of elections data between 2000 and 2012, focusing only the endpoints of that interval. *See* Sur-reply Expert Report & Decl. of Paul Gronke, PhD, Doc. 117 at JA0661 ("Gronke Sur-reply") ¶ 29.[5] But, according to generally accepted standards in the field of political science, a proper time series analysis would utilize "regression models that include *each year* of turnout data," in order to account for "the over-time nature of the data." *Id*. As Dr. Gronke explains, "[a]ppropriate accounting for time dependent processes in statistical data is perhaps the

---

[4] Dr. Stewart is the Kenan Sahin Distinguished Professor of Political Science at the Massachusetts Institute of Technology and the author of a substantial body of peer-reviewed political science scholarship. *See* Decl. of Charles Stewart III, Ph.D., Doc. 117-2 ("Stewart Rep.") ¶¶ 1-13.

[5] Dr. Gronke is Professor of Political Science at Reed College and Director of the Early Voting Information Center, and a widely-published author of peer-reviewed political science scholarship. *See* Amended Rule 26(A)(2)(B) Expert Report & Decl. of Paul Gronke, PhD, Doc. 117 ("Gronke Rep.") ¶¶ 1-5. He has been acknowledged as perhaps the nation's leading expert on early voting. *See Florida v. United States*, 885 F. Supp. 2d 299, 322 n.19 (D.D.C. 2012). Trende himself acknowledges that Dr. Gronke is among the nation's leading scholars in early voting research. *See* Ex. A, Trende Dep., at 166:13-20.

8

first lesson taught in basic statistics classes on time series." *Id*. Moreover, Trende treats any voting reform—regardless of *when* it was enacted—as though it should be expected to have an identical effect on the change in African-American turnout between 2000 and 2012. He does so regardless of whether a law was enacted in during the 1970s (which was the case for SDR in Wisconsin and Minnesota, *see* Dep. Ex. 117,[6] attached hereto as Ex. B) or in the late 2000s. *See* Ex. A, Trende Dep., at 131:11-25; 232:7-11; 305:17-24. This is improper, as it ignores the possibility that laws could have greater effects around the time that they were enacted or during the next few elections thereafter, rather than decades later. *See* Gronke Sur-reply ¶ 32. Trende's method here is analogous to trying to measure the effects of exercise on a patient by evaluating whether his health improves during an arbitrary period of time several decades after his last workout.

*Second*, Trende compounds his error by treating the different types of voting reforms at issue as an undifferentiated mass, with each reform expected to have identical effects on turnout regardless of its nature or scope. Trende uses what he calls an "ordinal" system: he assigns points to states for each voting reform (*e.g.*, early voting, SDR, etc.) that a state has implemented; he then tries to determine if there is a correlation between the number of points a state has, and any growth in African-American turnout during the period from 2000 to 2012. Ex. A, Trende Dep., at 123:24; 206:16 – 207:6. But Trende's ordinal system assumes that different types of voting reforms will have identical effects

---

[6] National Conference of State Legislatures, "Same Day Voter Registration."

on turnout. *See id.* at 273:4-8; 274:9-16. This fails to account for the reality that the different reforms at issue in this case affect vastly different numbers of people: *e.g.*, out-of-precinct voting was used by a few thousand voters each year, but over 90,000 voters used SDR in recent elections, and millions have used early voting. Gronke Sur-reply ¶ 30. Trende's assumption that such dramatically different reforms should each affect turnout in the same way is plainly contrary to generally accepted standards within the field of political science. *Id.* ¶ 33.

Perhaps realizing this, Trende next attempts to analyze the turnout effects of each reform individually. *See* Trende Rep. ¶ 125. But this analysis is riddled with serious factual mistakes: for example, in attempting to measure the turnout effects of SDR, *half* of the states that Trende treats as having SDR in place before 2012 did *not in fact offer SDR*; at the same time, he *failed to include North Carolina* among the states that *did* have SDR in place for the 2012 election. *See* Ex. A, Trende Dep., at 145:12-22; 217:4-12; 218:17-24; 230:18 – 232:1.[7] Moreover, like his general regression analysis, Trende's

