IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PATRICK LLOYD MCCRORY, in his official capacity as the Governor of North Carolina, et al., <br><br> Defendants. | **UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION AND FOR THE APPOINTMENT OF FEDERAL OBSERVERS** <br><br> Civil Action No. 1:13-CV-658 |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE STATE OF NORTH CAROLINA, et al., <br><br> Defendants. | Civil Action No. 1:13-CV-660 |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF NORTH CAROLINA, *et al.*, <br><br> Defendants. | Civil Action No. 13-cv-861 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ........................................................................................................ 3

      A. The United States is Likely to Succeed on its Section 2 Results Claim ............ 3

           1.  This Court Should Reject Defendants' Attempts to Immunize
               HB 589 from Review Under the Voting Rights Act. .................................... 3

           2.  This Court Should Reject Defendants' Attempts to Inject an
               Independent Causation Requirement into Section 2. .................................... 8

           3.  The United States has Established that the Challenged Provisions of
               HB 589 Disproportionately Burden African-American Voters. ................. 14

           4.  The Lack of Evidence to Support Defendants' Claims Regarding
               the State's Interest Reinforces the Conclusion that HB 589
               Violates Section 2 ...................................................................................... 19

      B. The United States is Likely to Succeed on its Section 2 Discriminatory
         Purpose Claim ................................................................................................. 24

           1.  The Evidence the United States has Recently Obtained Through the
               Discovery Process Reinforces the Conclusion that the Legislature
               Acted with Discriminatory Intent. ............................................................. 24

           2.  The Legislative Process that Produced HB 589 Supports the
               Conclusion that the Challenged Provisions were Enacted with
               Discriminatory Intent. ............................................................................... 25

      C. The United States is Entitled to Preliminary Injunctive Relief ........................ 28

      D. The Appointment of Federal Observers is Necessary to Enforce the
         Voting Guarantees of the Fourteenth and Fifteenth Amendment .................... 30

III.  CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Inter Tribal Council of Ariz.,* 133 S. Ct. 2247 (2013) ...................................... 11

*Bartlett v. Strickland*, 556 U.S. 1 (2008) ............................................................. 7

*Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291(D. Mass. 2004) ................... 13

*Brown v. Dean*, 555 F. Supp. 502 (D.R.I. 1982) ................................................... 5

*Brown v. Detzner*, 895 F. Supp. 2d 1236 (M.D. Fla. 2012) ............................... 13

*Chisom v. Roemer*, 501 U.S. 380 (1991) ........................................................... 7

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181(2008) ............................... 20

*Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012) ......................... 13

*Frank v. Walker*, 2014 WL 1775432 (E.D. Wis. 2014) ...................................... 5

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) ................................... 11, 12

*Harris v. Graddick*, 593 F. Supp. 128 (M.D. Ala. 1984) .............................. 4, 28

*Holder v. Hall*, 512 U.S. 874 (1994) ............................................................ 5

*Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352 (4th Cir. 1989) ............... 11

*Johnson v. DeGrandy*, 512 U.S. 997 (1994) ................................................. 6

*Johnson v. Halifax Cnty.*, 594 F. Supp 161 (E.D.N.C. 1984) .......................... 29

*LULAC v. Perry*, 548 U.S. 399 (2006) ......................................................... 8

*NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*, 858 F. Supp. 2d 516

   (M.D.N.C. 2012) ................................................................................ 30

*Newsome v. Albermarle County Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) .................. 30

*Operation PUSH v. Allain*, 674 F. Supp.1245(N.D. Miss. 1987) ....................................... 5

*Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991) .................................................. 5

*Ortiz v. City of Philadelphia*, 28 F.3d 306 (3d Cir. 1994) ................................................. 11

*Pashby v. Delia*, 709 F. 3d 307(4th Cir. 2013) .................................................................. 29

*Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542, 1555-56 (5th Cir.1992).................. 10

*See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ........... 26

*Shelby County v. Holder*, 133 S. Ct. 2612 (2013) ............................................................ 27

*Smith v. Salt River Project Agric. Improvement & Power Dist.*,109 F.3d 586 (9th Cir.

    1997) .................................................................................................................. 13

*Spirit Lake Tribe v. Benson Cnty.*, 2010 WL 4226614 (D.N.D. Oct. 21, 2010) ................ 5

*Taylor v. Louisiana*, 419 U.S. 522 (1975) ........................................................................ 29

*Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) ................................................................. 10

*United States v. Berks Cnty.*, 250 F. Supp. 2d 525 (E.D. Pa. 2003).................................. 31

*United States v. Berks Cnty.*, 277 F. Supp. 2d 570 (E.D. Pa. 2003)................................. 29

*United States v. Cambridge*, 799 F.2d 137 (4th Cir. 1986).............................................. 30

*Washington v. Davis*, 426 U.S. 229 (1976) ................................................................. 24, 25

*Wesley v. Collins*, 791 F.2d 1255 (6th Cir. 1986) ............................................................ 12

*Whitcomb v. Chavis*, 403 U.S. 124 (1971) ......................................................................... 6

## Statutes

42 U.S.C. § 1973(a) ......................................................................................................... 3, 30

42 U.S.C. § 1973(b)............................................................................................................. 1, 6

42 U.S.C. § 1973h(a)(i), (iii) ............................................................................... 9

42 U.S.C. § 1973j(d) ........................................................................................... 29

Plaintiff United States of America respectfully submits this reply memorandum in further support of its motion for preliminary injunction. This brief addresses Defendants' opposition brief, ECF 126 ("Defs' Opp'n"),[1] and the *amicus curiae* brief submitted in support of Defendants. ECF 136 ("Am. Br."). The arguments opposing the United States' motion should be rejected, and the requested relief should be granted.

## I.    INTRODUCTION

In its opening Memorandum in Support of the United States' Motion for a Preliminary Injunction, ECF 97 ("U.S. P.I. Mem."), the United States showed that it is likely to succeed on its claim that the challenged provisions of House Bill 589 ("HB 589") have both the purpose and the result of leaving African-American voters in North Carolina with "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(b). That Memorandum also explains why, absent a preliminary injunction to prevent implementation of the challenged provisions during the November 2014 general election, there will be two irreparable injuries: black voters will be irreparably denied the opportunity to participate equally in the political process and the public will be irreparably denied its interest in having elections free from racial discrimination. Finally, that Memorandum explains why these injuries outweigh any interest Defendants might have in proceeding with these provisions.