---

[7] These and other errors are what Trende attempted to address at the beginning of his deposition, *see supra* p. 7. Trende sought to correct for various errors in his initial expert report with a "Supplement," Doc. 142-1 at p. 278, which was provided to Plaintiffs *during his deposition* on June 6, some 42 days after his report was due, and 35 days after Plaintiffs provided Defendants with their Sur-Rebuttal Reports in accordance with the Court's order of March 28, 2014. *See* Doc. 98. Defendants offered no reason as to their delay in providing Plaintiffs with this report, arguing that Plaintiffs were not prejudiced because they were free to question Trende about the Supplement during his deposition (without giving Plaintiffs or their experts any meaningful time to review the materials). *See* Email from Thomas Farr to Dale Ho, dated June 9, 2014, attached hereto as Ex. C. Defendants further refused to permit Plaintiffs to depose Trende at a later time

analysis of individual reforms ignores years of data between 2000 and 2012, and fails to account for time-specific effects of reforms. *See* Gronke Sur-reply ¶ 35.

*Third*, Trende erroneously describes his cross-state comparison as a "multivariate" regression. Ex. A, Trende Dep., at 140:7-11. Normally, in analyzing the impact of election laws on turnout, political scientists control for other factors. But Trende includes only two controls (competitiveness and baseline levels of African-American turnout, neither of which he explains in any detail, *see* Gronke Sur-reply ¶ 34), despite the fact that it is customary to include "many more" controls, "with the two most basic being age and education," Stewart Surrebuttal ¶ 78. Moreover, instead of adding all his controls at once, Trende chose to add only one at a time, which is, at best, "highly unusual." *Id.* ¶ 78; *see also* Gronke Sur-reply ¶ 6. A true multivariate analysis would have introduced all controls simultaneously in order to account for their effects at the same time. Thus, despite his best efforts, Trende fails to adequately take into account alternative causes.

concerning the Supplement. *See id.* The Court should not consider the Supplement: Rule 37(c)(1) imposes, as an "automatic sanction," *Coles v. Perry*, 217 F.R.D. 1, 5 (D.D.C. 2003), on a party that, "without substantial justification," fails to disclose information required by Rule 26(a), exclusion of that information "as evidence, whether at trial, at a hearing, or on a motion," Advisory Comm. Notes to Fed. R. Civ. P. 37(c)(1), unless the failure to disclose was harmless. *See also Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 630-31 (E.D.N.C. 2008) (explaining that although Rule 26(e) obliges parties to "correct inadvertent errors or omissions," it is not "license to sandbag one's opponent" (citation omitted)); *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 598 (4th Cir. 2003) (the "rules of expert disclosure are designed to allow an opponent to examine an expert opinion for flaws and to develop counter-testimony through that party's own experts"); *Main Street Am. Grp. v. Sears, Roebuck, & Co.*, No. JFM 08-3292, 2010 WL 956178, at *2 (D. Md. Mar. 11, 2010) (striking supplemental expert testimony where not disclosed in a timely fashion without explanation).

*See Cooper*, 259 F.3d at 202 (failure to consider alternative causes justifies exclusion of expert's report).

*Fourth*, Trende's ultimate opinion that the challenged provisions will not affect turnout depends entirely on a methodologically unsound leap that conflates the effects of adding and removing voting opportunities. As one court explained in declining to credit similar testimony in another early voting case, "even if the addition of early voting days does not significantly increase turnout, *it is not methodologically sound* to assume that there will . . . be little or no impact on overall turnout when voters (who have habituated to early in-person voting) face a loss of previously available voting days." *Florida*, 885 F. Supp. 2d at 332 (emphasis added). Trende ignores substantial political science research concerning the habitual nature of voting, which explains that, although some research "has shown that introducing additional convenience for registering or voting has mixed effects on turnout," academic work in this area "demonstrate[s] that <u>removing</u> options consistently reduces participation, especially among those with fewer resources to navigate the disruption." Expert Report of Barry C. Burden, Ph.D., Doc. 117-4 ("Burden Rep.") at 4-5;[8] *see also* Sur-Rebuttal Expert Report of Barry C. Burden, Ph.D., Doc. 117-4 at JA1134 ("Burden Sur-Rebuttal") at 4; Gronke Sur-reply ¶ 12.

---

[8] Dr. Burden is a Professor of Political Science at the University of Wisconsin-Madison, and a widely-published author in peer-reviewed political science journals. *See* Burden Rep. at 2. Trende himself acknowledged Dr. Burden as one of the leading scholars in early voting research. *See* Ex. A, Trende Dep., at 166:13-20.