With respect to the United States' Section 2 results claim, Defendants and their *amici* make essentially four arguments. First, they assert that because the challenged

---

[1] ECF citations in this brief refer to *United States v. North Carolina*, 13-CV-861.

provisions of HB 589 do not involve an exclusionary eligibility "qualification," Defs' Opp'n 11- 12, any Section 2 results claim must fail because "there is no acceptable or 'objective benchmark' by which to measure disproportionate harm to minorities, and thus no cognizable argument that the state's voting procedure results in the denial of equal opportunity to minority voters," *id.* at 12. Second, they argue that, because the challenged provisions, as a formal matter, "apply equally to all North Carolina voters," *id.* at 10, any impact those provisions has on black voters is the product of nothing more than "fewer minority voters *tak[ing] advantage* of the equal opportunity that is available to them," *id.* at 23, and thus not attributable to the challenged practices. Third, they claim that data from the May 2014 primary election undercuts any Section 2 results claim. *Id.* at 4-5, 6-8, 22-23; Am. Br. 2-4. Fourth, they assert that the challenged provisions of HB 589 further legitimate state interests. Defs' Opp'n 34-40; Am. Br. 17-20. With respect to the United States' Section 2 intent claim, Defendants make essentially one additional argument: they contest the claim that the enactment of HB 589 was characterized by procedural and substantive departures from the normal legislative procedure. *See* Defs' Opp'n 40-51.

Defendants' arguments are unpersuasive. They rest on a combination of misunderstanding the legal standard for Section 2 liability; disregarding or misreading the existing case law; and misconstruing the relevant facts. Thus, this Court should grant the preliminary injunction the United States seeks.

## II.  ARGUMENT

### A.  The United States is Likely to Succeed on its Section 2 Results Claim

#### 1.  This Court Should Reject Defendants' Attempts to Immunize HB 589 from Review Under the Voting Rights Act.

Defendants advance an interpretation of Section 2 of the Voting Rights Act that is unsupported by either the text or the caselaw.  Put simply, Defendants' arguments rest on inserting a distinction into Section 2 that does not exist and then misconstruing the word "less" in the operative language that refers to minority voters having "less opportunity than other members of the electorate."

Contrary to Defendants' suggestion, Defs' Opp'n at 10-14, the plain language of Section 2 does not differentiate between, and then establish a higher standard of proof for, plaintiffs challenging a voting practice or procedure— such as the restrictions on early voting, same-day registration, and out-of-precinct provisional voting at issue in this case— than it does for plaintiffs challenging a voting "qualification."  Indeed, the Act lists "voting qualification[s]" and voting "procedure[s]" in a single sentence, 42 U.S.C. § 1973(a), and then articulates the same statutory test for *all* cases:  A violation "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," *id.* § 1973(b).

Defendants and *amici* similarly misread the plain language of Section 2 when they argue that plaintiffs must prove complete exclusion from the electoral process. *See* Defs' Opp'n at 23-26; Am. Br. at 8-15.[2] As discussed in the United States' opposition to Defendants' motion to dismiss on the pleadings, the language of Section 2 prohibits practices that afford minority voters "less" opportunity to participate, and not only those that afford them "no" opportunity. Thus, Section 2 does not require that the challenged practice completely deprive minority voters of *all* opportunity to participate in the political process. *See* ECF 135 at 9-12 ("U.S. Opp'n"). An electoral structure or practice can unlawfully abridge minority voters' access to the political process without outright denying it. In *Harris v. Graddick*, for example, the court found Section 2 liability after finding that the underrepresentation of African Americans among poll officials in Alabama interacted with the past and present realities of the local political process to "substantially impede[] and impair[] the access of many black persons to the political process, in violation of [S]ection 2." 593 F. Supp. 128, 133 (M.D. Ala. 1984). Of course, the relative absence of black poll officials did not categorically bar African Americans from registering or casting a ballot. Nevertheless, the court found that the underrepresentation of minority poll officials caused "polling places across the state . . . to be viewed by many blacks as areas circumscribed for whites and off-limits for blacks."

---

[2] *Amici* argue that Plaintiffs' claims must fail because it "is probable that most electoral laws affect different races to different extents" and HB 589 imposes only "slight inconveniences" on minority voters. Am. Br. at 13-15. Electoral laws do not *inherently* affect different races to different extents. Election laws can, however, interact with social, economic, and historical conditions to cause an inequality in access to the political process based on race. It is in precisely these circumstances—when electoral laws erect obstacles that affect different races differently—that Section 2 applies.

*Id.* The political process was, accordingly, not equally open to African Americans. *See id.*; *see also Frank v. Walker*, 2014 WL 1775432, at *29 (E.D. Wis. 2014); *Operation PUSH v. Allain*, 674 F. Supp. 1245, 1256, 1263-68 (N.D. Miss. 1987), *aff'd sub nom Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991).

Cases like *Harris*, *Frank*, and *Operation PUSH* show that Defendants are simply wrong when they assert that "there has never been a successful Section 2 challenge to neutral voting and registration processes not involving voting qualifications." Defs' Opp'n at 14; *see also* Am. Br. 14-15. To the contrary, plaintiffs have successfully challenged practices such as restrictive registration systems, *see Operation PUSH*, 674 F. Supp. at 1263, and choices about polling place locations, *see*, *e.g.*, *Spirit Lake Tribe v. Benson Cnty.*, 2010 WL 4226614 (D.N.D. Oct. 21, 2010); *Brown v. Dean*, 555 F. Supp. 502 (D.R.I. 1982); *see also* U.S. P.I. Mem. at 22.

Another fundamental error in Defendants' position stems from their misreading of the Supreme Court's decision in *Holder v. Hall*, 512 U.S. 874 (1994). Defendants claim that *Holder* stands for the proposition that "in claims brought under Section 2 of the VRA that do not involve exclusionary qualifications to vote (or vote dilution cases), there is no acceptable or 'objective benchmark' by which to measure disproportionate harm to minorities, and thus no cognizable argument that the state's voting procedure results in the denial of equal opportunity to minority voters." Defs' Opp'n at 12. Even beyond the fact that Defendants' position rests on their wholesale invention of a tripartite classification of Section 2 cases (into exclusionary qualification, dilution, and other), *Holder* does not say what Defendants assert it does.

*Holder* involved a Section 2 vote dilution challenge to a Georgia county's decision to use a single-commissioner form of government rather than a multimember commission. In the passage Defendants cite, Justice Kennedy's opinion announcing the judgment of the Court offers only the unremarkable observation that "where there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice, it follows that the voting practice cannot be challenged as dilutive under § 2." 512 U.S. at 881. Applying that principle to challenges to the size of a governing body, the Justices concluded that "[t]he wide range of possibilities" with respect to size "makes the choice inherently standardless." *Id.* at 889 (opinion of O'Connor, J.).