Accordingly, even if Trende were correct that the *addition* of voting reforms does not affect turnout—and, for reasons explained herein, that is far from the case—his inference that HB 589's *elimination* of reforms will have no effect on voters is methodologically unsound, rendering his conclusion unreliable. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another. . . . A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); Fed. R. Evid. 702 Advisory Comm. Notes (explaining that courts should consider "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.").

*Fifth*, attempting to bolster his opinions, Trende cites some news articles and other sources, arguing that turnout patterns in North Carolina in recent presidential elections are the product of the Obama campaign's efforts, rather than the voting reforms at issue in this case. Trende Rep. ¶¶ 103-111. Notably, Trende did not conduct any independent study of these issues himself. *See* Ex. A, Trende Dep., at 109:13-16; 264:24 – 265:15. Furthermore, even taking Trende's sources at face value, they do not support his conclusions: the news articles include some broad statements about the Obama campaign's strategies, but *none* of them mentions *African-American* voting patterns, or *North Carolina* specifically. *See* Stewart Surrebuttal ¶ 75. More fundamentally, his sources generally consist of anecdotal news stories from sources like the CNN website. Such materials are of course sometimes used in academic work for quotations or to

establish basic facts, but they are "rarely relied on to rigorously establish statistical patterns" in social science research. Stewart Surrebuttal ¶ 72.[9] Trende's reliance on the reporting of others, without any independent study, is an insufficient basis for forming reliable opinions about the effects of election practices. *See Koppell*, 97 F. Supp. 2d at 481-82 (excluding testimony of political scientist "because the analysis he provides is largely anecdotal and does not rely upon any particular type of expertise that would assist the trier of fact in rendering the ultimate determination in this action").

**C.    Trende Omits and Fails to Address the Substantial Weight of Scholarly Authority that Contradicts His Findings**

Trende's discussion of scholarly literature is also highly selective and misleading, omitting any mention of the substantial body of work by professional scholars in political science overwhelmingly contradicting his own findings. *See* Trende Rep. ¶¶ 145-49. This is most evident in relation to SDR, as the universal consensus among political scientists is that, contrary to Trende's conclusions, SDR boosts turnout. *See* Gronke Sur-reply ¶ 53. This includes research showing that SDR produces significant gains in African-American turnout specifically, *see* Gronke Rep. ¶ 43, and that these positive turnout effects persist even when controlling for the competitiveness of elections, *see* Stewart Surrebuttal ¶ 74.

_____

[9] Trende does cite one peer-reviewed article in this section of his report, authored by Dr. Seth Masket, concerning the turnout effects of the Obama campaign's field offices. *See* Trende Rep. ¶ 104. Notably, however, Dr. Masket's article does not discuss early voting or SDR, let alone racial disproportionality with respect to the use of those practices. *See* Ex. A, Trende Dep., at 268:8 – 269:5. Dr. Masket's uncontroversial finding that campaigns can affect turnout does not speak at all to Trende's conclusion that turnout— and in particular, African-American turnout—is entirely *unaffected* by legal reforms.

Indeed, during his deposition, Trende admitted that he is not aware of a single peer-reviewed article indicating that SDR does not boost turnout. Ex. A, Trende Dep., at 253:24 – 254:6. Trende is apparently the only person who has ever analyzed SDR and opined that it has not affected turnout; that alone constitutes grounds for exclusion. *See Marsh v. W.R. Grace & Co.*, 80 F. App'x 883, 887 (4th Cir. 2003).[10]

Trende himself essentially conceded that these omissions were inconsistent with professional standards. He acknowledged that the standard practice in peer-reviewed political science is to present a comprehensive account of the scholarly literature in the area, *see* Ex. A, Trende Dep., at 245:17-22, but then admitted that he did not attempt to do so in his report, *see id.* at 245:23-25. As the Advisory Committee Notes to Federal Rule of Evidence 702 explain,

> [W]hen an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied.

*See also Marsh*, 80 F. App'x at 887-88 (affirming exclusion where expert's opinion was "not generally accepted in the scientific community"); *Ortho-Clinical Diagnostics*, 440 F.Supp.2d at 470, 472-73 (affirming exclusion when expert's testimony "relied upon a number of disparate and unconnected studies" to reach "a piecemeal conclusion" that is not "generally accepted in the scientific community").