As Defendants have acknowledged, however, this case does not involve a claim of vote dilution. Defs.' Opp'n at 12; ECF 95 (Defs.' 12(c) Mem.) at 32-33. Dilution claims, as the Supreme Court has repeatedly recognized, pose a complex question: in a democratic system, when dealing with a racial group that is a numerical minority within the relevant jurisdiction, how is a reviewing court to distinguish between impermissible discrimination and "mere . . . political defeat at the polls"? *Whitcomb v. Chavis*, 403 U.S. 124, 153 (1971); *see also Johnson v. DeGrandy*, 512 U.S. 997, 1012-13 (1994) (exploring the difficulty). Section 2 itself forecloses the simplest benchmark: "[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). At the same time, the relative successes of the majority and minority communities in electing candidates of their choice can be "one circumstance" relevant to the "totality of circumstances," *id.*

This case, by contrast, poses no such analytic difficulty in identifying a workable benchmark for determining whether the challenged provisions will result in African Americans having less opportunity to participate in the electoral process.[3] This Court can look both to the relative impact of the regime it creates for white and black voters— and the United States' expert report shows that more black voters than white voters will be denied their preferred method of registering to vote, casting a ballot, and having that ballot counted, ECF 101-2 (JA 779-991)—and to the effect of the changes HB 589 wreaks on the preexisting and current ability to participate that black voters possess.

Thus, the United States does not contend that an existing electoral system should yield to a "hypothetical alternative." Defs' Opp'n at 17. Rather, North Carolina *had* a well-functioning electoral system under which, after decades of depressed participation, African-American registration and voting rates rose substantially. Only then did the legislature revoke the very practices on which black voters disproportionately relied to participate in the political process. The legislature offered—at best—tenuous justifications for the changes. *See* U.S. P.I. Mem. at 46-52. In doing so, North Carolina violated Section 2. As the Supreme Court explained in *Bartlett v. Strickland*, 556 U.S. 1 (2008), in the context of a claim involving the right to so-called "crossover districts," although Section 2 does not require jurisdictions to create those districts, evidence that a

---

[3] As the Supreme Court observed in *Chisom v. Roemer*, 501 U.S. 380 (1991), it is axiomatic that "[a]ny abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election." *Id.* at 397.

state "intentionally . . . destroy[ed]" those districts "would raise serious questions under both the Fourteenth and Fifteenth Amendments," *id.* at 24, as well as under Section 2.

*Holder* nowhere forecloses a comparison when such a comparison is possible. Indeed, Justice Kennedy, on whose opinion in *Holder* Defendants rely, performed precisely such a comparison in *LULAC v. Perry*, explaining how "changes" to a legislative district "undermined the progress of a racial group" in violation of Section 2. 548 U.S. 399, 439 (2006). Defendants and *amici* further err in intimating that such a comparison somehow improperly conflates the Section 2 results test with the Section 5 retrogression standard. *See* Defs' Opp'n at 16 n.2; Am. Br. at 16 n.11. The retrogression standard involved a narrow comparison between the before-and-after levels of minority opportunity. It did not consider the totality of the circumstances, nor did it compare the opportunity held by minority voters to the opportunities enjoyed by white voters. The Section 2 standard by contrast involves that more nuanced inquiry. The mere fact that the remedy for this violation may be to reinstate past practice does not implicate Section 5 or take this claim outside the scope of Section 2.

### 2. This Court Should Reject Defendants' Attempts to Inject an Independent Causation Requirement into Section 2.

Defendants' statutory argument also misconstrues the meaning of the word "opportunity" under the totality of the circumstances test. They argue there is a legally significant difference "between circumstances where minority voters *lack opportunity* compared to white voters, as opposed to situations where fewer minority voters *take advantage* of the equal opportunity that is available to them." Defs' Opp'n at 23.

As the United States has already explained, Defendants' argument proves too much, because it would re-import the intent test into Section 2, thereby undermining the central congressional purpose behind the 1982 amendments. U.S. Opp'n at 8-13. *Any* facially neutral practice provides formally equal opportunity. Under Defendants' logic, even the poll tax would not violate Section 2—despite Congress's clear contrary view, *see* 42 U.S.C. § 1973h(a)(i), (iii) (finding that the tax "precludes persons of limited means from voting or imposes unreasonable financial hardship upon such persons" and "in some areas has the purpose or effect of denying persons the right to vote because of race")— because the fee would apply equally to all voters and African Americans who did not pay their poll tax would have "caused" their own injury by choosing to feed their family, clothe their children, or pay for their utilities, instead of paying the poll tax.

But that blame-the-victim strategy is not the law. Since its amendment, Section 2 has directed courts to determine whether the challenged practice "results[s] in the denial of *equal access* to any phase of the electoral process for minority group members." Senate Report at 30 (emphasis added).[4] A practice that burdens minority voters disproportionately as compared to white voters, violates Section 2 if it "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Determining "whether the political processes are equally open [to minority voters] depends upon a searching practical evaluation of the

---

[4] In *Thornburg v. Gingles*, the Supreme Court recognized that the Senate Report is "the authoritative source for legislative intent" on amended Section 2. 478 U.S. at 43.

past and present reality" and a "functional view of the political process." *Id.* at 45 (internal citations and quotation marks omitted). To be sure, the decisions individual minority voters make about whether and how to participate in the electoral system are relevant to the totality of the circumstances inquiry, but when those decisions are constrained by the Senate Factors—as the United States has already shown in this case, where black voters face a greater burden than white voters to register, cast ballots, and have those ballots counted under the restrictive regime imposed by HB 589, *see* U.S. P.I. Mem. at 37-54—Defendants may not disclaim responsibility for the ensuing results.

Defendants and *amici*'s reliance on cases where plaintiffs failed to prove that connection is therefore misplaced. *See* Defs' Opp'n at 23-26, Am. Br. at 9-10. For example, in *Salas v. Sw. Tex. Junior Coll. Dist.,* the Fifth Circuit rejected a challenge to at-large elections in a jurisdiction where Latinos formed a majority of both the population and the registered electorate. 964 F.2d 1542, 1555-56 (5th Cir.1992). The plaintiffs claimed that disparities in turnout rates nonetheless denied them an equal opportunity to elect candidates of their choice. The court rejected that claim not as a matter of law, but because they failed to establish through credible evidence the continued existence of "practical impediments" to voting, *id.* at 1545-46, 1555-56, and provided no direct evidence "linking . . . low turnout with past official discrimination," *id.* at 1556. Having conducted an intensely local appraisal, the court concluded that the lack of electoral success was therefore not caused by the challenged practice. *Id.* at 1544. *Salas* does not stand for a general proposition that a minority group fails to show a causal link when they "fail[] to take advantage of a political opportunity." Defs' Opp'n at 23. Instead, *Salas*

stands in sharp contrast to this case, where the United States has shown how the Senate Factors interact with the restrictions imposed by HB 589 to affect African-American voters differently than white voters. U.S. P.I. Mem. at 37-54.

That same distinction similarly undermines the Defendants' reliance on *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352 (4th Cir. 1989); *Ortiz v. City of Philadelphia*, 28 F.3d 306 (3d Cir. 1994); and *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc)*, aff'd on other grounds sub nom., Arizona v. Inter Tribal Council of Ariz.,* 133 S. Ct. 2247 (2013). In each of those cases, the court's decision rested on its conclusion that the plaintiffs had failed to show how the totality of the circumstances produced a discriminatory result.