---

[10] Trende's treatment of the literature on early voting similarly is selective at best, and misleading at worst. *See* Gronke Sur-reply ¶¶ 54-56; Gronke Rep. ¶¶ 17-20 & n.25.

**D. Trende Fails to Account for the Known Rate of Error in the Data Upon Which He Relies**

Even if Trende's work were methodologically sound—which it clearly is not—under *Daubert*, the Court should also consider Trende's failure to account of "the known or potential rate of error" in the underlying data upon which he relies constitutes an independent basis for excluding his testimony. *Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 296 (4th Cir. 1998). All of Trende's cross-state comparisons, including his regression analysis, rely on a data set from the U.S. Census Bureau's Current Population Survey ("CPS"), a survey that generates estimates for registration, turnout, and other voting behavior based on a statistical sample. *See* Stewart Rep. ¶ 48. Although the CPS is frequently used by political scientists, it suffers from two known rates of error—the "non-response rate" and the "over-reporting rate"—that, if unaccounted for, can render turnout comparisons across states, racial groups, or different elections inaccurate.

*First*, the "non-response" rate refers to the fact that not all individuals who receive the CPS survey respond to it (*i.e.*, they are "non-respondents").[11] The CPS, however, treats these "non-respondents" as non-voters when calculating the turnout rate. *See* Ex. A, Trende Dep., at 81:5-7; 211:10 – 214:17; Dep. Ex. 116,[12] attached hereto as Ex. D, at 2. The non-response rate is significant: as Dr. Michael McDonald, a renowned political

---

[11] Notwithstanding Trende's unsupported assertion that responding to the CPS survey is "required," Trende Rep. ¶ 69, there are in fact no penalties for failing to respond to the CPS, *see* Ex. A, Trende Dep., at 212:18 – 213:1.

[12] Michael P. McDonald, "2012 Turnout: Race, Ethnicity and the Youth Vote," Huffington Post, May 8, 2013.

scientist on whom Trende relies in his report, *see* Trende Rep. ¶ 70, has explained, 13.8% of all respondents did not respond to the CPS survey in 2008; 12.8% did not respond in 2012, *see* Dep. Ex. 116 at 2. This skews the data significantly; moreover, the non-response rate "varies across important demographic groups—*such as race and ethnicity*—which can lead to *erroneous conclusions* when making temporal comparisons of registration and turnout rates." *Id.* (emphasis added). Indeed, Trende admitted that the non-response rate varies from year to year, among different racial groups, and even within individual racial groups from year to year. Ex. A, Trende Dep., at 212:14-17; 213:12-18. This counsels caution when comparing registration and turnout rates of different racial groups based on the CPS data. *Id.* at 211:10 − 212:5.

*Second*, the CPS is known to *overestimate* turnout because of a problem known as the "over-reporting rate." The CPS depends on individuals to accurately self-report their voting behavior. As Trende acknowledges, "more people report voting than actually did so, and there are some good reasons to believe that the over-reporting issue isn't uniform across demographic groups." *Id.* at 174:4-9; Dep. Ex. 109,[13] attached hereto as Ex. E, at 2; *see also* Ex. A, Trende Dep., at 175:3-7; 81:1-2. Like the non-response rate, the over-reporting rate is not uniform: it varies across demographic groups, *see id.* at 176:9-11, and, in particular, is higher among African-American respondents, *see id.* at 179:9-18,

---

[13] Sean Trende, "How Much Did Demographics Matter in Va. Race?" Real Clear Politics, Nov. 12, 2013.

meaning that the CPS overestimates turnout for African-American voters in particular.[14]

Trende also acknowledged that the over-reporting rate varies from year to year, *see id.* at 180:12-14, and among states, *see id.* at 180:24 – 181:3. Indeed, "[t]here is tremendous nonrandom variation from state to state in the rates at which people overreport voting in the Current Population Surveys (CPS)."[15]