In *Irby*, which involved a challenge to appointed school boards, the court pointed to the lack of even statistically significant disparities with respect to several of the boards and then emphasized that it was unclear how the use of appointment, rather than election, explained any remaining disparities. 889 F.2d at 1358-59. In *Ortiz*, a challenge to Pennsylvania's non-voting purge law, the Third Circuit affirmed the district court's rejection of a Section 2 claim where there was "not even one iota of evidence introduced at trial or present in the record," 28 F.3d at 314, to show that the purge statute was responsible for disparate turnout rates. Finally, in *Gonzalez*, the Ninth Circuit found that plaintiffs "produced no evidence supporting [the] allegation" that "'Latinos, among other ethnic groups, are less likely to possess the forms of identification required under Proposition 200 to . . . cast a ballot.'" 677 F.3d at 407. *Wesley v. Collins*, 791 F.2d 1255, 1262-63 (6th Cir. 1986), provides even less support for Defendants' position. That case

rejected a Section 2 challenge to Tennessee's felon disenfranchisement statute. As explained in prior briefing, U.S. Opp'n at 7 n.6, felon disenfranchisement statutes involve a unique factor— the Fourteenth Amendment's explicit anticipation that states could disenfranchise persons convicted of a crime. U.S. Const. amend. XIV, § 2. Given that constitutional authorization, nothing in *Wesley* sheds light on how to assess H.B. 589's recent changes to North Carolina law. Moreover, the court found no evidence of a discriminatory purpose underlying the felon disfranchisement law, 791 F.2d at 1262-63, in further contrast to the facts of this case, *see* U.S. P.I. Mem. at 56-64; *infra* Part II.B.

The United States has already shown how HB 589 interacts with the relevant Senate Factors to result in black voters in North Carolina facing greater limitations on their ability to register, to vote, and to have their ballots counted. Defendants do not dispute the existence of the fifth Senate Factor. Socioeconomic disparities—including lower educational levels, lack of access to transportation, less flexibility for time off from work and family responsibilities, etc.—mean that the abolition of same-day registration, the reduction of opportunities for early voting, and the refusal to count out-of-precinct voters— will fall with disproportionate force on the African-American community in North Carolina. *See* U.S. P.I. Mem. at 43-46. Thus, this case has nothing in common with *Smith v. Salt River Project Agric. Improvement & Power Dist.*, where the Ninth Circuit determined that plaintiffs "effectively stipulated to the nonexistence of virtually every circumstance which might indicate that [the challenged law] results in racial discrimination." 109 F.3d 586, 595 (9th Cir. 1997).

Moreover, although Defendants do dispute the final Senate Factor—whether the state's policy is "tenuous"— the United States has already shown this factor here, and that distinguishes this case from the ones cited by Defendants. The North Carolina legislature's poorly supported rationales for the challenged provisions "represent[ ] a step back" from the state's prior electoral system. *Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291, 315 (D. Mass. 2004). Such efforts to manipulate voting opportunities based on race "speaks eloquently to the totality of the circumstances" inquiry. *Id.* at 314.

Finally, nothing in *Brown v. Detzner*, 895 F. Supp. 2d 1236 (M.D. Fla. 2012) supports Defendants' argument here.[5] In *Brown*, the district court declined to enter a preliminary injunction against Florida's reduction of the early voting period from 14 days to eight days for the November 2012 election. Even though the court agreed that "minority voters [would] be disproportionately affected by the changes in early voting procedures because they disproportionately use early in-person voting," *id.* at 1251, and that "that change could impose a material burden on 'African-American voters' effective exercise of the electoral franchise,'" *id.* at 1252, it viewed as "ameliorative" the decision of counties to offer the same number of hours of early voting (as well as the law's

---

[5] *Brown* involved a Section 2 challenge to Florida's reduction of its early voting period in 2012. A three-judge panel also considered this reduction, in Florida counties subject to Section 5 of the Voting Rights Act, and found it could be retrogressive under Section 5. *See Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012) (three-judge court). Following the three-judge court's retrogression finding, the United States precleared early voting plans for five counties, which included 12 hours of early voting each day over the new early voting period, including 12 new hours on Sunday and expanded hours on Saturday. Unlike the non-retrogression standard in Section 5, the standard in Section 2 cases requires courts to look at whether the voting practice provides equal opportunity to minority voters based on the totality of the circumstances.

expansion of weekend early voting). But a lesson can be drawn from the subsequent events: it is well documented that Florida counties were plagued by very long wait times in early voting and on Election Day in November 2012. ECF 101-2, JA 861-867 (Stewart ¶¶ 196-210, 214); ECF 100-23, JA 437 (Sancho ¶¶ 6-8). Indeed, those problems prompted Florida's legislature to swiftly restore the 14 day period and even expand the number of permissible hours. ECF 100-23, JA 437 (Sancho ¶ 9). That the North Carolina legislature heard testimony on Florida's disastrous efforts to cut back its early voting period, *see id.* at JA 444-445 (Sancho ¶ 24); ECF 109-3, JA 2420-21; 2422-23 (4/3/13 Tr. 69: 1-5, 69:22-70:4, 78:13-79:3), and nonetheless acted in the teeth of that experience supports the United States' position here, not the Defendants'.

### 3. The United States has Established that the Challenged Provisions of HB 589 Disproportionately Burden African-American Voters.

The United States has presented extensive evidence supporting its claims that the challenged provisions of HB 589 will disproportionately impact African-Americans, *see, e.g.*, U.S. P.I. Mem. at 24-37. Defendants do not effectively dispute this central fact. Instead, their opposition rests primarily on the misguided arguments that aggregate minority voter turnout is not affected by the challenged provisions, and that the policy justifications for the challenged provisions are not tenuous. The argument on which they place the greatest weight is that the May 2014 primary disproves any disproportionate burden. *See* Defs' Opp'n at 4-5, 7-8, 22-23; Am. Br. at 2-4. That argument not only misunderstands the nature of the underlying social scientific inquiry, but it also misunderstands the 2014 primary itself.

The findings of the United States' expert, Dr. Charles Stewart, coupled with other mostly uncontested evidence related to the Senate Factors, *see* U.S. P.I. Mem. at 37-54, support the claim that the challenged provisions result in the denial of equal access to the political process for African-American voters in North Carolina. Specifically, after examining individual-level voter history data from four recent general elections in North Carolina, Dr. Stewart concluded that HB 589's curtailment of early voting, elimination of same-day registration, and prohibition on the counting of out-of-precinct provisional ballots will disproportionately burden African-American voters. *See* ECF 101-2, JA 879-80, 800-01, 833, 842, 867-68 (Stewart ¶¶ 247-48; 51-53; 127-28; 151; 212; 217; 245).