The non-response rate and the over-reporting rate are two independent error rates, and do not cancel each other out, but rather combine to produce a significant overall error rate. For overall turnout in 2012, the CPS over-reported the number of Americans who voted by over 4 million in 2012. *See id.* at 177:15-24; Dep. Ex. 110,[16] attached hereto as Ex. F, at 2. These error rates do not render the CPS an improper data source, but because these two sources of error are not uniform across years, states, and demographic groups, they significantly complicate efforts to compare turnout in different states across different years. Indeed, the over-reporting rate led Trende himself to author an article for RCP titled, "Sweeping Conclusions From Census Data Are a *Mistake*," Dep. Ex. 110; Ex. A, Trende Dep., at 176:20 – 177:1 (emphasis added), and to

---

[14] *See, e.g.*, Seth C. McKee, *et al.*, "Achieving Validation: Barack Obama and Black Turnout in 2008," 12(1) *State Politics & Policy Quarterly* 3, 7 (2012) ("The turnout literature makes it clear that blacks consistently overreport voting at higher rates than whites").

[15] Robert A. Bernstein, *et al*., "Cross-Bias in Voting and Registration Overreporting in the Current Population Surveys," 3(4) *State Politics & Policy Quarterly* 367 (2003).

[16] Sean Trende, "Sweeping Conclusions From Census Data Are a Mistake," Real Clear Politics, May 9, 2013.

opine that "analysts and reporters *should avoid making sweeping pronouncements* on the basis of this data," Dep. Ex. 110 at 3; Ex. A, Trende Dep., at 182:20 – 183:6 (emphasis added).

In his report in this case, however, Trende failed to heed his own advice. Despite acknowledging that inaccuracies in the data underlying his analysis could call into question the validity of his conclusions, *see id.* at 207:17-24, Trende makes the sweeping pronouncement that HB 589 will not affect turnout, based entirely on the same raw CPS data that he has criticized others for using. *See* Ex. A, Trende Dep., at 208:6-10. He does so despite the fact that he could have easily accounted for these errors in his analysis: political scientists generally rely on a method of weighting the CPS data to correct the known error rates arising from non-responses and over-reporting, a "relatively simple procedure [that] conforms to prevailing standards among political scientists." Gronke Sur-reply ¶ 14.[17] Trende did not use this—or any other method—to correct these known error rates. Ex. A, Trende Dep., at 214:13-17; 208:11 – 209:2.[18] His failure to do so renders his analysis unreliable and warrants exclusion. *See Coleman v. Union Carbide Corp.*, No. 2:11-0366, 2013 WL 5461855, at *26 (S.D.W.Va. Sept. 30, 2013) (excluding

---

[17] *See also* Aram Hur & Christopher H. Achen, "Coding Voter Turnout Responses in the Current Population Survey," 77(4) *Public Opinion Quarterly* 985 (2013).

[18] Nor did Trende supplement his analysis of raw CPS data by examining the actual turnout statistics from the state's official records, even though this data was available to him, *see* Ex. A, Trende Dep., at 215:16-25, and even though he has used analogous data from other states in his other work, *see id.* at 36:8-9, 37:20-23.

expert's testimony where he made crucial errors in his calculations but failed to admit or remember the source of the error); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1026 (8th Cir. 2006) (excluding expert's testimony as unreliable where expert relied on "a statistical method that incorporates an admittedly erroneous equation that yields a result with an error of unknown quantity and effect.").

### III.    CONCLUSION

For the reasons set forth herein—including: (i) Trende's lack of relevant qualifications and experience; (ii) the methodological flaws in his report; (iii) the overwhelming scholarly consensus that runs contrary to his conclusions; and (iv) his failure to account for known rates of error in his underlying data—this Court should grant Plaintiffs' motion to strike the Declaration of Sean Trende and exclude his testimony at the preliminary injunction hearing.

Dated: June 30, 2014                    Respectfully submitted,


                                         By:   _/s/ Dale Ho_

Laughlin McDonald*                            Dale Ho*
ACLU Voting Rights Project                    Julie A. Ebenstein*
2700 International Tower                       ACLU Voting Rights Project
229 Peachtree Street, NE                       125 Broad Street
Atlanta, GA 30303                             New York, NY 10004
(404) 500-1235                                (212) 549-2693
lmcdonald@aclu.org                            dale.ho@aclu.org
*appearing pursuant to Local Rule             *appearing pursuant to Local Rule 83.1(d)
83.1(d)