Defendants argue that because African-American voter participation rates increased in the May 2014 primary election as compared to the May 2010 primary election, the challenged provisions could not have imposed greater burdens on African-American voters. Defs Opp'n at 21-23. Further, relying on supplemental expert materials submitted after the expert deadlines in this case, ECF 81 at 3 (Order setting April 25 deadline for State's rebuttal expert reports), Defendants tout turnout data from the May 2014 primary as proof that Plaintiffs' "predictions" about the effects of HB 589's challenged provisions on minority voters are flawed. Defs' Opp'n at 22, 26.

This argument is misguided for several reasons. *See* Reply Joint Appendix ("R-JA") 2790-91 (Stewart Suppl. ¶ 3) (responding to June 2014 supplemental analyses provided by Defendants and *amici*). First, aggregate turnout is not the only, and certainly not the most important, metric for assessing the effect of election laws on voters. For this reason, among others, Dr. Stewart focused on determining whether the challenged

provisions would impose a disproportionate burden on individual African-American voters as opposed to white voters, and he made few, if any, predictions about the likely effects of the challenged provisions on voter registration or turnout rates in the aggregate. *See* ECF 101-2, JA 995-1001, 1012 (Stewart Surr. ¶¶ 9-22, 51-53). Aggregate turnout rates and total turnout levels are less reliable measures in any given election because they may rise or fall for any number of reasons, including not only election law changes such as the challenged provisions, but also, for example, demographic changes (such as population growth) and political factors (such as the competitiveness of races in any given election). *See* R-JA 2795-96, 2798 (Stewart Suppl. ¶¶ 11-12, 18). There is nothing in the May 2014 primary data presented by Defendants that refutes Dr. Stewart's conclusion that individual black voters will experience a disproportionate burden from the restrictions imposed by HB 589. *See id.*

In addition, primary elections are poor examples for testing the impact of voting law changes on turnout because primary election turnout is highly sensitive to the vagaries of individual primary contests and is therefore much lower, more volatile, and less geographically consistent than in general elections. *See id.* at ¶¶ 3, 6-10, 18-37. As outlined in Table 1 of Dr. Stewart's supplemental report, turnout rates are significantly lower in primary elections as compared to general elections, and indeed mid-term primary elections have the lowest turnout rates of federal elections. *Id.* (Table 1). Furthermore, "the analysis of turnout dynamics in May 2014 provides no insight into the likelihood of increased congestion [*i.e.,* long lines] in in-person voting in future general elections," *id.* at ¶ 6, and therefore are of limited value in assessing the impact of these

voting changes on black voters. Finally, the data provided by the State for the May 2014 primary confirm Dr. Stewart's original conclusion that African Americans use early voting in North Carolina at a greater rate than white voters. *Id*. at ¶ 3. Nor have Defendants refuted the more general point that H.B. 589 will disproportionately burden black voters.

In an attempt to discount Dr. Stewart's analysis and explain away the effects of the challenged provisions, Defendants and their experts offer flawed and irrelevant analyses and conclusions about factors influencing minority voter turnout.[6] First, flawed and incomplete comparisons between North Carolina's election law and the election laws of other states are not relevant to the crux of this case—whether the challenged provisions of HB 589 disproportionately burden minority voters in North Carolina *relative to white voters in North Carolina*. *See* ECF 101-2, JA 994-95 (Stewart Surr. ¶¶ 5-7). Mr. Trende's examination and description of other states' laws, as well as the conclusions that he draws from that compilation, are riddled with errors, *see e.g*., ECF 142 (Trende Dep. 145:9-149:17; 216:12-227:5; 230:11-232:1) and methodological flaws, ECF 101-2, JA 879-80, 633 (Stewart Surr. ¶¶ 21-22; 48-50, 61-71). His cross-state analysis does not dispute or undercut Plaintiffs' experts' detailed analyses and findings that the provisions of HB 589 will place new obstacles before North Carolina voters and that those obstacles will be disproportionately faced by African-Americans, ECF 101-2, JA 879-80, 633 (Stewart ¶¶ 247-48; Gronke ¶¶ 51-54) and he does not purport to have conducted any

---

[6] Plaintiffs are contemporaneously filing motions to exclude the testimony and declarations of Sean Trende, Donald Schroeder, and Thomas Hofeller offered on behalf of Defendants.

analyses regarding the disproportionate burdens of the challenged provisions. ECF 142 (Trende Dep. 157:10-158:3; 163:21-165:21).[7]

Moreover, Mr. Trende's analysis regarding the influence of national politics and President Obama's campaign strategy on minority voter participation in 2008 and 2012 are also methodologically unsound and offer no conclusions that bear on the effects of the challenged provisions. *Id.* at 264:24-265:15; ECF 101-2, JA 1021(Stewart Surr. ¶ 75). Similarly, the observations offered by declarant John Davis regarding Obama campaign efforts in North Carolina in 2008 and 2012, ECF 128, are irrelevant to the Court's review of the challenged provisions.[8]

Defendants' expert Dr. Janet Thornton has even less to offer, other than the undisputed proposition that *many* factors, in addition to election laws, impact individuals' decisions whether to register and cast a ballot. Defendants attempt to find significance in Dr. Thornton's assertion that voter participation rates in the 2008 and 2012 general elections were similar to those in the 1984 and 1992 general elections. Defs' Opp'n at 27. Dr. Thornton's analysis, however, only considered *total* voter participation and registration rates for the 1984 and 1992 elections and reveals precisely nothing regarding

---

[7] Similarly, Dr. Schroeder's analyses of the challenged provisions and similar laws in the other states was irrelevant to the issues at stake here. *See* R-JA 2880 (Schroeder Dep. 27: 2-5).

[8] In fact, Mr. Davis's observation that the North Carolina Republican Party in 2012 built a "turnout organization that neutralized the Obama 2008 turnout advantage," including increased early voting turnout, ECF 128 (Davis ¶ 16), directly undermines Defendants' argument that the disproportionate use of early voting by black voters as compared to white voters in 2012 is attributable to campaign strategy. *See* Defs' Opp'n at 33.

changes in African-American voter participation and registration rates.[9]  *See* ECF 127

(Thornton Dep. at 76:8-77:16; 177:23-178:18).

In an attempt to identify why African-American voters were more likely to avail

themselves of early voting than other voters, Defendants rely on Dr. Thornton's analysis

of black population in census tracts with and without early voting sites (and in counties

with and without Sunday early voting hours).  Defs' Opp'n at 30-32.  Based on her

findings, Defendants assert that early voting is more available to African-American

voters, thereby allegedly explaining why they use early voting disproportionately.  Defs'

Opp'n at 33.  Yet Dr. Thornton herself testified that she was not drawing any conclusions

about causation (as Defendants attempt to do) from her analysis or addressing the impact

that any of the challenged provisions would have on African-American voters.  *See* ECF

127 (Thornton Dep. 183:19-184:13, 187:9-12).  These findings are ultimately irrelevant

to the issues in this case and certainly do not undermine Dr. Stewart's conclusions.  ECF

101-2, JA 1027-28 (Stewart Surr. ¶¶ 92-93).