                                              _/s/ Allison J. Riggs_

Christopher Brook (State Bar                   Anita S. Earls (State Bar # 15597)
#33838) ACLU of North Carolina                Allison J. Riggs (State Bar # 40028)
Legal Foundation                              Southern Coalition for Social Justice
P.O. Box 28004                                1415 Highway 54, Suite 101
Raleigh, NC 27611-8004                        Durham, NC 27707
Telephone: 919-834-3466                       Telephone: 919-323-3380 ext. 115
Facsimile: 866-511-1344                       Facsimile: 919-323-3942
E-mail: cbrook@acluofnc.org                   E-mail: allisonriggs@southerncoalition.org


*Attorneys for Plaintiffs in League of Women Voters of North Carolina, et al. v. North
Carolina, et al.*

Dated:  June 30, 2014                              Respectfully submitted,


                                        By:   */s/ Adam Stein*
Penda D. Hair                                  Adam Stein (N.C. State Bar # 4145)
Edward A. Hailes, Jr.                          Of Counsel
Denise D. Lieberman                            TIN FULTON WALKER & OWEN, PLLC
Donita Judge                                   312 West Franklin Street
Caitlin Swain                                  Chapel Hill, NC 27516
ADVANCEMENT PROJECT                            Phone: (919) 240-7089
Suite 850                                      astein@tinfulton.com
1220 L Street, N.W.
Washington, DC 20005                           */s/ Daniel T. Donovan*
Phone: (202) 728-9557                          Thomas D. Yannucci
phair@advancementproject.com                   Daniel T. Donovan
                                               Susan M. Davies
Irving Joyner (N.C. State Bar #                Bridget K. O'Connor
7830)                                          K. Winn Allen
P.O. Box 374                                   Uzoma Nkwonta
Cary, NC 27512                                 Kim Knudson
Phone: (919)319-353                            Jodi Wu
ijoyner@nccu.edu                               KIRKLAND & ELLIS LLP
                                               655 Fifteenth St., N.W.
                                               Washington, DC 20005
                                               Phone: (202) 879-5000
                                               tyannucci@kirkland.com

*Attorneys for Plaintiffs in North Carolina Conference of NAACP, et al. v. McCrory, et al.*

Dated: June 30, 2014                                   Respectfully submitted,


/s/ John M. Devaney                                    /s/ Edwin M. Speas, Jr.
John M. Devaney                                        Edwin M. Speas, Jr.
PERKINS COIE LLP                                       POYNER SPRUILL LLP
D.C. Bar No. 375465                                    N.C. State Bar No. 4112
JDevaney@perkinscoie.com                               espeas@poynerspruill.com
Marc E. Elias                                          John W. O'Hale
D.C. Bar No. 442007                                    N.C. State Bar No. 35895
MElias@perkinscoie.com                                 johale@poynerspruill.com
Elisabeth C. Frost                                     Caroline P. Mackie
D.C. Bar No. 1007632                                   N.C. State Bar No. 41512
EFrost@perkinscoie.com                                 cmackie@poynerspruill.com
700 Thirteenth Street, N.W., Suite 600                 P.O. Box 1801 (27602-1801)
Washington, D.C. 20005-3960                            301 Fayetteville St., Suite 1900
Telephone:  (202) 654-6200                             Raleigh, NC 27601
Facsimile:  (202) 654-6211                             Telephone: (919) 783-6400
                                                       Facsimile:  (919) 783-1075
Joshua L. Kaul
Wisconsin Bar No. 1067529
JKaul@perkinscoie.com                                  *Local Rule 83.1*
1 East Main Street, Suite 201                          *Attorneys for Duke Plaintiff-Intervenors*
Madison, WI 53705
Telephone: (608)294-4007
Facsimile: (608) 663-7499


*Attorneys for Duke Plaintiff-Intervenors*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2014, I served the foregoing Brief in Support of Plaintiffs' Motion to Strike Declarations of Sean Trende and Motion in Limine to Exclude His Testimony at Preliminary Injunction Hearing with the Clerk of Court using the CM/ECF system in case numbers 1:13-cv-658, 1:13-cv-660, and 1:13-cv-861, which on the same date sent notification of the filing to the following:

*__Counsel for Plaintiffs in North Carolina Conference of NAACP, et al. v. McCrory, et al.__*
Adam Stein
TIN FULTON WALKER & OWEN, PLLC
312 West Franklin Street
Chapel Hill, NC 27516
Telephone: (919) 240-7089
Facsimile: (919) 240-7822
Email: astein@tinfulton.com

Penda D. Hair
Edward A. Hailes
Denise Lieberman
Donita Judge
Caitlin Swain
ADVANCEMENT PROJECT
Suite 850
1220 L Street, N.W.
Washington, DC 20005
Telephone: (202) 728-9557
Email: phair@advancementproject.com

Daniel T. Donovan
Thomas D. Yannucci
Susan M. Davies
Bridget K. O'Connor

K. Winn Allen
Uzoma Nkwonta
Kimberly D. Rancour
Jodi Wu
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Washington, DC 20005
Telephone: (202) 879-5174
Facsimile: (202) 879-5200
Email: daniel.donovan@kirkland.com

Irving Joyner, Esq.
PO Box 374
Cary, NC 27512
Email: ijoyner@nccu.edu

*__Counsel for Plaintiffs in League of Women Voters of North Carolina, et al. v. North Carolina, et al.__*
Anita S. Earls
Allison J. Riggs
Clare R. Barnett
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 Highway 54, Suite 101
Durham, NC 27707
Telephone: (919) 323-3380 ext. 115

Facsimile: (919) 323-3942
Email: anita@southerncoalition.org

Christopher Brook
ACLU of NORTH CAROLINA LEGAL
FOUNDATION
P.O. Box 28004
Raleigh, NC 27611-8004
Telephone: (919) 834-3466
Facsimile: (866) 511-1344
Email: cbrook@acluofnc.org

Dale Ho
Julie A. Ebenstein
ACLU VOTING RIGHTS PROJECT
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2693
Email: dale.ho@aclu.org

Laughlin McDonald
ACLU VOTING RIGHTS PROJECT
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303
Telephone: (404) 500-1235
Email: lmcdonald@aclu.org

***Counsel for Plaintiffs in US v. North
Carolina, et al.***
T. Christian Herren, Jr.
John A. Russ IV
Catherine Meza
David G. Cooper
Spencer R. Fisher
Elizabeth Ryan
Attorneys, Voting Section
Civil Rights Division
U.S. DEPARTMENT OF JUSTICE

Room 7254-NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: (800) 253-3931
Facsimile: (202) 307-3961
Email: john.russ@usdoj.gov
Email: catherine.meza@usdoj.gov

Gill P. Beck (State Bar # 13175)
Special Assistant United States Attorney
OFFICE OF THE UNITED STATES
ATTORNEY
United States Courthouse
100 Otis Street
Asheville, NC 28801
Telephone: (828) 259-0645
Email: gill.beck@usdoj.gov

***Counsel for Defendant Patrick
McCrory***
Karl S. Bowers, Jr.
BOWERS LAW OFFICE LLC
P.O. Box 50549
Columbia, SC 29250
Telephone: (803) 260-4124
Facsimile: (803) 250-3985
Email: butch@butchbowers.com

Robert C. Stephens
General Counsel
OFFICE OF THE GOVERNOR OF
NORTH CAROLINA
20301 Mail Service Center
Raleigh, North Carolina 27699
Telephone: (919) 814-2027
Facsimile: (919) 733-2120
Email: bob.stephens@nc.gov

**_Counsel for Defendants State of North Carolina and Members of the State Board of Elections_**
Alexander Peters, Esq.
NC DEPARTMENT OF JUSTICE
PO Box 629
Raleigh, NC 27602
Telephone: (919) 716-6913
Facsimile: (919) 716-6763
Email: apeters@ncdoj.gov

Thomas A. Farr, Esq.
Phillip J. Strach, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C
4208 Six Forks Road
Raleigh, NC 27609
Telephone: (919) 787-9700
Facsimile: (919)783-9412
Email: thomas.farr@ogletreedeakins.com
Email: phil.strach@ogletreedeakins.com

Respectfully submitted,

_/s/ Dale Ho_
Dale Ho
ACLU Voting Rights Project
125 Broad Street
New York, NY 10004
(212) 549-2693
dale.ho@aclu.org

_Attorney for Plaintiffs in League of Women Voters of North Carolina, et al. v. North Carolina, et al._