### 4.  The Lack of Evidence to Support Defendants' Claims Regarding the State's Interest Reinforces the Conclusion that HB 589 Violates Section 2

Finally, with respect to the United States' Section 2 results claim, the policies

underlying HB 589 are so tenuously connected to any legitimate state interest that they

fail to satisfy the final Senate Factor.  Defendants argument that HB 589's challenged

---

[9] Dr. Thornton also calculated voter turnout rate as a percentage of registered voters, instead of as a percentage of voting age population.  She admitted that if voter participation rates are calculated as a percentage of voting age population, participation rates in 2008 and 2012 are higher than 1984 and 1992.  *See* ECF 127 (Thornton Dep. 135:4-138:17).

provisions serve North Carolina's interests in "preventing voter fraud and maintaining confidence in the election system," Defs' Opp'n at 35; Am. Br. at 17-20, are simply unsupported by the evidence before the legislature. The abstract proposition that states have a legitimate interest in preventing voter fraud, *see Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196-197 (2008), does not provide a blank check to enact any restrictions on voting, particularly ones that will bear more heavily on minority voters (an issue not in contention in the *Crawford* case).

Defendants claim that eliminating a week of early voting furthers the State's interest in "uniformity and fair treatment of all voters." Defs' Opp'n at 37. Defendants fail to explain, however, why eliminating seven days of early voting is necessary to create "uniformity" in counties' one-stop absentee site schedules. Indeed, HB 589 contains a waiver provision that necessarily creates non-uniformity among the counties. Uniformity is no more consistent with eliminating a week of early voting than with retaining that week, and cannot justify HB 589. [10]  *See* U.S. P.I. Mem. at 48.

Perhaps recognizing that the legislative record is incredibly weak on rationales for cutting the method of voting used by 70 percent of African-American voters in

---

[10]  Defendants state that prior to HB 589, "some counties allowed one-stop absentee voting on Sunday, while others did not," Defs' Opp'n at 37. In fact, although HB 589 cut one of two weekends from the early voting period, whether to offer one-stop voting on the remaining weekend is up to the county. Also, while Defendants make no attempt to analyze the extent or effects of any non-uniformity in one-stop voting availability, they do submit data showing the number of one-stop voters per hour of availability for each county in the 2010 and 2014 primaries, a metric which continues to differ significantly across counties. *See* ECF 126-1 at 9-15 (Strach Decl. Exs. 7-8 (showing range of 1.35 to 33.01 for 2010 and 2.04 to 58.67 for 2014)).

presidential elections, *see* ECF 101-2, JA 833 (Stewart ¶ 130), Defendants turn to *post hoc* rationales that were not considered by the legislature. For example, citing the declaration of Thomas H. Fetzer, Jr., *see* ECF 134, Defendants argue that eliminating seven days of early voting "decreases the cost of political campaigns."[11] Defs' Opp'n at 37-38. But even if that were so, the change does not necessarily reduce the overall costs of holding the election because reducing the early voting period will increase, not decrease, the costs of election administration in high turnout elections. *See* U.S. P.I. Mem. at 49; ECF 102-10, JA 1541-43 (SBOE 5/18/11 Memo.); ECF 104, JA 1677, 1701-02 (SBOE 3/11/13 Memo). And in any event, nothing about this *post hoc* rationalization explains how decreasing political campaigns costs serves the State's interests in preventing voter fraud or maintaining confidence in the election system.

With respect to same-day registration, Defendants claim that its elimination is justified by an interest in maintaining the accuracy of the State's voter rolls, yet the record lends no support to the proposition that same-day registration obstructed this interest. Defs' Opp'n 35-36. To the contrary, the evidence (including a State Board of Elections ("SBOE") report) shows that same-day registration promoted accountability and integrity. *See* ECF 103, JA 1621 (SBOE 2/11/13 Report); ECF 100, JA 225-27 (Gilbert ¶¶ 22-24); ECF 100-4, JA 146-48 (Bartlett ¶¶ 29-36)). Defendants offer no concrete evidence to support their claim that North Carolina's voter rolls are "highly inflated and include many alleged registered voters who no longer reside in North

---

[11] In light of the brief, conclusory nature of Mr. Fetzer's statement and his lack of involvement in any political campaigns in the last four years, *see* R-JA 2861 (Fetzer Dep. 55:13-56:13), his testimony is not credible.

Carolina," Defs.' Opp'n at 35, or that this alleged problem is related in any way to same-day registration.[12]  Indeed, Gary Bartlett, who served as the SBOE's Executive Director for 20 years, maintains that same-day registration does not cause inflated voter rolls in North Carolina.  R-JA 2778 (Bartlett 2d Decl. ¶ 3).

Defendants claim that the same-day registration verification process was inaccurate and could lead to fraudulent votes.  Defs' Opp'n at 35-36.  For example, Kim Strach asserts that the same-day registration verification process could be easily manipulated and that during the 2012 general election there were "multiple cases" of ineligible voters casting ballots through the use of same day registration.  ECF 126-1 (Strach ¶¶ 26-27).  This claim of manipulation is directly contradicted, however, by an official 2012 SBOE report that concluded that the undeliverable rate for same-day registration mail verifications during the 2012 primary and general elections was considerably *lower* than the rate for regular registration verification.[13]  ECF 103-7, JA 1621; U.S. P.I. Mem. at 50-51.  Moreover, the same-day registration process had a number of safeguards to verify identity and protect against fraudulent registration and voting, a proof-of-residence requirement, and the use of retrievable ballots that could be

---

[12]  Defendants' expert Dr. Hofeller, testified that he did not perform any study to verify whether any non-eligible voters on the State's voter rolls had indeed voted, and he offered no opinion as to any relationship between same-day registration and the allegedly inflated voter rolls or the potential for voter fraud.  R-JA 2956 (Hofeller Dep. 137:11-35).

[13]  Ms. Strach states that the SBOE report only provides a "snapshot" of the data at the time the information was accessed, ECF 126-1 (Strach ¶ 29), but she verified that the report accurately reported the data reflected on the specific dates noted: November 27, 2012; January 30, 2013; and February 6, 2013.  ECF 100-25, JA 494 (Strach Dep. 165:24-.167:5).  These dates are all months after the elections to which the data is relevant.  *See also* ECF 1007, JA 226 (Gilbert ¶ 24).

excluded from the vote count if a same-day registrant was deemed ineligible (a measure not available for election day votes). U.S. P.I. Mem. at 51; N.C.G.S. §§ 163-82.6A(c), 163-227.2(e1) (2012). Notably, although Ms. Strach claims that the procedures to register, verify, and maintain voter registration information in general are "not ideal" and result in inflated voter rolls, HB 589 does nothing to change *those* procedures. ECF 126-1 (Strach ¶¶ 15-23).

Also, Defendants contend that concerns related to election administration support HB 589's elimination of out-of-precinct provisional voting. Defs' Opp'n at 39-40. Here, too, their evidence is unpersuasive. The testimony of Cherie Poucher, director of Wake County Board of Elections, describes the procedure for processing out-of-precinct provisional ballots as labor intensive but does not claim that it was overly burdensome or impossible. *See* ECF 134-1 (Poucher ¶ 5); *see also* R-JA 3062 (Poucher Testimony). Further undermining Poucher's claim, Gary Bartlett testified that regular assessments of the provisional balloting process following each election did not find that the process of counting provisional ballots was overly burdensome on the counties, only a handful of counties ever complained about the time it took to count the out-of-precinct ballots, and no county ever had any difficulty completing the counting of these ballots by the conclusion of the canvass. ECF 100-4, JA 0153 (Barlett ¶ 49).

Finally, Defendants make the completely counterintuitive claim that eliminating out-of-precinct provisional voting "helps ensure that voters will not be disenfranchised." Defs' Opp'n at 39-40. In fact, where previously several thousand voters had their ballots at least partially counted when they cast out-of-precinct provisional ballots, ECF 101-2,

JA 872-879 (Stewart ¶¶ 227-244), now those ballots would be rejected. ECF 100-4, JA

153 (Bartlett ¶ 48); ECF 100-13, JA 318 (Glazier ¶ 710).

### B. The United States is Likely to Succeed on its Section 2 Discriminatory Purpose Claim

#### 1. The Evidence the United States has Recently Obtained Through the Discovery Process Reinforces the Conclusion that the Legislature Acted with Discriminatory Intent.

In addition to the evidence already discussed in the United States' Memorandum,

*see* U.S. P.I. Mem. at 10-11, 13-15, 58-59, 63-64, Defendants' long-delayed production

of certain SBOE documents has provided further support for a finding that the legislature

likely knew the harm the challenged provisions would have on black voters.[14]

"Necessarily, an invidious discriminatory purpose may often be inferred from the totality

of the relevant facts, including the fact, if it is true, that the law bears more heavily on

one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). That inference

may be particularly justifiable when the decision-maker was aware of that burden at the

time it acted. The recently produced communications between the SBOE and legislators

show precisely that awareness. They reveal that, during consideration of HB 589,

supporters of the bill received extensive data from the SBOE showing that African-

Americans disproportionately lacked DMV-issued photo ID and disproportionately used

same-day registration. They also requested data by race on the usage of early voting and

provisional ballots by voters who lacked DMV-issued photo ID. *See* R-JA 3120-24,

3127-37, 3148-66, 3170-3230, 3231-46, 3265-84; ECF 103-2, JA 1627; ECF 104-3, JA

---

[14] *See* ECF 114, Joint Status Report Regarding Defendants' and the State Legislators' Document Production (May 22, 2014).

1783-87; ECF 110-5, JA 2633-36; ECF 103-5, JA 1611; ECF 103-9, JA 1669-1675; ECF 102-10, JA 1543; *see also* R- JA 3084-3112, 3113-16, 3117-19.  This evidence confirms that at the time they were drafting and considering HB 589, supporters possessed objective data showing that the bill's provisions would disproportionately burden African-American voters, yet they proceeded with the enactment anyway.  Further, none of the individual legislators who requested the data and supported HB 589 made mention of it during floor debate in either the House or Senate, or provided a response when legislators who opposed the bill presented evidence reflecting the disproportionate effects of the challenged provisions.  In these circumstances, it is reasonable to infer an invidious discriminatory purpose based on the totality of the relevant facts.  *Davis*, 426 U.S. at 253 (Stevens, J., concurring).

> ### 2. The Legislative Process that Produced HB 589 Supports the Conclusion that the Challenged Provisions were Enacted with Discriminatory Intent.

Despite the extensive evidence presented by Plaintiffs showing that HB 589 was enacted with discriminatory intent, Defendants take issue only with the allegations regarding procedural and substantive departures from the normal legislative procedure. Defs.' Opp'n at 40.  Even if Defendants were right, that would not preclude finding a discriminatory purpose.  *Arlington Heights* does not require that state laws or rules be violated; instead, the Supreme Court found only that "[d]epartures from the normal procedural sequence" and "[s]ubstantive departures" *can* "afford evidence that improper purposes" played a role in the enactment of contested statute.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

But Defendants are actually wrong about the facts. To rebut the declarations cited by Plaintiffs, Defendants offer the testimony of one former member of the North Carolina House of Representatives, Carolyn Justice. Defs' Opp'n at 41-51. Ms. Justice is of course not a percipient witness: she left the legislature in 2012 prior to the enactment of HB 589. ECF 134-3 (Justice ¶ 2). In any event, Ms. Justice's general description of the process that produced HB 589 omits many important details, including that the April 2013 bill radically differed from the bill introduced in the last days of July 2013, growing suddenly from 16 pages to 57 pages, U.S. P.I. Mem. at 9-10, 12-13; that the three provisions at issue in the United States' motion here were only added to HB 589 within days prior to the vote to adopt them, *id.*; that the legislators had before them data regarding the racial impact of these changes; or that the SBOE had issued a report on voter possession rates of DMV-issued ID, which showed African Americans disproportionately lacked such ID compared to white voters, ECF 105, JA 1821-30.

The gaping holes in Ms. Justice's recitation of the legislative process makes her testimony unreliable, even apart from the lack of her participation in that process. For example, she fails to provide any information on events that transpired between April 25 and July 18, including the impact of the Supreme Court's decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013) on June 25 or why countless provisions were added to HB 589 after that decision, and she further fails to disclose that even the committee substitute version of HB 589 distributed on July 18 to members of the Senate Rules Committee was still primarily a voter photo ID bill and did not contain any of the challenged provisions. *See* R-JA 3249-64 (email with committee substitute).

Similarly, Ms. Justice conveniently fails to relay that the committee substitute bill distributed on July 22, 2013, just hours before the July 23, 2013 Committee hearing, was the first time any of the challenged provisions appeared in HB 589 and that the revised voter ID provision was significantly more restrictive than previous iterations. *See* ECF ECF 100-6, JA 183 (Stein ¶ 15). Although Ms. Justice asserts that many of the provisions added to the omnibus were contained in other pending bills, ECF 134-3 (Justice ¶ 23), she does not disclose that none of these alternative bills were ever considered by the full House or Senate. *See* R-JA 3374-77. These alternative bills, thus, did not provide an opportunity for meaningful legislative debate or public comment on any of the challenged provisions.

Defendants further claim that the legislative process by which HB 589 became law was not unusual. Defs' Opp'n at 46; ECF 134-3 (Justice ¶ 30). A handful of bills enacted over a 15-year period hardly rebuts the United States' claim. Just as tellingly, each of the other election-related bills Defendants provide as an example of enactment late in a legislative session *expanded* access to the ballot, including SB 568, which removed the excuse requirement for one-stop absentee ballots cast during the early voting period in even-numbered general election years, and SB 133, which required the counting of out-of-precinct provisional ballots. Defs' Opp'n at 47. In contrast, the provisions of HB 589 restrict, not expand, voters access to the ballot.

Whether the legislative process complied with the technical rules of the General Assembly does not counter the totality of the relevant facts surrounding the passage of bill, including the legislature's knowledge of the disproportionate burdens the challenged

provisions would inflict on African Americans, the sequence of events leading up to the consideration and passage of the bill, the substantively irregular legislative process,[15] and the tenuousness of the justifications provided by the challenged provisions. These factors support a finding that the HB 589 was likely motivated by a discriminatory purpose.

## C.  The United States is Entitled to Preliminary Injunctive Relief

Defendants do not contest the legal proposition that if HB 589 denies or abridges the right to vote, it imposes an irreparable harm on the citizens whose voting rights are denied or abridged. Violations of Section 2 constitute irreparable harm for purposes of preliminary relief. *See Harris,* 593 F. Supp. at 135 ("[S]ection 2 and its history reflect a strong national mandate for the immediate removal of all impediments, intended or not, to equal participation in the election process. Thus when Section 2 is violated the public as a whole suffers irreparable injury.").

Moreover, where Congress has provided for governmental enforcement of a statute through injunctive relief, irreparable harm is presumed. *Id*.; *see, e.g., United States v. Berks Cnty.*, 277 F. Supp. 2d 570, 578 (E.D. Pa. 2003). The Voting Rights Act specifically authorizes injunctive relief. 42 U.S.C. § 1973j(d). Accordingly, given the

---

[15]  Several legislators, including at least one supporter of HB 589, disagree with Defendants' contention that the legislative process was usual. *See* JA1887-88 (Rep. Blust, a supporter of the bill stating: "[HB 589] was received by the House only at 6:11 p.m. on the last night of the session for concurrence only. I readily admit that is not good practice."); *see* ECF 100-13, JA 304, 306-307, 310 (Glazier ¶ 18, 29, 40); ECF 100-17, JA 378 (Kinnaird ¶ 24); ECF 100-5, JA 167 (Michaux ¶ 27); *see also* JA XX (Glazier Dep. 134:18-25 (testifying that Rep. Warren stated, "I'm really sorry, I'm sorry we did what we did. I would have much preferred to have just voted the House bill and a few other technical changes and provisions. I can't express to you my sorrow and my apologies")).

United States' showing with respect to the likely violation of Section 2, irreparable harm should be presumed here.

Defendants' only real argument against granting injunctive relief is their assertion that an injunction will impose administrative costs on the State. But "administrative convenience" cannot justify a set of procedures that impinge upon a fundamental right. *Taylor v. Louisiana*, 419 U.S. 522, 535 (1975). That is why the district court in *Johnson v. Halifax Cnty.*, 594 F. Supp 161, 171 (E.D.N.C. 1984) found that the administrative and financial burdens on the defendant were "not…undue in view of the otherwise irreparable harm to be incurred by plaintiffs."

Defendants' are mistaken when they assert that the continued enforcement of HB 589's challenged provisions represents the *status quo* because they were enforced during the 2014 primary. To the contrary, the *status quo* here is "the 'last uncontested status between the parties which preceded the controversy.'" *Pashby v. Delia*, 709 F. 3d 307, 320 (4th Cir. 2013). Defendants also claim that they will be irreparably harmed because counties have already undertaken tasks and incurred costs to implement the challenged provisions in 2014. Defs' Opp'n at 52. However, these harms are self-inflicted, as Defendants should not have adopted the discriminatory practices to begin with, knowing the harm that would befall black voters. As the Plaintiffs are likely to show that a Section 2 violation exists, delaying a remedy would only increase the voter confusion, burdens, and costs Defendants argue would result from granting a preliminary injunction. *NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*, 858 F. Supp. 2d 516, 526 (M.D.N.C. 2012). Moreover, the United States has a significant interest in addressing

violations of the Voting Rights Act, *United States v. Cambridge*, 799 F.2d 137, 141 (4th Cir. 1986), as does the public in ensuring that elections are conducted in a manner that is not racially discriminatory. *Newsome v. Albermarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

### D. The Appointment of Federal Observers is Necessary to Enforce the Voting Guarantees of the Fourteenth and Fifteenth Amendment

Defendants make only a cursory argument against the appointment of federal observers pursuant to Section 3(a) of the Voting Rights Act. Defs' Opp'n at 53-55. Their argument misreads the statute, though they quote it at length. For purposes of a preliminary injunction, the issuing court need not find a violation of the Fourteenth or Fifteenth Amendment. Rather, it is sufficient that "the Attorney General" has brought suit "under any statute to enforce the voting guarantees" of those amendments, and "the court determines that the appointment of such observers is necessary to enforce such voting guarantees." 42 U.S.C. § 1973a(a). In light of the likely violations of Section 2 caused by HB 589's challenged provisions, and the potential harms that may arise from other provisions (such as the expansion of the ability to challenge voters at the polls), federal observers will provide reassurance that voters will be able to exercise their right to vote. *United States v. Berks Cnty.*, 250 F. Supp. 2d 525, 543 (E.D. Pa. 2003).

## III. CONCLUSION

The United States respectfully requests that its Motion for a Preliminary Injunction and for the Appointment of Federal Observers be granted.

Dated:  June 30, 2014

Respectfully submitted,

RIPLEY RAND
United States Attorney
Middle District of North Carolina

JOCELYN SAMUELS
Acting Assistant Attorney General
Civil Rights Division

 /s/ Gill P. Beck
GILL P. BECK
NCSB No. 13175
Special Assistant Unites States Attorney
100 Otis Street
Asheville, NC 28801
Telephone: (828) 259-0645

 /s/ Catherine Meza
T. CHRISTIAN HERREN, JR.
JOHN A. RUSS IV
CATHERINE MEZA
DAVID G. COOPER
SPENCER R. FISHER
JENIGH J. GARRETT
ELIZABETH M. RYAN
Attorneys, Voting Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: (800) 253-3931
Email:  john.russ@usdoj.gov
Email:  catherine.meza@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2014, I electronically filed the foregoing **United States' Reply Memorandum in Support of Its Motion for a Preliminary Injunction and for the Appointment of Federal Observers,** using the CM/ECF system in case numbers 1:13- cv-658, 1:13- cv-660, and 1:13-cv-861, which will send notification of such filing to all counsel of record.


*/s/ Catherine Meza*

U.S. Department of Justice
Civil Rights Division - Voting Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Phone: (800) 253-3931
Email: catherine.meza@usdoj.gov