**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1468

NORTH CAROLINA STATE CONFERENCE OF THE NAACP; ROSANELL
EATON; EMMANUEL BAPTIST CHURCH; BETHEL A. BAPTIST CHURCH;
COVENANT PRESBYTERIAN CHURCH; BARBEE'S CHAPEL MISSIONARY
BAPTIST CHURCH, INC.; ARMENTA EATON; CAROLYN COLEMAN;
JOCELYN FERGUSON-KELLY; FAITH JACKSON; MARY PERRY, MARIA
TERESA UNGER PALMER,

                    Plaintiffs - Appellants,

          and

JOHN DOE 1; JANE DOE 1; JOHN DOE 2; JANE DOE 2; JOHN DOE 3;
JANE DOE 3; NEW OXLEY HILL BAPTIST CHURCH; CLINTON
TABERNACLE AME ZION CHURCH; BAHEEYAH MADANY,

                    Plaintiffs,

          v.

PATRICK L. MCCRORY, in his official capacity as Governor of
the State of North Carolina; KIM WESTBROOK STRACH, in her
official capacity as a member of the State Board of
Elections; JOSHUA B. HOWARD, in his official capacity as a
member of the State Board of Elections; RHONDA K. AMOROSO,
in her official capacity as a member of the State Board of
Elections; JOSHUA D. MALCOLM, in his official capacity as a
member of the State Board of Elections; PAUL J. FOLEY, in
his official capacity as a member of the State Board of
Elections; MAJA KRICKER, in her official capacity as a
member of the State Board of Elections; JAMES BAKER, in his
official capacity as a member of the North Carolina State
Board of Elections,

                    Defendants - Appellees.

------------------------------

CONSTITUTIONAL ACCOUNTABILITY CENTER; STACEY STITT; MARIA
DIAZ; ROBERT GUNDRUM; MISTY TAYLOR; SERVICE EMPLOYEES
INTERNATIONAL UNION; DEMOCRACY NORTH CAROLINA; UNC CENTER
FOR CIVIL RIGHTS; PEARLEIN REVELS; LOUISE MITCHELL; ERIC
LOCKLEAR; ANITA HAMMONDS BLANKS,

        Amici Supporting Appellants,

JUDICIAL WATCH, INCORPORATED; ALLIED EDUCATIONAL FOUNDATION;
THOM TILLIS; LINDSEY GRAHAM; TED CRUZ; MIKE LEE; JUDICIAL
EDUCATION PROJECT; LAWYERS DEMOCRACY FUND; MOUNTAIN STATES
LEGAL FOUNDATION; AMERICAN CIVIL RIGHTS UNION; STATE OF
INDIANA; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF
ARKANSAS; STATE OF GEORGIA; STATE OF KANSAS; STATE OF
MICHIGAN; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF
OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF TEXAS; STATE OF
WEST VIRGINIA; STATE OF WISCONSIN; PACIFIC LEGAL FOUNDATION;
CENTER FOR EQUAL OPPORTUNITY; PROJECT 21,

        Amici Supporting Appellees.

————————————

**No. 16-1469**

————————————

LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA; NORTH CAROLINA A.
PHILIP RANDOLPH INSTITUTE; UNIFOUR ONESTOP COLLABORATIVE;
COMMON CAUSE NORTH CAROLINA; GOLDIE WELLS; KAY BRANDON;
OCTAVIA RAINEY; SARA STOHLER; HUGH STOHLER,

        Plaintiffs,

CHARLES M. GRAY; ASGOD BARRANTES; MARY-WREN RITCHIE,

        Intervenors/Plaintiffs,

      and

LOUIS M. DUKE; JOSUE E. BERDUO; NANCY J. LUND; BRIAN M.
MILLER; BECKY HURLEY MOCK; LYNNE M. WALTER; EBONY N. WEST,

        Intervenors/Plaintiffs - Appellants,

        v.

2

STATE OF NORTH CAROLINA; JOSHUA B. HOWARD, in his official
capacity as a member of the State Board of Elections; RHONDA
K. AMOROSO, in her official capacity as a member of the
State Board of Elections; JOSHUA D. MALCOLM, in his official
capacity as a member of the State Board of Elections; PAUL
J. FOLEY, in his official capacity as a member of the State
Board of Elections; MAJA KRICKER, in her official capacity
as a member of the State Board of Elections; PATRICK L.
MCCRORY, in his official capacity as Governor of the State
of North Carolina,

                 Defendants - Appellees.

    ----------------------------

CONSTITUTIONAL ACCOUNTABILITY CENTER; STACEY STITT; MARIA
DIAZ; ROBERT GUNDRUM; MISTY TAYLOR; SERVICE EMPLOYEES
INTERNATIONAL UNION; DEMOCRACY NORTH CAROLINA; UNC CENTER
FOR CIVIL RIGHTS; PEARLEIN REVELS; LOUISE MITCHELL; ERIC
LOCKLEAR; ANITA HAMMONDS BLANKS,

                 Amici Supporting Appellants,

JUDICIAL WATCH, INCORPORATED; ALLIED EDUCATIONAL FOUNDATION;
THOM TILLIS; LINDSEY GRAHAM; TED CRUZ; MIKE LEE; JUDICIAL
EDUCATION PROJECT; LAWYERS DEMOCRACY FUND; MOUNTAIN STATES
LEGAL FOUNDATION; AMERICAN CIVIL RIGHTS UNION; STATE OF
INDIANA; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF
ARKANSAS; STATE OF GEORGIA; STATE OF KANSAS; STATE OF
MICHIGAN; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF
OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF TEXAS; STATE OF
WEST VIRGINIA; STATE OF WISCONSIN; PACIFIC LEGAL FOUNDATION;
CENTER FOR EQUAL OPPORTUNITY; PROJECT 21,

                 Amici Supporting Appellees.

                 _____

                    **No. 16-1474**

                 _____

LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA; NORTH CAROLINA A.
PHILIP RANDOLPH INSTITUTE; UNIFOUR ONESTOP COLLABORATIVE;
COMMON CAUSE NORTH CAROLINA; GOLDIE WELLS; KAY BRANDON;
OCTAVIA RAINEY; SARA STOHLER; HUGH STOHLER,

                 Plaintiffs - Appellants,

3

and

LOUIS M. DUKE; CHARLES M. GRAY; ASGOD BARRANTES; JOSUE E.
BERDUO; BRIAN M. MILLER; NANCY J. LUND; BECKY HURLEY MOCK;
MARY-WREN RITCHIE; LYNNE M. WALTER; EBONY N. WEST,

Intervenors/Plaintiffs,

v.

STATE OF NORTH CAROLINA; JOSHUA B. HOWARD, in his official
capacity as a member of the State Board of Elections; RHONDA
K. AMOROSO, in her official capacity as a member of the
State Board of Elections; JOSHUA D. MALCOLM, in his official
capacity as a member of the State Board of Elections; PAUL
J. FOLEY, in his official capacity as a member of the State
Board of Elections; MAJA KRICKER, in her official capacity
as a member of the State Board of Elections; PATRICK L.
MCCRORY, in his official capacity as Governor of the State
of North Carolina,

Defendants - Appellees.

----------------------------

CONSTITUTIONAL ACCOUNTABILITY CENTER; STACEY STITT; MARIA
DIAZ; ROBERT GUNDRUM; MISTY TAYLOR; SERVICE EMPLOYEES
INTERNATIONAL UNION; DEMOCRACY NORTH CAROLINA; UNC CENTER
FOR CIVIL RIGHTS; PEARLEIN REVELS; LOUISE MITCHELL; ERIC
LOCKLEAR; ANITA HAMMONDS BLANKS,

Amici Supporting Appellants,

JUDICIAL WATCH, INCORPORATED; ALLIED EDUCATIONAL FOUNDATION;
THOM TILLIS; LINDSEY GRAHAM; TED CRUZ; MIKE LEE; JUDICIAL
EDUCATION PROJECT; LAWYERS DEMOCRACY FUND; MOUNTAIN STATES
LEGAL FOUNDATION; AMERICAN CIVIL RIGHTS UNION; STATE OF
INDIANA; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF
ARKANSAS; STATE OF GEORGIA; STATE OF KANSAS; STATE OF
MICHIGAN; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF
OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF TEXAS; STATE OF
WEST VIRGINIA; STATE OF WISCONSIN; PACIFIC LEGAL FOUNDATION;
CENTER FOR EQUAL OPPORTUNITY; PROJECT 21,

Amici Supporting Appellees.

4

No. 16-1529

UNITED STATES OF AMERICA,

          Plaintiff - Appellant,

      v.

STATE OF NORTH CAROLINA; NORTH CAROLINA STATE BOARD OF ELECTIONS; KIM WESTBROOK STRACH,

          Defendants - Appellees,

      and

CHRISTINA KELLEY GALLEGOS-MERRILL; JUDICIAL WATCH, INCORPORATED,

          Intervenors/Defendants.

------------------------------

CONSTITUTIONAL ACCOUNTABILITY CENTER; STACEY STITT; MARIA DIAZ; ROBERT GUNDRUM; MISTY TAYLOR; SERVICE EMPLOYEES INTERNATIONAL UNION; DEMOCRACY NORTH CAROLINA; UNC CENTER FOR CIVIL RIGHTS; PEARLEIN REVELS; LOUISE MITCHELL; ERIC LOCKLEAR; ANITA HAMMONDS BLANKS,

          Amici Supporting Appellant,

JUDICIAL WATCH, INCORPORATED; ALLIED EDUCATIONAL FOUNDATION; THOM TILLIS; LINDSEY GRAHAM; TED CRUZ; MIKE LEE; JUDICIAL EDUCATION PROJECT; LAWYERS DEMOCRACY FUND; MOUNTAIN STATES LEGAL FOUNDATION; AMERICAN CIVIL RIGHTS UNION; STATE OF INDIANA; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF GEORGIA; STATE OF KANSAS; STATE OF MICHIGAN; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF TEXAS; STATE OF WEST VIRGINIA; STATE OF WISCONSIN; PACIFIC LEGAL FOUNDATION; CENTER FOR EQUAL OPPORTUNITY; PROJECT 21,

          Amici Supporting Appellees.

Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro. Thomas D. Schroeder, District Judge. (1:13-cv-00658-TDS-JEP; 1:13-cv-00660-TDS-JEP; 1:13-cv-00861-TDS-JEP)

---

Argued: June 21, 2016                    Decided: July 29, 2016

---

Before MOTZ, WYNN, and FLOYD, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Motz wrote the opinion for the court, in which Judge Wynn and Judge Floyd joined except as to Part V.B. Judge Wynn wrote the opinion for the court as to Part V.B., in which Judge Floyd joined. Judge Motz wrote a separate dissenting opinion as to Part V.B.

---

**ARGUED**: Anna Marks Baldwin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Penda D. Hair, ADVANCEMENT PROJECT, Washington, D.C.; Allison Jean Riggs, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina, for Appellants. Thomas A. Farr, OGLETREE DEAKINS NASH SMOAK & STEWART, PC, Raleigh, North Carolina; Alexander McClure Peters, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF**: Denise D. Lieberman, Donita Judge, Caitlin Swain, ADVANCEMENT PROJECT, Washington, D.C.; Irving Joyner, Cary, North Carolina; Adam Stein, TIN FULTON WALKER & OWEN, PLLC, Chapel Hill, North Carolina; Daniel T. Donovan, Bridget K. O'Connor, K. Winn Allen, Michael A. Glick, Ronald K. Anguas, Jr., Madelyn A. Morris, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellants North Carolina State Conference of Branches of the NAACP, Rosanell Eaton, Emmanuel Baptist Church, Bethel A. Baptist Church, Covenant Presbyterian Church, Barbee's Chapel Missionary Baptist Church, Inc., Armenta Eaton, Carolyn Coleman, Jocelyn Ferguson-Kelly, Faith Jackson, Mary Perry, and Maria Teresa Unger Palmer. Edwin M. Speas, John O'Hale, Caroline P. Mackie, POYNER SPRUILL LLP, Raleigh, North Carolina; Joshua L. Kaul, Madison, Wisconsin, Marc E. Elias, Bruce V. Spiva, Elisabeth C. Frost, Amanda Callais, Washington, D.C., Abha Khanna, PERKINS COIE LLP, Seattle, Washington, for Appellants Louis M. Duke, Josue E. Berduo, Nancy J. Lund, Brian M. Miller, Becky Hurley Mock, Lynne M. Walter, and Ebony N. West. Dale E. Ho, Julie A. Ebenstein, Sophia Lin Lakin, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, INC., New York, New York; Christopher Brook, ACLU OF NORTH CAROLINA LEGAL FOUNDATION,

6

Raleigh, North Carolina; Anita S. Earls, George Eppsteiner, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina for Appellants League of Women Voters of North Carolina, North Carolina A. Philip Randolph Institute, Unifour Onestop Collaborative, Common Cause North Carolina, Goldie Wells, Kay Brandon, Octavia Rainey, Sara Stohler, and Hugh Stohler. Ripley Rand, United States Attorney for the Middle District of North Carolina, Gill P. Beck, Special Assistant United States Attorney for the Middle District of North Carolina, Gregory B. Friel, Deputy Assistant Attorney General, Justin Levitt, Deputy Assistant Attorney General, Diana K. Flynn, Christine H. Ku, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant United States of America. L. Gray Geddie, Jr., Phillip J. Strach, Michael D. McKnight, OGLETREE DEAKINS NASH SMOAK & STEWART, PC, Raleigh, North Carolina, for Appellees State of North Carolina and North Carolina State Board of Elections; Karl S. Bowers, Jr., BOWERS LAW OFFICE LLC, Columbia, South Carolina, Robert C. Stephens, OFFICE OF THE GOVERNOR OF NORTH CAROLINA, Raleigh, North Carolina, for Appellee Patrick L. McCrory. Elizabeth B. Wydra, Brianne J. Gorod, David H. Gans, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amicus Constitutional Accountability Center. Claire Prestel, Ryan E. Griffin, JAMES & HOFFMAN, P.C., Washington, D.C.; Mary Joyce Carlson, Washington, D.C.; Judith A. Scott, Lauren Bonds, Katherine Roberson-Young, SERVICE EMPLOYEES INTERNATIONAL UNION, Washington, D.C., for Amici Stacey Stitt, Maria Diaz, Robert Gundrum, Misty Taylor, and Service Employees International Union. Mark R. Sigmon, SIGMON LAW, PLLC, Raleigh, North Carolina, for Amicus Democracy North Carolina. Mark Dorosin, Elizabeth Haddix, Brent Ducharme, UNC CENTER FOR CIVIL RIGHTS, Chapel Hill, North Carolina, for Amicus UNC Center for Civil Rights. Jeanette Wolfley, Assistant Professor, UNIVERSITY OF NEW MEXICO SCHOOL OF LAW, Albuquerque, New Mexico, Arnold Locklear, LOCKLEAR, JACOBS, HUNT & BROOKS, Pembroke, North Carolina for Amici Pearlein Revels, Louise Mitchell, Eric Locklear, and Anita Hammonds Blanks. Bradley J. Schlozman, HINKLE LAW FIRM LLC, Wichita, Kansas; Chris Fedeli, Lauren M. Burke, JUDICIAL WATCH, INC., Washington, D.C.; H. Christopher Coates, LAW OFFICE OF H. CHRISTOPHER COATES, Charleston, South Carolina, for Amici Judicial Watch, Inc. and Allied Educational Foundation. Michael A. Carvin, Anthony J. Dick, Stephen A. Vaden, JONES DAY, Washington, D.C., for Amici Senators Thom Tillis, Lindsey Graham, Ted Cruz, Mike Lee, and the Judicial Education Project. Maya M. Noronha, Trevor M. Stanley, E. Mark Braden, Richard B. Raile, BAKER & HOSTETLER LLP, Washington, D.C., for Amicus Lawyers Democracy Fund. Joshua P. Thompson, Christopher M. Kieser, PACIFIC LEGAL

7

FOUNDATION, Sacramento, California, for Amici Pacific Legal Foundation, Center for Equal Opportunity, and Project 21. Steven J. Lechner, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, for Amicus Mountain States Legal Foundation.  Joseph A. Vanderhulst, PUBLIC INTEREST LEGAL FOUNDATION, Plainfield, Indiana, for Amicus American Civil Rights Union.  Gregory F. Zoeller, Attorney General of Indiana, Thomas M. Fisher, Solicitor General, Winston Lin, Deputy Attorney General, OFFICE OF THE INDIANA ATTORNEY GENERAL, Indianapolis, Indiana; Luther Strange, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama; Mark Brnovich, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona; Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas; Sam Olens, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF GEORGIA, Atlanta, Georgia; Derek Schmidt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas; Bill Schuette, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan; Wayne Stenehjem, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH DAKOTA, Bismarck, North Dakota; Michael DeWine, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio; E. Scott Pruitt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma; Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina; Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas; Patrick Morrisey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia; Brad D. Schimel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WISCONSIN, Madison, Wisconsin, for Amici States of Indiana, Alabama, Arizona, Arkansas, Georgia, Kansas, Michigan, North Dakota, Ohio, Oklahoma, South Carolina, Texas, West Virginia, and Wisconsin.

---

DIANA GRIBBON MOTZ, Circuit Judge, writing for the court except as to Part V.B.:

These consolidated cases challenge provisions of a recently enacted North Carolina election law. The district court rejected contentions that the challenged provisions violate the Voting Rights Act and the Fourteenth, Fifteenth, and Twenty-Sixth Amendments of the Constitution. In evaluating the massive record in this case, the court issued extensive factual findings. We appreciate and commend the court on its thoroughness. The record evidence provides substantial support for many of its findings; indeed, many rest on uncontested facts. But, for some of its findings, we must conclude that the district court fundamentally erred. In holding that the legislature did not enact the challenged provisions with discriminatory intent, the court seems to have missed the forest in carefully surveying the many trees. This failure of perspective led the court to ignore critical facts bearing on legislative intent, including the inextricable link between race and politics in North Carolina.

Voting in many areas of North Carolina is racially polarized. That is, "the race of voters correlates with the selection of a certain candidate or candidates." Thornburg v. Gingles, 478 U.S. 30, 62 (1986) (discussing North Carolina). In Gingles and other cases brought under the Voting Rights Act, the

9

Supreme Court has explained that polarization renders minority voters uniquely vulnerable to the inevitable tendency of elected officials to entrench themselves by targeting groups unlikely to vote for them. In North Carolina, restriction of voting mechanisms and procedures that most heavily affect African Americans will predictably redound to the benefit of one political party and to the disadvantage of the other. As the evidence in the record makes clear, that is what happened here.

After years of preclearance and expansion of voting access, by 2013 African American registration and turnout rates had finally reached near-parity with white registration and turnout rates. African Americans were poised to act as a major electoral force. But, on the day after the Supreme Court issued Shelby County v. Holder, 133 S. Ct. 2612 (2013), eliminating preclearance obligations, a leader of the party that newly dominated the legislature (and the party that rarely enjoyed African American support) announced an intention to enact what he characterized as an "omnibus" election law. Before enacting that law, the legislature requested data on the use, by race, of a number of voting practices. Upon receipt of the race data, the General Assembly enacted legislation that restricted voting and registration in five different ways, all of which disproportionately affected African Americans.

10

In response to claims that intentional racial discrimination animated its action, the State offered only meager justifications. Although the new provisions target African Americans with almost surgical precision, they constitute inapt remedies for the problems assertedly justifying them and, in fact, impose cures for problems that did not exist. Thus the asserted justifications cannot and do not conceal the State's true motivation. "In essence," as in League of United Latin American Citizens v. Perry (LULAC), 548 U.S. 399, 440 (2006), "the State took away [minority voters'] opportunity because [they] were about to exercise it." As in LULAC, "[t]his bears the mark of intentional discrimination." Id.

Faced with this record, we can only conclude that the North Carolina General Assembly enacted the challenged provisions of the law with discriminatory intent. Accordingly, we reverse the judgment of the district court to the contrary and remand with instructions to enjoin the challenged provisions of the law.

I.

"The Voting Rights Act of 1965 employed extraordinary measures to address an extraordinary problem." Shelby Cty., 133 S. Ct. at 2618. Although the Fourteenth and Fifteenth Amendments to the United States Constitution prohibit racial discrimination in the regulation of elections, state

11

legislatures have too often found facially race-neutral ways to deny African Americans access to the franchise. See id. at 2619; Johnson v. De Grandy, 512 U.S. 997, 1018 (1994) (noting "the demonstrated ingenuity of state and local governments in hobbling minority voting power" as "jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices" (alteration in original) (internal quotation marks omitted)).

To remedy this problem, Congress enacted the Voting Rights Act. In its current form, § 2 of the Act provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

52 U.S.C. § 10301(a) (2012) (formerly 42 U.S.C. § 1973(a)).

In addition to this general statutory prohibition on racial discrimination, Congress identified particular jurisdictions "covered" by § 5 of the Voting Rights Act. Shelby Cty., 133 S. Ct. at 2619. Covered jurisdictions were those that, as of 1972, had maintained suspect prerequisites to voting, like literacy tests, and had less than 50% voter registration or turnout. Id. at 2619-20. Forty North Carolina jurisdictions were covered under the Act. 28 C.F.R. pt. 51 app. (2016). As a result, whenever the North Carolina legislature sought to change

12

the procedures or qualifications for voting statewide or in those jurisdictions, it first had to seek "preclearance" with the United States Department of Justice. In doing so, the State had to demonstrate that a change had neither the purpose nor effect of "diminishing the ability of any citizens" to vote "on account of race or color." 52 U.S.C. § 10304 (2012) (formerly 42 U.S.C. § 1973c).

During the period in which North Carolina jurisdictions were covered by § 5, African American electoral participation dramatically improved. In particular, between 2000 and 2012, when the law provided for the voting mechanisms at issue here and did not require photo ID, African American voter registration swelled by 51.1%. J.A. 804[1] (compared to an increase of 15.8% for white voters). African American turnout similarly surged, from 41.9% in 2000 to 71.5% in 2008 and 68.5% in 2012. J.A. 1196-97. Not coincidentally, during this period North Carolina emerged as a swing state in national elections.

Then, in late June 2013, the Supreme Court issued its opinion in Shelby County. In it, the Court invalidated the preclearance coverage formula, finding it based on outdated data. Shelby Cty., 133 S. Ct. at 2631. Consequently, as of that date, North Carolina no longer needed to preclear changes

---

[1] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

13

in its election laws.  As the district court found, the day after the Supreme Court issued Shelby County, the "Republican Chairman of the [Senate] Rules Committee[] publicly stated, 'I think we'll have an omnibus bill coming out' and . . . that the Senate would move ahead with the 'full bill.'"  N.C. State Conf. of the NAACP v. McCrory, 2016 WL 1650774, at *9 (M.D.N.C. Apr. 25, 2016).  The legislature then swiftly expanded an essentially single-issue bill into omnibus legislation, enacting it as Session Law ("SL") 2013-381.[2]

In this one statute, the North Carolina legislature imposed a number of voting restrictions.  The law required in-person voters to show certain photo IDs, beginning in 2016, which African Americans disproportionately lacked, and eliminated or reduced registration and voting access tools that African Americans disproportionately used.  Id. at *9-10, *37, *123, *127, *131.  Moreover, as the district court found, prior to enactment of SL 2013-381, the legislature requested and received racial data as to usage of the practices changed by the proposed law.  Id. at *136-38.

---

[2] The parties and the district court sometimes identify the law at issue in this case as House Bill or HB 589, the initial bill that originated in the House of the North Carolina General Assembly.  That bill was amended in the North Carolina Senate and then enacted as SL 2013-381.  See H.B. 589, 2013 Gen. Assemb. (N.C. 2013); 2013 N.C. Sess. Laws 381.

14

This data showed that African Americans disproportionately lacked the most common kind of photo ID, those issued by the Department of Motor Vehicles (DMV). Id. The pre-Shelby County version of SL 2013-381 provided that all government-issued IDs, even many that had been expired, would satisfy the requirement as an alternative to DMV-issued photo IDs. J.A. 2114-15. After Shelby County, with race data in hand, the legislature amended the bill to exclude many of the alternative photo IDs used by African Americans. Id. at *142; J.A. 2291-92. As amended, the bill retained only the kinds of IDs that white North Carolinians were more likely to possess. Id.; J.A. 3653, 2115, 2292.

The district court found that, prior to enactment of SL 2013-381, legislators also requested data as to the racial breakdown of early voting usage. Id. at *136-37. Early voting allows any registered voter to complete an absentee application and ballot at the same time, in person, in advance of Election Day. Id. at *4-5. Early voting thus increases opportunities to vote for those who have difficulty getting to their polling place on Election Day.

The racial data provided to the legislators revealed that African Americans disproportionately used early voting in both 2008 and 2012. Id. at *136-38; see also id. at *48 n.74 (trial evidence showing that 60.36% and 64.01% of African Americans voted early in 2008 and 2012, respectively, compared to 44.47%

15

and 49.39% of whites). In particular, African Americans disproportionately used the first seven days of early voting. Id. After receipt of this racial data, the General Assembly amended the bill to eliminate the first week of early voting, shortening the total early voting period from seventeen to ten days. Id. at *15, *136. As a result, SL 2013-381 also eliminated one of two "souls-to-the-polls" Sundays in which African American churches provided transportation to voters. Id. at *55.

The district court found that legislators similarly requested data as to the racial makeup of same-day registrants. Id. at *137. Prior to SL 2013-381, same-day registration allowed eligible North Carolinians to register in person at an early voting site at the same time as casting their ballots. Id. at *6. Same-day registration provided opportunities for those as yet unable to register, as well as those who had ended up in the "incomplete registration queue" after previously attempting to register. Id. at *65. Same-day registration also provided an easy avenue to re-register for those who moved frequently, and allowed those with low literacy skills or other difficulty completing a registration form to receive personal assistance from poll workers. See id.

The legislature's racial data demonstrated that, as the district court found, "it is indisputable that African American

16

voters disproportionately used [same-day registration] when it was available." Id. at *61. The district court further found that African American registration applications constituted a disproportionate percentage of the incomplete registration queue. Id. at *65. And the court found that African Americans "are more likely to move between counties," and thus "are more likely to need to re-register." Id. As evidenced by the types of errors that placed many African American applications in the incomplete queue, id. at *65, *123 & n.26, in-person assistance likely would disproportionately benefit African Americans. SL 2013-381 eliminated same-day registration. Id. at *15.

Legislators additionally requested a racial breakdown of provisional voting, including out-of-precinct voting. Id. at *136-37. Out-of-precinct voting required the Board of Elections in each county to count the provisional ballot of an Election Day voter who appeared at the wrong precinct, but in the correct county, for all of the ballot items for which the voter was eligible to vote. Id. at *5-6. This provision assisted those who moved frequently, or who mistook a voting site as being in their correct precinct.

The district court found that the racial data revealed that African Americans disproportionately voted provisionally. Id. at *137. In fact, the General Assembly that had originally enacted the out-of-precinct voting legislation had specifically

17

found that "of those registered voters who happened to vote provisional ballots outside their resident precincts" in 2004, "a disproportionately high percentage were African American." Id. at *138. With SL 2013-381, the General Assembly altogether eliminated out-of-precinct voting. Id. at *15.

African Americans also disproportionately used preregistration. Id. at *69. Preregistration permitted 16- and 17-year-olds, when obtaining driver's licenses or attending mandatory high school registration drives, to identify themselves and indicate their intent to vote. Id. at *7, *68. This allowed County Boards of Elections to verify eligibility and automatically register eligible citizens once they reached eighteen. Id. at *7. Although preregistration increased turnout among young adult voters, SL 2013-381 eliminated it. Id. at *15, *69.[3]

The district court found that not only did SL 2013-381 eliminate or restrict these voting mechanisms used disproportionately by African Americans, and require IDs that African Americans disproportionately lacked, but also that African Americans were more likely to "experience socioeconomic

---

[3] SL 2013-381 also contained many provisions that did not restrict access to voting or registration and thus are not subject to challenge here. N.C. State Conf., 2016 WL 1650774, at *9. Of course, as explained below, our holding regarding discriminatory intent applies only to the law's challenged portions.

18

factors that may hinder their political participation." Id. at *89. This is so, the district court explained, because in North Carolina, African Americans are "disproportionately likely to move, be poor, less educated, have less access to transportation, and experience poor health." Id. at *89.

Nevertheless, over protest by many legislators and members of the public, the General Assembly quickly ratified SL 2013-381 by strict party-line votes. Id. at *9-13. The Governor, who was of the same political party as the party that controlled the General Assembly, promptly signed the bill into law on August 12, 2013. Id. at *13.

That same day, the League of Women Voters, along with numerous other organizations and individuals, filed suit. Id. at *16. These Plaintiffs alleged that the restrictions on early voting and elimination of same-day registration and out-of-precinct voting were motivated by discriminatory intent in violation of § 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments; that these provisions had a discriminatory result in violation of § 2 of the Voting Rights Act; and that these provisions burdened the right to vote generally, in contravention of the Fourteenth Amendment. See id.

Also that same day, the North Carolina State Conference of the NAACP, in conjunction with several other organizations and individuals, filed a separate action. Id. They alleged that

19

the photo ID requirement and the provisions challenged by the
League of Women Voters produced discriminatory results under § 2
and demonstrated intentional discrimination in violation of the
Fourteenth and Fifteenth Amendments. Id. Soon thereafter, the
United States also filed suit, challenging the same provisions
as discriminatory in both purpose and result in violation of § 2
of the Voting Rights Act. Id. Finally, a group of "young
voters" intervened, alleging that these same provisions violated
their rights under the Fourteenth and Twenty-Sixth Amendments.
Id.[4] The district court consolidated the cases. Id.

Ahead of the 2014 midterm general election, Plaintiffs
moved for a preliminary injunction of several provisions of the
law. See N.C. State Conf. of the NAACP v. McCrory, 997 F. Supp.
2d 322, 339 (M.D.N.C. 2014). The district court denied the
motion. Id. at 383. On appeal, we reversed in part, remanding
the case with instructions to issue an order staying the
elimination of same-day registration and out-of-precinct voting.
League of Women Voters of N.C. v. North Carolina (LWV), 769 F.3d
224, 248-49 (4th Cir. 2014).

Over the dissent of two Justices, the Supreme Court stayed
our injunction mandate on October 8, 2014, pending its decision

---

[4] The complaints also challenged a few other provisions of
SL 2013-381 that are not challenged on appeal and so not
discussed here. See, e.g., J.A. 16448.

20

on certiorari.  See North Carolina v. League of Women Voters of N.C., 135 S. Ct. 6 (2014) (mem.).  On April 6, 2015, the Supreme Court denied certiorari.  See North Carolina v. League of Women Voters of N.C., 135 S.Ct. 1735 (2015) (mem.).  This denial automatically reinstituted the preliminary injunction, restoring same-day registration and out-of-precinct voting pending the outcome of trial in this case.  North Carolina v. League of Women Voters of N.C., 135 S. Ct. at 6.

That consolidated trial was scheduled to begin on July 13, 2015.  N.C. State Conf., 2016 WL 1650774, at *18.  However, on June 18, 2015, the General Assembly ratified House Bill 836, enacted as Session Law ("SL") 2015-103.  Id. at *13, *18.  This new law amended the photo ID requirement by permitting a voter without acceptable ID to cast a provisional ballot if he completed a declaration stating that he had a reasonable impediment to acquiring acceptable photo ID ("the reasonable impediment exception").  Id. at *13.  Given this enactment, the district court bifurcated trial of the case.  Id. at *18.  Beginning in July 2015, the court conducted a trial on the challenges to all of the provisions except the photo ID requirement.  Id.  In January 2016, the court conducted a separate trial on the photo ID requirement, as modified by the reasonable impediment exception.  Id.

21

On April 25, 2016, the district court entered judgment against the Plaintiffs on all of their claims as to all of the challenged provisions. Id. at *171. The court found no discriminatory results under § 2, no discriminatory intent under § 2 or the Fourteenth and Fifteenth Amendments, no undue burden on the right to vote generally under the Fourteenth Amendment, and no violation of the Twenty-Sixth Amendment. See id. at *133-34, *148, *164, *167. At the same time, acknowledging the imminent June primary election, the court temporarily extended the preliminary injunction of same-day registration and out-of-precinct voting through that election. Id. at *167. The photo ID requirement went into effect as scheduled for the first time in the March 2016 primary election, and was again in effect during the June primary election. Id. at *19, *171.

Plaintiffs timely noted this appeal. J.A. 24967, 24970, 24976, 24980. They also requested that we stay the district court's mandate and extend the preliminary injunction, which we did pending our decision in this case. Order Extending the Existing Stay, No. 16-1468 (Dkt. No. 122).

On appeal, Plaintiffs reiterate their attacks on the photo ID requirement, the reduction in days of early voting, and the elimination of same-day registration, out-of-precinct voting, and preregistration, alleging discrimination against African Americans and Hispanics. Because the record evidence is limited

22

regarding Hispanics, we confine our analysis to African Americans. We hold that the challenged provisions of SL 2013-381 were enacted with racially discriminatory intent in violation of the Equal Protection Clause of the Fourteenth Amendment and § 2 of the Voting Rights Act. We need not and do not reach Plaintiffs' remaining claims.

## II.

### A.

An appellate court can reverse a district court's factual findings only if clearly erroneous. United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). This standard applies to the ultimate factual question of a legislature's discriminatory motivation. See Pullman-Standard v. Swint, 456 U.S. 273, 287-88 (1982); Hunt v. Cromartie (Cromartie I), 526 U.S. 541, 549 (1999). Such a finding is clearly erroneous if review of the entire record leaves the appellate court "with the definite and firm conviction that the [d]istrict [c]ourt's key findings are mistaken." Easley v. Cromartie (Cromartie II), 532 U.S. 234, 243 (2001) (citation and internal quotation marks omitted). This is especially so when "the key evidence consisted primarily of documents and expert testimony" and "[c]redibility evaluations played a minor role." Id.

23

Moreover, if "the record permits only one resolution of the factual issue" of discriminatory purpose, then an appellate court need not remand the case to the district court. Pullman-Standard, at 292; see Cromartie II, 532 U.S. at 257 (reversing, without remanding, three-judge court's factual finding that racial intent predominated in creation of challenged redistricting plan); Hunter v. Underwood, 471 U.S. 222, 229 (1985) (affirming Court of Appeals' reversal without remand where district court's finding of no discriminatory purpose was clearly erroneous); Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 534, 542 (1979) (affirming Court of Appeals' reversal of finding of no intentional discrimination with remand only to enter remedy order).

In Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977), the Supreme Court addressed a claim that racially discriminatory intent motivated a facially neutral governmental action. The Court recognized that a facially neutral law, like the one at issue here, can be motivated by invidious racial discrimination. Id. at 264-66. If discriminatorily motivated, such laws are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race. Id.; Washington v. Davis, 426 U.S. 229, 241 (1976).

24

When considering whether discriminatory intent motivates a facially neutral law, a court must undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266. Challengers need not show that discriminatory purpose was the "sole[]" or even a "primary" motive for the legislation, just that it was "a motivating factor." Id. at 265-66 (emphasis added). Discriminatory purpose "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." Davis, 426 U.S. at 242. But the ultimate question remains: did the legislature enact a law "because of," and not "in spite of," its discriminatory effect. Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979).

In Arlington Heights, the Court set forth a nonexhaustive list of factors to consider in making this sensitive inquiry. These include: "[t]he historical background of the [challenged] decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from normal procedural sequence"; the legislative history of the decision; and of course, the disproportionate "impact of the official action -- whether it bears more heavily on one race than another." Arlington Heights, 429 U.S. at 266-67 (internal quotation marks omitted).

25

In instructing courts to consider the broader context surrounding the passage of legislation, the Court has recognized that "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." Cromartie I, 526 U.S. at 553. In a vote denial case such as the one here, where the plaintiffs allege that the legislature imposed barriers to minority voting, this holistic approach is particularly important, for "[d]iscrimination today is more subtle than the visible methods used in 1965." H.R. Rep. No. 109-478, at 6 (2006), as reprinted in 2006 U.S.C.C.A.N. 618, 620. Even "second-generation barriers" to voting, while facially race neutral, may nonetheless be motivated by impermissible racial discrimination. Shelby Cty., 133 S. Ct. at 2635 (Ginsburg, J., dissenting) (cataloguing ways in which facially neutral voting laws continued to discriminate against minorities even after passage of Voting Rights Act).

"Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." Hunter, 471 U.S. at 228. When determining if this burden has been met, courts must be mindful that "racial discrimination is not just another competing consideration." Arlington Heights, 429 U.S. at 265-66. For this reason, the judicial deference

26

accorded to legislators when "balancing numerous competing considerations" is "no longer justified." Id. Instead, courts must scrutinize the legislature's actual non-racial motivations to determine whether they alone can justify the legislature's choices. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); cf. Miss. Univ. for Women v. Hogan, 458 U.S. 718, 728 (1982) (describing "inquiry into the actual purposes underlying a statutory scheme" that classified based on gender (emphasis added) (internal quotation marks omitted)). If a court finds that a statute is unconstitutional, it can enjoin the law. See, e.g., Hunter, 471 U.S. at 231; Anderson v. Martin, 375 U.S. 399, 404 (1964).

### B.

In the context of a § 2 discriminatory intent analysis, one of the critical background facts of which a court must take notice is whether voting is racially polarized. Indeed, to prevail in a case alleging discriminatory dilution of minority voting strength under § 2, a plaintiff must prove this fact as a threshold showing. See Gingles, 478 U.S. at 51, 56, 62. Racial polarization "refers to the situation where different races . . . vote in blocs for different candidates." Id. at 62. This legal concept "incorporates neither causation nor intent" regarding voter preferences, for "[i]t is the difference between the choices made by blacks and whites -- not the reasons for

27

that difference -- that results" in the opportunity for
discriminatory laws to have their intended political effect.
Id. at 62-63.

While the Supreme Court has expressed hope that "racially
polarized voting is waning," it has at the same time recognized
that "racial discrimination and racially polarized voting are
not ancient history." Bartlett v. Strickland, 556 U.S. 1, 25
(2009). In fact, recent scholarship suggests that, in the years
following President Obama's election in 2008, areas of the
country formerly subject to § 5 preclearance have seen an
increase in racially polarized voting. See Stephen
Ansolabehere, Nathaniel Persily & Charles Stewart III, Regional
Differences in Racial Polarization in the 2012 Presidential
Election: Implications for the Constitutionality of Section 5 of
the Voting Rights Act, 126 Harv. L. Rev. F. 205, 206 (2013).
Further, "[t]his gap is not the result of mere partisanship, for
even when controlling for partisan identification, race is a
statistically significant predictor of vote choice, especially
in the covered jurisdictions." Id.

Racially polarized voting is not, in and of itself,
evidence of racial discrimination. But it does provide an
incentive for intentional discrimination in the regulation of
elections. In reauthorizing the Voting Rights Act in 2006,
Congress recognized that "[t]he potential for discrimination in

28

environments characterized by racially polarized voting is great." H.R. Rep. No. 109-478, at 35. This discrimination can take many forms. One common way it has surfaced is in challenges centered on vote dilution, where "manipulation of district lines can dilute the voting strength of <u>politically cohesive</u> minority group members." <u>De Grandy</u>, 512 U.S. at 1007 (emphasis added); <u>see also</u> <u>Voinovich v. Quilter</u>, 507 U.S. 146, 153-54 (1993). It is the political cohesiveness of the minority groups that provides the political payoff for legislators who seek to dilute or limit the minority vote.

The Supreme Court squarely confronted this connection in <u>LULAC</u>. There, the record evidence revealed racially polarized voting, such that 92% of Latinos voted against an incumbent of a particular party, whereas 88% of non-Latinos voted for him. 548 U.S. at 427. The Court explained how this racial polarization provided the impetus for the discriminatory vote dilution legislation at issue in that case: "In old District 23 the increase in Latino voter registration and overall population, the concomitant rise in Latino voting power in each successive election, the near-victory of the Latino candidate of choice in 2002, and the resulting threat to the" incumbent representative motivated the controlling party to dilute the minority vote. <u>Id.</u> at 428 (citation omitted). Although the Court grounded its holding on the § 2 results test, which does not require proof of

29

intentional discrimination, the Court noted that the challenged legislation bore "the mark of intentional discrimination." <u>Id.</u> at 440.

The <u>LULAC</u> Court addressed a claim of vote dilution, but its recognition that racially polarized voting may motivate politicians to entrench themselves through discriminatory election laws applies with equal force in the vote denial context. Indeed, it applies perhaps even more powerfully in cases like that at hand, where the State has restricted access to the franchise. This is so because, unlike in redistricting, where states may consider race and partisanship to a certain extent, <u>see, e.g.</u>, <u>Miller v. Johnson</u>, 515 U.S. 900, 920 (1995), legislatures cannot restrict voting access on the basis of race. (Nor, we note, can legislatures restrict access to the franchise based on the desire to benefit a certain political party. <u>See Anderson v. Celebrezze</u>, 460 U.S. 780, 792-93 (1983).)

Using race as a proxy for party may be an effective way to win an election. But intentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose. This is so even absent any evidence of race-based hatred and despite the obvious political dynamics. A state legislature acting on such a motivation engages in

30

intentional racial discrimination in violation of the Fourteenth Amendment and the Voting Rights Act.

### III.

With these principles in mind, we turn to their application in the case at hand.

#### A.

Arlington Heights directs us to consider "[t]he historical background of the decision" challenged as racially discriminatory. 429 U.S. at 267. Examination of North Carolina's history of race discrimination and recent patterns of official discrimination, combined with the racial polarization of politics in the state, seems particularly relevant in this inquiry. The district court erred in ignoring or minimizing these facts.

Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular. Although we recognize its limited weight, see Shelby Cty., 133 S. Ct. at 2628-29, North Carolina's pre-1965 history of pernicious discrimination informs our inquiry. For "[i]t was in the South that slavery was upheld by law until uprooted by the Civil War, that the reign of Jim Crow denied African-Americans the most basic freedoms, and that state and

31

local governments worked tirelessly to disenfranchise citizens on the basis of race." Id. at 2628.

While it is of course true that "history did not end in 1965," id., it is equally true that SL 2013-381 imposes the first meaningful restrictions on voting access since that date -- and a comprehensive set of restrictions at that. Due to this fact, and because the legislation came into being literally within days of North Carolina's release from the preclearance requirements of the Voting Rights Act, that long-ago history bears more heavily here than it might otherwise. Failure to so recognize would risk allowing that troubled history to "pick[] up where it left off in 1965" to the detriment of African American voters in North Carolina. LWV, 769 F.3d at 242.

In considering Plaintiffs' discriminatory results claim under § 2, the district court expressly and properly recognized the State's "shameful" history of "past discrimination." N.C. State Conf., 2016 WL 1650774, at *83-86. But the court inexplicably failed to grapple with that history in its analysis of Plaintiffs' discriminatory intent claim. Rather, when assessing the intent claim, the court's analysis on the point consisted solely of the finding that "there is little evidence of official discrimination since the 1980s," accompanied by a footnote dismissing examples of more recent official discrimination. See id. at *143.

32

That finding is clearly erroneous. The record is replete with evidence of instances since the 1980s in which the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans. In some of these instances, the Department of Justice or federal courts have determined that the North Carolina General Assembly acted with discriminatory intent, "reveal[ing] a series of official actions taken for invidious purposes." Arlington Heights, 429 U.S. at 267. In others, the Department of Justice or courts have found that the General Assembly's action produced discriminatory results. The latter evidence, of course, proves less about discriminatory intent than the former, but it is informative. A historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose. See, e.g., Veasey v. Abbott, No. 14-41127, 2016 WL 3923868 (5th Cir. July 20, 2016) (en banc) (considering as relevant, in intentional discrimination analysis of voter ID law, DOJ letters and previous court cases about results and intent).

The record reveals that, within the time period that the district court found free of "official discrimination" (1980 to 2013), the Department of Justice issued over fifty objection letters to proposed election law changes in North Carolina --

33

including several since 2000 -- because the State had failed to prove the proposed changes would have no discriminatory purpose or effect. See U.S. Dep't of Justice, Civil Rights Div., Voting Determination Letters for North Carolina (DOJ Letters) (Aug. 7, 2015), https://www.justice.gov/crt/voting-determination-letters-north-carolina; see also Regents of the Univ. of California v. Bakke, 438 U.S. 265, 305 (1978) (referring to objections of the Department of Justice under § 5 as "administrative finding[s] of discrimination").[5]  Twenty-seven of those letters objected to laws that either originated in the General Assembly or originated with local officials and were approved by the General Assembly. See DOJ Letters.

---

[5] Most recently, the Department of Justice objected to a law the General Assembly enacted in 2011, Session Law ("SL") 2011-174. That statute changed the method of election for the school board in Pitt County, North Carolina by reducing the number of members and adding an at-large seat. See Letter from Thomas E. Perez, Assistant Att'y General, Dept. of Just., to Robert T. Sonnenberg, In-house Counsel, Pitt Cty. Sch. (Apr. 30, 2012), at 1, available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/3 0/l_120430.pdf. The Department of Justice conducted an Arlington Heights analysis and declined to preclear the retrogressive law. Id. at 1-4. Key facts in the discriminatory intent analysis included: that "[t]he county's elections are generally racially polarized," that "African Americans have never elected a candidate of choice to a county-wide office," that "Pitt County has a history of challenges to at-large positions under the Voting Rights Act," that the process for enacting the law represented "a complete departure from the normal procedures," and that the "discriminatory effect was not necessary to achieve the stated goal" of the law. Id. at 2-4.

34

During the same period, private plaintiffs brought fifty-five successful cases under § 2 of the Voting Rights Act. J.A. 1260; Anita S. Earls et al., Voting Rights in North Carolina: 1982-2006, 17 S. Cal. Rev. L. & Soc. Just. 577 (2008). Ten cases ended in judicial decisions finding that electoral schemes in counties and municipalities across the state had the effect of discriminating against minority voters. See, e.g., Ward v. Columbus Cty., 782 F. Supp. 1097 (E.D.N.C. 1991); Johnson v. Halifax Cty., 594 F. Supp. 161 (E.D.N.C. 1984) (granting preliminary injunction). Forty-five cases were settled favorably for plaintiffs out of court or through consent degrees that altered the challenged voting laws. See, e.g., Daniels v. Martin Cty. Bd. of Comm'rs., No. 4:89-cv-00137 (E.D.N.C. 1992); Hall v. Kennedy, No. 3:88-cv-00117 (E.D.N.C. 1989); Montgomery Cty. Branch of the NAACP v. Montgomery Cty. Bd. of Elections, No. 3:90-cv-00027 (M.D.N.C. 1990). On several occasions, the United States intervened in cases or filed suit independently. See, e.g., United States v. Anson Bd. of Educ., No. 3:93-cv-00210 (W.D.N.C. 1994); United States v. Granville Cty. Bd. of Educ., No. 5:87-cv-00353 (E.D.N.C. 1989); United States v. Lenoir Cty., No. 87-105-cv-84 (E.D.N.C. 1987).

And, of course, the case in which the Supreme Court announced the standard governing § 2 results claims -- Thornburg v. Gingles -- was brought by a class of African American

35

citizens in North Carolina challenging a statewide redistricting plan. 478 U.S. at 35. There the Supreme Court affirmed findings by the district court that each challenged district exhibited "racially polarized voting," and held that "the legacy of official discrimination in voting matters, education, housing, employment, and health services . . . acted in concert with the multimember districting scheme to impair the ability" of African American voters to "participate equally in the political process." Id. at 80.

And only a few months ago (just weeks before the district court issued its opinion in the case at hand), a three-judge court addressed a redistricting plan adopted by the same General Assembly that enacted SL 2013-381. Harris v. McCrory, No. 1:13-CV-949, 2016 WL 482052, at *1-2 (M.D.N.C. Feb. 5, 2016), prob. juris. noted, __ S. Ct. __, No. 15-1262, 2016 WL 1435913 (June 27, 2016). The court held that race was the predominant motive in drawing two congressional districts, in violation of the Equal Protection Clause. Id. at *1-2, *17 & n.9. Contrary to the district court's suggestion, see N.C. State Conf., 2016 WL 1650774, at *143 n.223, a holding that a legislature impermissibly relied on race certainly provides relevant evidence as to whether race motivated other election legislation passed by the same legislature.

36

The district court failed to take into account these cases and their important takeaway:  that state officials continued in their efforts to restrict or dilute African American voting strength well after 1980 and up to the present day.  Only the robust protections of § 5 and suits by private plaintiffs under § 2 of the Voting Rights Act prevented those efforts from succeeding.  These cases also highlight the manner in which race and party are inexorably linked in North Carolina.  This fact constitutes a critical -- perhaps the most critical -- piece of historical evidence here.  The district court failed to recognize this linkage, leading it to accept "politics as usual" as a justification for many of the changes in SL 2013-381.  But that cannot be accepted where politics as usual translates into race-based discrimination.

As it did with the history of racial discrimination, the district court again recognized this reality when analyzing whether SL 2013-381 had a discriminatory <u>result</u>, but not when analyzing whether it was motivated by discriminatory <u>intent</u>.  In its results analysis, the court noted that racially polarized voting between African Americans and whites remains prevalent in North Carolina.  <u>N.C. State Conf.</u>, 2016 WL 1650774, at *86-87.  Indeed, at trial the State admitted as much.  <u>Id.</u> at *86.  As one of the State's experts conceded, "in North Carolina, African-American race is a better predictor for voting

37

Democratic than party registration." J.A. 21400. For example, in North Carolina, 85% of African American voters voted for John Kerry in 2004, and 95% voted for President Obama in 2008. N.C. State Conf., 2016 WL 1650774, at *86. In comparison, in those elections, only 27% of white North Carolinians voted for John Kerry, and only 35% for President Obama. Id.

Thus, whether the General Assembly knew the exact numbers, it certainly knew that African American voters were highly likely, and that white voters were unlikely, to vote for Democrats. And it knew that, in recent years, African Americans had begun registering and voting in unprecedented numbers. Indeed, much of the recent success of Democratic candidates in North Carolina resulted from African American voters overcoming historical barriers and making their voices heard to a degree unmatched in modern history.

Despite this, the district court took no issue with one of the legislature's stated purposes in enacting SL 2013-381 -- to "mov[e] the law back to the way it was." N.C. State Conf., 2016 WL 1650774, at *111. Rather, the court apparently regarded this as entirely appropriate. The court noted repeatedly that the voting mechanisms that SL 2013-381 restricts or eliminates were ratified "relatively recently," "almost entirely along party lines," when "Democrats controlled" the legislature; and that SL 2013-381 was similarly ratified "along party lines" after

38

"Republicans gained . . . control of both houses." Id. at *2-7, *12.

Thus, the district court apparently considered SL 2013-381 simply an appropriate means for one party to counter recent success by another party. We recognize that elections have consequences, but winning an election does not empower anyone in any party to engage in purposeful racial discrimination. When a legislature dominated by one party has dismantled barriers to African American access to the franchise, even if done to gain votes, "politics as usual" does not allow a legislature dominated by the other party to re-erect those barriers.

The record evidence is clear that this is exactly what was done here. For example, the State argued before the district court that the General Assembly enacted changes to early voting laws to avoid "political gamesmanship" with respect to the hours and locations of early voting centers. J.A. 22348. As "evidence of justifications" for the changes to early voting, the State offered purported inconsistencies in voting hours across counties, including the fact that only some counties had decided to offer Sunday voting. Id. The State then elaborated on its justification, explaining that "[c]ounties with Sunday voting in 2014 were disproportionately black" and "disproportionately Democratic." J.A. 22348-49. In response, SL 2013-381 did away with one of the two days of Sunday voting.

39

See N.C. State Conf., 2016 WL 1650774, at *15. Thus, in what comes as close to a smoking gun as we are likely to see in modern times, the State's very justification for a challenged statute hinges explicitly on race -- specifically its concern that African Americans, who had overwhelmingly voted for Democrats, had too much access to the franchise.[6]

These contextual facts, which reveal the powerful undercurrents influencing North Carolina politics, must be considered in determining why the General Assembly enacted SL 2013-381. Indeed, the law's purpose cannot be properly understood without these considerations. The record makes clear that the historical origin of the challenged provisions in this statute is not the innocuous back-and-forth of routine partisan struggle that the State suggests and that the district court accepted. Rather, the General Assembly enacted them in the immediate aftermath of unprecedented African American voter participation in a state with a troubled racial history and racially polarized voting. The district court clearly erred in ignoring or dismissing this historical background evidence, all of which supports a finding of discriminatory intent.

---

[6] Of course, state legislators also cannot impermissibly dilute or deny the votes of opponent political parties, see Anderson, 460 U.S. at 793 -- as this same General Assembly was found to have done earlier this year. See Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections, No. 16-1270, 2016 WL 3568147 (4th Cir. July 1, 2016).

40

B.

Arlington Heights also instructs us to consider the "specific sequence of events leading up to the challenged decision." 429 U.S. at 267. In doing so, a court must consider "[d]epartures from the normal procedural sequence," which may demonstrate "that improper purposes are playing a role." Id. The sequential facts found by the district court are undeniably accurate. N.C. State Conf., 2016 WL 1650774, at *8-13. Indeed, they are undisputed. Id. And they are devastating. The record shows that, immediately after Shelby County, the General Assembly vastly expanded an earlier photo ID bill and rushed through the legislative process the most restrictive voting legislation seen in North Carolina since enactment of the Voting Rights Act of 1965. Id. The district court erred in refusing to draw the obvious inference that this sequence of events signals discriminatory intent.

The district court found that prior to Shelby County, SL 2013-381 numbered only sixteen pages and contained none of the challenged provisions, with the exception of a much less restrictive photo ID requirement. Id. at *8, *143-44. As the court further found, this pre-Shelby County bill was afforded more than three weeks of debate in public hearings and almost three more weeks of debate in the House. Id. at *8. For this version of the bill, there was some bipartisan support: "[f]ive

41

House Democrats joined all present Republicans in voting for the voter-ID bill." Id.

The district court found that SL 2013-381 passed its first read in the Senate on April 25, 2013, where it remained in the Senate Rules Committee. Id. At that time, the Supreme Court had heard argument in Shelby County, but had issued no opinion. Id. "So," as the district court found, "the bill sat." Id. For the next two months, no public debates were had, no public amendments made, and no action taken on the bill.

Then, on June 25, 2013, the Supreme Court issued its opinion in Shelby County. Id. at *9. The very next day, the Chairman of the Senate Rules Committee proclaimed that the legislature "would now move ahead with the full bill," which he recognized would be "omnibus" legislation. Id. at *9. After that announcement, no further public debate or action occurred for almost a month. Id. As the district court explained, "[i]t was not until July 23 . . . that an expanded bill, including the election changes challenged in this case, was released." Id. at *144.

The new bill -- now fifty-seven pages in length -- targeted four voting and registration mechanisms, which had previously expanded access to the franchise, and provided a much more stringent photo ID provision. See 2013 N.C. Sess. Laws 381. Post-Shelby County, the change in accepted photo IDs is of

42

particular note: the new ID provision retained only those types of photo ID disproportionately held by whites and excluded those disproportionately held by African Americans. N.C. State Conf., 2016 WL 1650774, at *37, *142. The district court specifically found that "the removal of public assistance IDs" in particular was "suspect," because "a reasonable legislator [would be] aware of the socioeconomic disparities endured by African Americans [and] could have surmised that African Americans would be more likely to possess this form of ID." Id. at *142.

Moreover, after the General Assembly finally revealed the expanded SL 2013-381 to the public, the legislature rushed it through the legislative process. The new SL 2013-381 moved through the General Assembly in three days: one day for a public hearing, two days in the Senate, and two hours in the House. Id. at *9-12. The House Democrats who supported the pre-Shelby County bill now opposed it. Id. at *12. The House voted on concurrence in the Senate's version, rather than sending the bill to a committee. Id. at *12. This meant that the House had no opportunity to offer its own amendments before the up-or-down vote on the legislation; that vote proceeded on strict party lines. Id.; see J.A. 1299; N.C. H.R. Rules 43.2, 43.3, 44. The Governor, of the same party as the proponents of the bill, then signed the bill into law. N.C. State Conf., 2016 WL 1650774, at *13. This hurried pace, of course, strongly

43

suggests an attempt to avoid in-depth scrutiny. See, e.g., Veasey, 2016 WL 3923868, at *12 (noting as suspicious voter ID law's "three-day passage through the Senate"). Indeed, neither this legislature -- nor, as far as we can tell, any other legislature in the Country -- has ever done so much, so fast, to restrict access to the franchise.

The district court erred in accepting the State's efforts to cast this suspicious narrative in an innocuous light. To do so, the court focused on certain minor facts instead of acknowledging the whole picture. For example, although the court specifically found the above facts, it dismissed Plaintiffs' argument that this sequence of events demonstrated unusual legislative speed because the legislature "acted within all [of its] procedural rules." N.C. State Conf., 2016 WL 1650774, at *145. But, of course, a legislature need not break its own rules to engage in unusual procedures. Even just compared to the process afforded the pre-Shelby County bill, the process for the "full bill" was, to say the very least, abrupt.

Similarly, the district court accused Plaintiffs of "ignor[ing] the extensive debate and consideration the initial voter-ID bill received in the spring." Id. at *146. But because the pre-Shelby County bill did not contain any of the provisions challenged here, that debate hardly seems probative. The district court also quoted one senator who opposed the new

44

"full bill" as saying that the legislators had "a good and thorough debate." Id. at *12, *145. We note, however, that many more legislators expressed dismay at the rushed process. Id. at *145. Indeed, as the court itself noted, "[s]everal Democratic senators characterized the bill as voter suppression of minorities. Others characterized the bill as partisan." Id. at *12 (citations omitted). Republican senators "strongly denied such claims," while at the same time linking the bill to partisan goals: that "the bill reversed past practices that Democrats passed to favor themselves." Id.

Finally, the district court dismissed the expanded law's proximity to the Shelby County decision as above suspicion. The Court found that the General Assembly "would not have been unreasonable" to wait until after Shelby County to consider the "full bill" because it could have concluded that the provisions of the "full bill" were "simply not worth the administrative and financial cost" of preclearance. Id. at *144. Although desire to avoid the hassle of the preclearance process could, in another case, justify a decision to await the outcome in Shelby County, that inference is not persuasive in this case. For here, the General Assembly did not simply wait to enact changes to its election laws that might require the administrative hassle of, but likely would pass, preclearance. Rather, after Shelby County it moved forward with what it acknowledged was an

45

omnibus bill that restricted voting mechanisms it knew were used disproportionately by African Americans, <u>id.</u> at *148, and so likely would not have passed preclearance. And, after <u>Shelby County</u>, the legislature substantially changed the one provision that it had fully debated before. As noted above, the General Assembly completely revised the list of acceptable photo IDs, removing from the list the IDs held disproportionately by African Americans, but retaining those disproportionately held by whites. <u>Id.</u> at *37, *142. This fact alone undermines the possibility that the post-<u>Shelby County</u> timing was merely to avoid the administrative costs.

Instead, this sequence of events -- the General Assembly's eagerness to, at the historic moment of <u>Shelby County</u>'s issuance, rush through the legislative process the most restrictive voting law North Carolina has seen since the era of Jim Crow -- bespeaks a certain purpose. Although this factor, as with the other <u>Arlington Heights</u> factors, is not dispositive on its own, it provides another compelling piece of the puzzle of the General Assembly's motivation.

C.

<u>Arlington Heights</u> also recognizes that the legislative history leading to a challenged provision "may be highly relevant, especially where there are contemporaneous statements by members of the decisionmaking body, minutes of its meetings,

46

or reports." 429 U.S. at 268. Above, we have discussed much of what can be gleaned from the legislative history of SL 2013-381 in the sequence of events leading up to its enactment.

No minutes of meetings about SL 2013-381 exist. And, as the Supreme Court has recognized, testimony as to the purpose of challenged legislation "frequently will be barred by [legislative] privilege." Id. That is the case here. See N.C. State Conf., 2016 WL 1650774, at *71 n.124. The district court was correct to note that statements from only a few legislators, or those made by legislators after the fact, are of limited value. See id. at 146; Barber v. Thomas, 560 U.S. 474, 485-86 (2010); Hunter, 471 U.S. at 228.[7]

---

[7] Some of the statements by those supporting the legislation included a Republican precinct chairman who testified before the House Rules Committee that the photo ID requirement would "disenfranchise some of [Democrats'] special voting blocks [sic]," and that "that within itself is the reason for the photo voter ID, period, end of discussion." See J.A. 1313-14; Yelton testimony, Transcript of Public Hearing of the North Carolina General Assembly, House Elections Committee (Apr. 10, 2013) at 51. Responding to the outcry over the law after its enactment, the same witness later said publicly: "If [SL 2013-381] hurts the whites so be it. If it hurts a bunch of lazy blacks that want the government to give them everything, so be it." See J.A. 1313-14; Joe Coscarelli, Don Yelton, GOP Precinct Chair, Delivers Most Baldly Racist Daily Show Interview of All Time, New York Magazine, Oct. 24, 2013. These statements do not prove that any member of the General Assembly necessarily acted with discriminatory intent. But the sheer outrageousness of these public statements by a party leader does provide some evidence of the racial and partisan political environment in which the General Assembly enacted the law.

47

We do find worthy of discussion, however, the General
Assembly's requests for and use of race data in connection with
SL 2013-381.  As explained in detail above, prior to and during
the limited debate on the expanded omnibus bill, members of the
General Assembly requested and received a breakdown by race of
DMV-issued ID ownership, absentee voting, early voting, same-day
registration, and provisional voting (which includes out-of-
precinct voting).  N.C. State Conf., 2016 WL 1650774, at *136-
38, *148; J.A. 1628-29, 1637, 1640-41, 1782-97, 3084-3119.

This data revealed that African Americans
disproportionately used early voting, same-day registration, and
out-of-precinct voting, and disproportionately lacked DMV-issued
ID.  N.C. State Conf., 2016 WL 1650774, at *148; J.A. 1782-97,
3084-3119.  Not only that, it also revealed that African
Americans did not disproportionately use absentee voting; whites
did.  J.A. 1796-97, 3744-47.  SL 2013-381 drastically restricted
all of these other forms of access to the franchise, but
exempted absentee voting from the photo ID requirement.  In sum,
relying on this racial data, the General Assembly enacted
legislation restricting all -- and only -- practices
disproportionately used by African Americans.  When juxtaposed
against the unpersuasive non-racial explanations the State
proffered for the specific choices it made, discussed in more

48

detail below, we cannot ignore the choices the General Assembly made with this data in hand.

D.

Finally, Arlington Heights instructs that courts also consider the "impact of the official action" -- that is, whether "it bears more heavily on one race than another."  429 U.S. at 266 (internal quotation marks omitted).  The district court expressly found that "African Americans disproportionately used" the removed voting mechanisms and disproportionately lacked DMV-issued photo ID.  N.C. State Conf., 2016 WL 1650774, at *37, *136.  Nevertheless, the court concluded that this "disproportionate[] use[]" did not "significantly favor a finding of discriminatory purpose."  Id. at *143.  In doing so, the court clearly erred.  Apparently, the district court believed that the disproportionate impact of the new legislation "depends on the options remaining" after enactment of the legislation.  Id. at *136.  Arlington Heights requires nothing of the kind.

The Arlington Heights Court recognized that "[t]he impact of [a governmental] decision" not to rezone for low-income housing "bear[s] more heavily on racial minorities."  429 U.S. at 269.  In concluding that the zoning decision had a disproportionate impact, the Court explained that "[m]inorities constitute[d] 18% of the Chicago area population, and 40% of the

49

income groups said to be eligible for" the low-income housing. Id. The Court did not require those minority plaintiffs to show that the Chicago area as a whole lacked low-income housing or that the plaintiffs had no other housing options. Instead, it was sufficient that the zoning decision excluded them from a particular area. Id. at 260, 265-66, 269; see also City of Memphis v. Greene, 451 U.S. 100, 110, 126 (1981) (indicating that closing a street used primarily by African Americans had a disproportionate impact, even though "the extent of the inconvenience [was] not great").

Thus, the standard the district court used to measure impact required too much in the context of an intentional discrimination claim. When plaintiffs contend that a law was motivated by discriminatory intent, proof of disproportionate impact is not "the sole touchstone" of the claim. Davis, 426 U.S. at 242. Rather, plaintiffs asserting such claims must offer other evidence that establishes discriminatory intent in the totality of the circumstances. Id. at 239-42. Showing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent.[8]

---

[8] Interpreting Arlington Heights to require a more onerous impact showing would eliminate the distinction between discriminatory results claims under § 2 of the Voting Rights Act (Continued)

50

Accordingly, the district court's findings that African Americans disproportionately used each of the removed mechanisms, as well as disproportionately lacked the photo ID required by SL 2013-381, if supported by the evidence, establishes sufficient disproportionate impact for an Arlington Heights analysis. As outlined above, the record evidence provides abundant support for that holding.

Moreover, the district court also clearly erred in finding that the cumulative impact of the challenged provisions of SL 2013-381 does not bear more heavily on African Americans. See Clingman v. Beaver, 544 U.S. 581, 607-08 (2005) (O'Connor, J., concurring) ("A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition."). For example, the photo ID requirement inevitably increases the steps required to vote, and so slows the process. The early voting provision reduced the number of days in which citizens can vote, resulting in more voters voting

_____

and discriminatory intent claims under § 2 and the Constitution. When plaintiffs contend that a law has a discriminatory result under § 2, they need prove only impact. In that context, of course plaintiffs must make a greater showing of disproportionate impact. Otherwise, plaintiffs could prevail in any and every case in which they proved any impact.

51

on Election Day.[9]  Together, these produce longer lines at the polls on Election Day, and absent out-of-precinct voting, prospective Election Day voters may wait in these longer lines only to discover that they have gone to the wrong precinct and are unable to travel to their correct precincts.  Thus, cumulatively, the panoply of restrictions results in greater disenfranchisement than any of the law's provisions individually.

The district court discounted the claim that these provisions burden African Americans, citing the fact that similar election laws exist or have survived challenges in other states.  See, e.g., N.C. State Conf., 2016 WL 1650774, at *45, *139 (photo ID), *46 (early voting), *57 (same-day registration), *66 (out-of-precinct voting), *69 (preregistration).  But the sheer number of restrictive

---

[9] The State unpersuasively contends that SL 2013-381's "same hours" provision leaves the opportunity to vote early "materially the same as the early voting opportunities before the bill was enacted," despite the reduction in early voting days.  State Br. 51 (internal quotation marks omitted).  The same hours provision requires counties to offer the same number of aggregate hours of early voting in midterm and presidential elections as they did in the comparable 2010 midterm or 2012 presidential elections.  N.C. State Conf., 2016 WL 1650774, at *11.  A critical problem with the State's argument is that the law provided that any county could waive out of this requirement, and, in 2014, about 30% of the counties did waive out of the requirement.  See J.A. 9541-44.  Moreover, longer lines during the reduced number of days in which citizens can vote would necessitate opening new polling sites and placing them in high-demand locations; the law does not require either.

52

provisions in SL 2013-381 distinguishes this case from others. See, e.g., Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 185 (2008) (challenging only a photo ID requirement); Hunter, 471 U.S. at 223 (challenging only a felon and misdemeanant disenfranchisement law); Veasey, 2016 WL 3923868, at *1 (challenging only a photo ID requirement). Moreover, removing voting tools that have been disproportionately used by African Americans meaningfully differs from not initially implementing such tools. Cf. Harper v. Va. Bd. of Elections, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

The district court also erred in suggesting that Plaintiffs had to prove that the challenged provisions prevented African Americans from voting at the same levels they had in the past. No law implicated here -- neither the Fourteenth Amendment nor § 2 -- requires such an onerous showing. Emblematic of this error is the almost dispositive weight the court gave to the fact that African American aggregate turnout increased by 1.8% in the 2014 midterm election as compared to the 2010 midterm election. See N.C. State Conf., 2016 WL 1650774, at *18, *122, *132. In addition to being beyond the scope of disproportionate impact analysis under Arlington Heights, several factors counsel against such an inference.

53

First, as the Supreme Court has explained, courts should not place much evidentiary weight on any one election. See Gingles, 478 U.S. at 74-77 (noting that the results of multiple elections are more probative than the result of a single election, particularly one held during pending litigation). This is especially true for midterm elections. As the State's own expert testified, fewer citizens vote in midterm elections, and those that do are more likely to be better educated, repeat voters with greater economic resources. J.A. 23801-02; cf. League of Women Voters of North Carolina, 135 S. Ct. at 6-7 (Ginsburg, J., dissenting) (noting that midterm primary elections are "highly sensitive to factors likely to vary from election to election," more so than presidential elections).

Moreover, although aggregate African American turnout increased by 1.8% in 2014, many African American votes went uncounted. As the district court found, African Americans disproportionately cast provisional out-of-precinct ballots, which would have been counted absent SL 2013-381. See N.C. State Conf., 2016 WL 1650774, at *63. And thousands of African Americans were disenfranchised because they registered during what would have been the same-day registration period but because of SL 2013-381 could not then vote. See id. at *67. Furthermore, the district court failed to acknowledge that a 1.8% increase in voting actually represents a significant

54

decrease in the rate of change.  For example, in the prior four-
year period, African American midterm voting had increased by
12.2%.  J.A. 1197.

In sum, while the district court recognized the undisputed
facts as to the impact of the challenged provisions of SL 2013-
381, it simply refused to acknowledge their import.  The court
concluded its analysis by remarking that these provisions simply
eliminated a system "preferred" by African Americans as "more
convenient."  N.C. State Conf., 2016 WL 1650774, at *170.  But
as the court itself found elsewhere in its opinion, "African
Americans . . . in North Carolina are disproportionately likely
to move, be poor, less educated, have less access to
transportation, and experience poor health."  Id. at *89.

These socioeconomic disparities establish that no mere
"preference" led African Americans to disproportionately use
early voting, same-day registration, out-of-precinct voting, and
preregistration.  Nor does preference lead African Americans to
disproportionately lack acceptable photo ID.  Yet the district
court refused to make the inference that undeniably flows from
the disparities it found many African Americans in North
Carolina experienced.  Registration and voting tools may be a
simple "preference" for many white North Carolinians, but for
many African Americans, they are a necessity.

55

E.

In sum, assessment of the <u>Arlington Heights</u> factors requires the conclusion that, at least in part, discriminatory racial intent motivated the enactment of the challenged provisions in SL 2013-381. The district court clearly erred in holding otherwise. In large part, this error resulted from the court's consideration of each piece of evidence in a vacuum, rather than engaging in the totality of the circumstances analysis required by <u>Arlington Heights</u>. Any individual piece of evidence can seem innocuous when viewed alone, but gains an entirely different meaning when considered in context.

Our conclusion does not mean, and we do not suggest, that any member of the General Assembly harbored racial hatred or animosity toward any minority group. But the totality of the circumstances -- North Carolina's history of voting discrimination; the surge in African American voting; the legislature's knowledge that African Americans voting translated into support for one party; and the swift elimination of the tools African Americans had used to vote and imposition of a new barrier at the first opportunity to do so -- cumulatively and unmistakably reveal that the General Assembly used SL 2013-381 to entrench itself. It did so by targeting voters who, based on race, were unlikely to vote for the majority party. Even if done for partisan ends, that constituted racial discrimination.

56

IV.

Because Plaintiffs have established race as a factor that motivated enactment of the challenged provisions of SL 2013-381, the burden now "shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." Hunter, 471 U.S. at 228; Arlington Heights, 429 U.S. at 271 n.21.[10]    Once the burden shifts, a court must carefully scrutinize a state's non-racial motivations to determine whether they alone can explain enactment of the challenged law. Arlington Heights, 429 U.S. at 265-66. "[J]udicial deference" to the legislature's stated justifications "is no longer justified." Id.

A court assesses whether a law would have been enacted without a racially discriminatory motive by considering the substantiality of the state's proffered non-racial interest and how well the law furthers that interest. See Hunter, 471 U.S. at 228-33; see also Mhany Mgmt., Inc. v. Cty. of Nassau, 819 F.3d 581, 614 (2d Cir. 2016) (considering "whether [non-racial] concerns were sufficiently strong to cancel out any

_____

[10] We note that at least one of our sister circuits has rejected the second step of this inquiry as inappropriate for intent claims under § 2. See Askew v. City of Rome, 127 F.3d 1355, 1373 (11th Cir. 1997) ("[I]t is not a defense under the Voting Rights Act that the same action would have been taken regardless of the racial motive.").

57

discriminatory animus" after shifting the burden under Arlington Heights in a Fair Housing Act claim).

Given a state's interest in the fair administration of its elections, a rational justification can be imagined for many election laws, including some of the challenged provisions here. But a court must be mindful of the number, character, and scope of the modifications enacted together in a single challenged law like SL 2013-381. Only then can a court determine whether a legislature would have enacted that law regardless of its impact on African American voters.

In this case, despite finding that race was not a motivating factor for enactment of the challenged provisions of SL 2013-381, the district court addressed the State's justifications for each provision at length. N.C. State Conf., 2016 WL 1650774, at *96-116, *147. The court did so, however, through a rational-basis-like lens. For example, the court found the General Assembly's decision to eliminate same-day registration "not unreasonable," and found "at least plausible" the reasons offered for excluding student IDs from the list of qualifying IDs. Id. at *108, *142. But, of course, a finding that legislative justifications are "plausible" and "not unreasonable" is a far cry from a finding that a particular law would have been enacted without considerations of race. As the Supreme Court has made clear, such deference in that inquiry is

58

wholly inappropriate. See Arlington Heights, 429 U.S. at 265-66 (explaining that because "racial discrimination is not just another competing consideration," a court must do much more than review for "arbitrariness or irrationality").

Accordingly, the ultimate findings of the district court regarding the compelling nature of the State's interests are clearly erroneous. Typically, that fact would recommend remand. But we need not remand where the record provides "a complete understanding" of the merits, Tejada v. Dugger, 941 F.2d 1551, 1555 (11th Cir. 1991) (internal quotation marks omitted), and "permits only one resolution of the factual issue," Pullman-Standard, 456 U.S. at 292. See also Withrow v. Larkin, 421 U.S. 35, 45 (1975) (declining to remand where Court "doubt[ed] that such action . . . would add anything essential to the determination of the merits"). After a total of four weeks of trial, the district court entered a 479-page order based on more than 25,000 pages of evidence. N.C. State Conf., 2016 WL 1650774, at *2. Although the court erred with respect to the appropriate degree of deference due to the State's proffered justifications, that error affected only its ultimate finding regarding their persuasive weight; it did not affect the court's extensive foundational findings regarding those justifications.

These foundational findings as to justifications for SL 2013-381 provide a more than sufficient basis for our review of

59

that law. For we are satisfied that this record is "complete," indeed as "complete" as could ever reasonably be expected, and that remand would accomplish little. <u>Tejada</u>, 941 F.2d at 1555; <u>see</u> <u>Withrow</u>, 421 U.S. at 45. And, after painstaking review of the record, we must also conclude that it "permits only one resolution of the factual issue." <u>Pullman-Standard</u>, 456 U.S. at 292. The record evidence plainly establishes race as a "but-for" cause of SL 2013-381. <u>See</u> <u>Hunter</u>, 471 U.S. at 232.

In enacting the photo ID requirement, the General Assembly stated that it sought to combat voter fraud and promote public confidence in the electoral system. <u>See</u> 2013 N.C. Sess. Laws 381. These interests echo those the <u>Crawford</u> Court held justified a photo ID requirement in Indiana. 553 U.S. at 194-97. The State relies heavily on that holding. But that reliance is misplaced because of the fundamental differences between <u>Crawford</u> and this case.

The challengers in <u>Crawford</u> did not even allege intentional race discrimination. Rather, they mounted a facial attack on a photo ID requirement as unduly burdensome on the right to vote generally. The <u>Crawford</u> Court conducted an "<u>Anderson</u>-<u>Burdick</u>" analysis, balancing the burden of a law on voters against the state's interests, and concluded that the photo ID requirement "impose[d] only a limited burden on voters' rights." <u>Crawford</u>, 553 U.S. at 202-03 (internal quotation marks omitted). Given

60

that limited burden, the Court deferred to the Indiana legislature's choice of how to best serve its legitimate interests. See id. at 194-97, 203.

That deference does not apply here because the evidence in this case establishes that, at least in part, race motivated the North Carolina legislature. Thus, we do not ask whether the State has an interest in preventing voter fraud -- it does -- or whether a photo ID requirement constitutes one way to serve that interest -- it may -- but whether the legislature would have enacted SL 2013-381's photo ID requirement if it had no disproportionate impact on African American voters. The record evidence establishes that it would not have.

The photo ID requirement here is both too restrictive and not restrictive enough to effectively prevent voter fraud; "[i]t is at once too narrow and too broad." Romer v. Evans, 517 U.S. 620, 633 (1996); see Anderson, 460 U.S. at 805 (rejecting election law as "both too broad and too narrow"). First, the photo ID requirement, which applies only to in-person voting and not to absentee voting, is too narrow to combat fraud. On the one hand, the State has failed to identify even a single individual who has ever been charged with committing in-person voter fraud in North Carolina. See J.A. 6802. On the other, the General Assembly did have evidence of alleged cases of mail-in absentee voter fraud. J.A. 1678, 6802. Notably, the

61

legislature also had evidence that absentee voting was <u>not</u> disproportionately used by African Americans; indeed, whites disproportionately used absentee voting. J.A. 1796-97. The General Assembly then exempted absentee voting from the photo ID requirement. 2013 N.C. Sess. Laws 381, pt. 4. This was so even though members of the General Assembly had proposed amendments to require photo ID for absentee voting, N.C. Gen. Assemb. Proposed Amend. No. A2, H589-AST-50 [v.2] (April 24, 2013), and the bipartisan State Board of Elections[11] specifically requested that the General Assembly remedy the potential for mail-in absentee voter fraud and expressed no concern about in-person voter fraud, J.A. 1678.

The photo ID requirement is also too broad, enacting seemingly irrational restrictions unrelated to the goal of combating fraud. This overbreadth is most stark in the General Assembly's decision to exclude as acceptable identification all forms of state-issued ID disproportionately held by African Americans. See <u>N.C. State Conf.</u>, 2016 WL 1650774, at *142. The State has offered little evidence justifying these exclusions.

---

[11] The North Carolina State Board of Elections is the state agency responsible for administering the elections process and overseeing campaign finance disclosure. N.C. Gen. Stat. § 163-19 (2016); <u>see also</u> About Us, North Carolina State Board of Elections, http://www.ncsbe.gov/about-us (last visited July 25, 2016). The Board is composed of five members appointed by the Governor, three of which belong to the same party as the Governor. <u>See</u> N.C. Gen. Stat § 163-19.

Review of the record further undermines the contention that the exclusions are tied to concerns of voter fraud. This is so because voters who lack qualifying ID under SL 2013-381 may apply for a free voter card using two of the very same forms of ID excluded by the law. See N.C. State Conf., 2016 WL 1650774, at *26. Thus, forms of state-issued IDs the General Assembly deemed insufficient to prove a voter's identity on Election Day are sufficient if shown during a separate process to a separate state official. In this way, SL 2013-381 elevates form over function, creating hoops through which certain citizens must jump with little discernable gain in deterrence of voter fraud.[12]

The State's proffered justifications regarding restrictions on early voting similarly fail. The State contends that one purpose of SL 2013-381's reduction in early voting days was to correct inconsistencies among counties in the locations and hours of early voting centers. J.A. 3325; 22348-50. See, e.g., J.A. 3325 (senator supporting the law: "what we're trying to do is put some consistency into the process and allow for the

---

[12] Tellingly, as discussed above, it was only after Shelby County that the General Assembly removed these IDs, retaining as acceptable ID only those disproportionately held by whites. N.C. State Conf., 2016 WL 1650774, at *142. Further, the General Assembly had before it recommendations from the State Board of Elections that the law include some of the excluded IDs. J.A. 6866, 7392. Thus, the record evidence indicates that the General Assembly's decision in the wake of Shelby County to exclude certain IDs had less to do with combating fraud, and more to do with the race of the ID holders.

63

facilities to be similarly treated in one county as in being [sic] all the counties"). In some minor ways, SL 2013-381 does achieve consistency in the availability of early voting <u>within</u> each county. <u>See</u> N.C. Gen. Stat. § 163-227.2(g) (mandating the same days and hours within counties).

But the record does not offer support for the view that SL 2013-381 actually achieved consistency in early voting <u>among</u> the various counties. For example, while the State contends that it meant to eliminate inconsistencies between counties in the availability of Sunday early voting, <u>see, e.g.</u>, J.A. 12997-98; 20943-44; 22348-49, SL 2013-381 offers no fix for that. Rather, it permits the Board of Elections of each county to determine, in the Board's discretion, whether to provide Sunday hours during early voting. <u>See</u> J.A. 3325 (senator supporting the law: "[the law] still leaves the county the choice of opening on a Sunday or not opening on Sunday"); <u>cf.</u> N.C. Gen. Stat. § 163-227.2(f) ("A county board <u>may</u> conduct [early voting] during evenings or on weekends . . . ." (emphasis added)). Moreover, as discussed above, the State explicitly and problematically linked these "inconsistencies" in Sunday early voting to race and party. J.A. 22348-49.

In other ways, the challenged provision actually promotes <u>inconsistency</u> in the availability of early voting across North Carolina. SL 2013-381 mandates that County Boards of Elections

64

offer at least the same number of aggregate hours of early voting as offered in 2010 for future non-presidential elections and as offered in 2012 for future presidential elections. See N.C. Gen. Stat. § 163-227.2(g2). If, as the State asserts, the 2010 and 2012 elections saw great disparities in voting hours across county lines, SL 2013-381 in effect codifies those inconsistencies by requiring those same county-specific hours for all future elections.

Moreover, in its quest for "consistency" in the availability of early voting, the General Assembly again disregarded the recommendations of the State Board of Elections. The Board counseled that, although reducing the number of days of early voting might ease administrative burdens for lower turnout elections, doing so for high-turnout elections would mean that "North Carolina voters' needs will not be accommodated." J.A. 1700. The Board explained that reducing early voting days would mean that "traffic will be increased on Election Day, increasing demands for personnel, voting equipment and other supplies, and resulting in likely increases to the cost of elections." J.A. 1700; see also J.A. 1870-72 (reducing early voting days, according to one County Board of Elections, would lead to "increased costs, longer lines, increased wait times, understaffed sites, staff burn-out leading to mistakes,

65

and inadequate polling places; or, in a worst case scenario, all of these problems together").

Concerning same-day registration, the State justifies its elimination as a means to avoid administrative burdens that arise when verifying the addresses of those who register at the very end of the early voting period. These concerns are real. Even so, the complete elimination of same-day registration hardly constitutes a remedy carefully drawn to accomplish the State's objectives. The General Assembly had before it alternative proposals that would have remedied the problem without abolishing the popular program. J.A. 1533-34; 6827-28. The State Board of Elections had reported that same-day registration "was a success." J.A. 1529. The Board acknowledged some of the conflicts between same-day registration and mail verification, J.A. 1533-34, but clarified that "same day registration does not result in the registration of voters who are any less qualified or eligible to vote than" traditional registrants, J.A. 6826, and that "undeliverable verification mailings were not caused by the nature of same day registration," J.A. 6827. Indeed, over 97% of same-day registrants passed the mail verification process. J.A. 6826. The State Board of Elections believed this number would have been higher had some counties not delayed the mail verification process in violation of the law. J.A. 6826-28.

66

Again, the General Assembly ignored this advice. In other circumstances we would defer to the prerogative of a legislature to choose among competing policy proposals. But, in the broader context of SL 2013-381's multiple restrictions on voting mechanisms disproportionately used by African Americans, we conclude that the General Assembly would not have eliminated same-day registration entirely but-for its disproportionate impact on African Americans.

Turning to the elimination of out-of-precinct voting, the State initially contended that the provision was justified to "move[] the law back to the way it was"; i.e., the way it was before it was broadened to facilitate greater participation in the franchise by minority voters. J.A. 3307. Recognizing the weakness of that justification, during the litigation of this case, the State asserted that the General Assembly abolished out-of-precinct voting to "permit[] election officials to conduct elections in a timely and efficient manner." J.A. 22328. Such post hoc rationalizations during litigation provide little evidence as to the actual motivations of the legislature. See Miss. Univ. for Women, 458 U.S. at 730 (analyzing whether the State's recited justification was "the actual purpose" (emphasis added)); United States v. Virginia, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented post hoc in response to litigation.").

67

Finally, the General Assembly's elimination of preregistration provides yet another troubling mismatch with its proffered justifications. Here, the record makes clear that the General Assembly contrived a problem in order to impose a solution. According to the State, the preregistration system was too confusing for young voters. SL 2013-381 thus sought, in the words of a sponsor of the law, to "offer some clarity and some certainty as to when" a "young person is eligible to vote," by eliminating preregistration altogether. J.A. 3317.[13] But, as the district court itself noted, that explanation does not hold water. The court found that "pre-registration's removal [] ma[d]e registration more complex" and prone to confusion. N.C. State Conf., 2016 WL 1650774, at *116 (emphasis added).

In sum, the array of electoral "reforms" the General Assembly pursued in SL 2013-381 were not tailored to achieve its purported justifications, a number of which were in all events insubstantial. In many ways, the challenged provisions in SL 2013-381 constitute solutions in search of a problem. The only clear factor linking these various "reforms" is their impact on

---

[13] Strangely, the main evidence regarding this asserted confusion appears to be a single senator's testimony regarding the experience of his high-school-aged son. See J.A. 3317 (senator indicating his son was confused about when to vote with pre-registration). But even that testimony does not coherently identify the problem that the law sought to remedy. See J.A. 3335 (same senator indicating his son was not confused about when to vote under pre-SL 2013-381 law).

68

African American voters.   The record thus makes obvious that the
"problem" the majority in the General Assembly sought to remedy
was emerging support for the minority party.   Identifying and
restricting the ways African Americans vote was an easy and
effective way to do so.   We therefore must conclude that race
constituted a but-for cause of SL 2013-381, in violation of the
Constitutional and statutory prohibitions on intentional
discrimination.

## V.

As relief in this case, Plaintiffs ask that we declare the
challenged provisions in SL 2013-381 unconstitutional and
violative of § 2 of the Voting Rights Act, and that we
permanently enjoin each provision.   They further ask that we
exercise our authority pursuant to § 3 of the Voting Rights Act
to authorize federal poll observers and place North Carolina
under preclearance.   These requests raise issues of severability
and the proper scope of any equitable remedy.   We address each
in turn.

### A.

When discriminatory intent impermissibly motivates the
passage of a law, a court may remedy the injury -- the impact of
the legislation -- by invalidating the law.   See, e.g., Hunter,
471 U.S. at 231; Anderson, 375 U.S. at 400-04.   If a court finds

69

only part of the law unconstitutional, it may sever the offending provision and leave the inoffensive portion of the law intact. Leavitt v. Jane L., 518 U.S. 137, 139-40 (1996). State law governs our severability analysis. Id. In North Carolina, severability turns on whether the legislature intended that the law be severable, Pope v. Easley, 556 S.E.2d 265, 268 (N.C. 2001), and whether provisions are "so interrelated and mutually dependent" on others that they "cannot be enforced without reference to another," Fulton Corp. v. Faulkner, 481 S.E.2d 8, 9 (N.C. 1997).

We have held that discriminatory intent motivated only the enactment of the challenged provisions of SL 2013-381. As an omnibus bill, SL 2013-381 contains many other provisions not subject to challenge here. We sever the challenged provisions from the remainder of the law because it contains a severability clause, see 2013 N.C. Sess. Laws 381 § 60.1, to which we defer under North Carolina law. Pope, 556 S.E.2d at 268. Further, the remainder of the law "can[] be enforced without" the challenged provisions. Fulton Corp., 481 S.E.2d at 9. Therefore, we enjoin only the challenged provisions of SL 2013-381 regarding photo ID, early voting, same-day registration, out-of-precinct voting, and preregistration.

70

WYNN, Circuit Judge, with whom FLOYD, Circuit Judge, joins, writing for the court as to Part V.B.:

B.

As to the appropriate remedy for the challenged provisions, "once a plaintiff has established the violation of a constitutional or statutory right in the civil rights area, . . . court[s] ha[ve] broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs." Smith v. Town of Clarkton, 682 F.2d 1055, 1068 (4th Cir. 1982); see Green v. Cty. Sch. Bd., 391 U.S. 430, 437–39 (1968) (explaining that once a court rules that an official act purposefully discriminates, the "racial discrimination [must] be eliminated root and branch"). In other words, courts are tasked with shaping "[a] remedial decree . . . to place persons" who have been harmed by an unconstitutional provision "in 'the position they would have occupied in the absence of [discrimination].'" Virginia, 518 U.S. at 547 (last alteration in original) (quoting Milliken v. Bradley, 433 U.S. 267, 280 (1977)).

The Supreme Court has established that official actions motivated by discriminatory intent "ha[ve] no legitimacy at all under our Constitution or under the [Voting Rights Act]." City of Richmond v. United States, 422 U.S. 358, 378 (1975). Thus, the proper remedy for a legal provision enacted with discriminatory intent is invalidation. See id. at 378–79

71

("[Official actions] animated by [a discriminatory] purpose have no credentials whatsoever; for [a]cts generally lawful may become unlawful when done to accomplish an unlawful end." (last alteration in original) (internal quotation marks omitted)); see also Hunter, 471 U.S. at 229, 231–33 (affirming the invalidation of a state constitutional provision because it was adopted with the intent of disenfranchising African Americans); Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 466, 470–71, 487 (1982) (affirming a permanent injunction of a state initiative that was motivated by a racially discriminatory purpose); Anderson, 375 U.S. at 403–04 (indicating that the purposefully discriminatory use of race in a challenged law was "sufficient to make it invalid"). Notably, the Supreme Court has invalidated a state constitutional provision enacted with discriminatory intent even when its "more blatantly discriminatory" portions had since been removed. Hunter, 471 U.S. at 232–33.

Moreover, the fact that the General Assembly later amended one of the challenged provisions does not change our conclusion that invalidation of each provision is the appropriate remedy in this case. Specifically, in 2015, the General Assembly enacted SL 2015-103, which amended the photo ID requirement and added the reasonable impediment exception. See 2015 N.C. Sess. Laws 103 § 8 (codified at N.C. Gen. Stat. §§ 163-82.8, 163-166.13, 163-166.15, 163-182.1B, 163-227.2). Our dissenting colleague

72

contends that even though we all agree that 1) the General Assembly unconstitutionally enacted the photo ID requirement with racially discriminatory intent, and 2) the remedy for an unconstitutional law must completely cure the harm wrought by the prior law, we should remand for the district court to consider whether the reasonable impediment exception has rendered our injunction of that provision unnecessary. But, even if the State were able to demonstrate that the amendment lessens the discriminatory effect of the photo ID requirement, it would not relieve us of our obligation to grant a complete remedy in this case. That remedy must reflect our finding that the challenged provisions were motivated by an impermissible discriminatory intent and must ensure that those provisions do not impose any lingering burden on African American voters. We cannot discern any basis upon which this record reflects that the reasonable impediment exception amendment fully cures the harm from the photo ID provision. Thus, remand is not necessary.

While remedies short of invalidation may be appropriate if a provision violates the Voting Rights Act only because of its discriminatory effect, laws passed with discriminatory intent inflict a broader injury and cannot stand. See Veasey, 2016 WL 3923868, at *36, *36 n.66 (distinguishing between the proper remedy for a law enacted with a racially discriminatory purpose

73

and the more flexible range of remedies that should be considered if the law has only a discriminatory effect).

Here, the amendment creating the reasonable impediment exception does not invalidate or repeal the photo ID requirement. It therefore falls short of the remedy that the Supreme Court has consistently applied in cases of this nature.

Significantly, the burden rests on the State to prove that its proposed remedy completely cures the harm in this case. See Virginia, 518 U.S. at 547 (noting that the defendant "was obliged to show that its remedial proposal 'directly address[ed] and relate[d] to' the violation" (alterations in original) (quoting Milliken, 433 U.S. at 282)); Green, 391 U.S. at 439 (placing the burden on the defendant to prove that its plan would effectively cure the violation). Here, nothing in this record shows that the reasonable impediment exception ensures that the photo ID law no longer imposes any lingering burden on African American voters. To the contrary, the record establishes that the reasonable impediment exception amendment does not so fundamentally alter the photo ID requirement as to eradicate its impact or otherwise "eliminate the taint from a law that was originally enacted with discriminatory intent." Johnson v. Governor of Fla., 405 F.3d 1214, 1223 (11th Cir. 2005) (en banc).

74

For example, the record shows that under the reasonable impediment exception, if an in-person voter cannot present a qualifying form of photo ID -- which "African Americans are more likely to lack" -- the voter must undertake a multi-step process. N.C. State Conf., 2016 WL 1650774, at *37. First, the voter must complete and sign a form declaring that a reasonable impediment prevented her from obtaining such a photo ID, and identifying that impediment.[14] N.C. Gen. Stat. § 163-166.15. In addition, the voter must present one of several alternative types of identification required by the exception. Id. § 163-166.15(c). Then, the voter may fill out a provisional ballot, which is subject to challenge by any registered voter in the county. Id. § 163-182.1B. On its face, this amendment does not fully eliminate the burden imposed by the photo ID requirement. Rather, it requires voters to take affirmative steps to justify to the state why they failed to comply with a provision that we have declared was enacted with racially discriminatory intent and is unconstitutional.

In sum, the State did not carry its burden at trial to prove that the reasonable impediment exception amendment

---

[14] While declaring that a reasonable impediment "prevent[ed]" her from obtaining an acceptable photo ID, the voter must heed the form's warning that "fraudulently or falsely completing this form is a Class I felony" under North Carolina law. J.A. 10368.

75

completely cures the harm in this case, nor could it given the requirements of the reasonable impediment exception as enacted by the General Assembly. Accordingly, to fully cure the harm imposed by the impermissible enactment of SL 2013-381, we permanently enjoin all of the challenged provisions, including the photo ID provision.

DIANA GRIBBON MOTZ, Circuit Judge, writing for the court:

C.

As to the other requested relief, we decline to impose any of the discretionary additional relief available under § 3 of the Voting Rights Act, including imposing poll observers during elections and subjecting North Carolina to ongoing preclearance requirements. See 52 U.S.C. § 10302(a), (c) (formerly 42 U.S.C. § 1973a). Such remedies "[are] rarely used" and are not necessary here in light of our injunction. Conway Sch. Dist. v. Wilhoit, 854 F. Supp. 1430, 1442 (E.D. Ark. 1994).

To be clear, our injunction does not freeze North Carolina election law in place as it is today. Neither the Fourteenth Amendment nor § 2 of the Voting Rights Act binds the State's hands in such a way. The North Carolina legislature has authority under the Constitution to determine the "times, places, and manner" of its elections. U.S. Const. art. I § 4. In exercising that power, it cannot be that states must forever

76

tip-toe around certain voting provisions disproportionately used by minorities. Our holding, and the injunction we issue pursuant to it, does not require that. If in the future the General Assembly finds that legitimate justifications counsel modification of its election laws, then the General Assembly can certainly so act. Of course, legitimate justifications do not include a desire to suppress African American voting strength.

***

It is beyond dispute that "voting is of the most fundamental significance under our constitutional structure." Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979). For "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17 (1964). We thus take seriously, as the Constitution demands, any infringement on this right. We cannot ignore the record evidence that, because of race, the legislature enacted one of the largest restrictions of the franchise in modern North Carolina history.

We therefore reverse the judgment of the district court. We remand the case for entry of an order enjoining the

77

implementation of SL 2013-381's photo ID requirement and changes to early voting, same-day registration, out-of-precinct voting, and preregistration.

<u>REVERSED AND REMANDED</u>

78

DIANA GRIBBON MOTZ, Circuit Judge, dissenting as to Part V.B.:

We have held that in 2013, the General Assembly, acting with discriminatory intent, enacted a photo ID requirement to become effective in 2016. But in 2015, before the requirement ever went into effect, the legislature significantly amended the law. North Carolina recently held two elections in which the photo ID requirement, as amended, was in effect. The record, however, contains no evidence as to how the amended voter ID requirement affected voting in North Carolina. In view of these facts and Supreme Court precedent as to the propriety of injunctive relief, I believe we should act cautiously.

The Supreme Court has explained that "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." Winter v. Natural Res. Defense Council Inc., 555 U.S. 7, 32 (2008); see also Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982). Given the "inherent limitation upon federal judicial authority," a court's charge is only to "cure the condition that offends the Constitution." Milliken v. Bradley, 433 U.S. 267, 282 (1977) (internal quotation marks omitted).

If interim events have "cured the condition," id., and a defendant carries its "heavy burden" of demonstrating that the wrong will not be repeated, a court will properly deny an injunction of the abandoned practice. United States v. W.T.

79

Grant, 345 U.S. 894, 896-97 (1953); see Kohl by Kohl v. Woodhaven Learning Ctr., 865 F.2d 930, 934 (8th Cir. 1989) ("A change in circumstances can destroy the need for an injunction."). Thus, a defendant's voluntary cessation of an unconstitutional practice or amendment of an unconstitutional law fundamentally bears "on the question of whether a court should exercise its power to enjoin" the practice or law. City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 288-89 (1982).

The remedy for an unconstitutional law must completely cure the harm wrought by the prior law. But, a superseding statute can have that effect. See id. And, where a governmental body has already taken adequate steps to remedy an unconstitutional law, courts "generally decline to add . . . a judicial remedy to the heap." Winzler, 681 F.3d at 1211; cf. A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 331 (1961) ("[S]ound discretion withholds the remedy where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted.").

In 2015, two years after the enactment of the photo ID requirement, but prior to its implementation, the General Assembly added the reasonable impediment exception to the photo ID requirement. See 2015 N.C. Sess. Laws 103 § 8. The

80

exception provides that a voter without qualifying photo ID may cast a provisional ballot after declaring under penalty of perjury that he or she "suffer[s] from a reasonable impediment that prevents [him] from obtaining acceptable photo identification." N.C. State Conf., 2016 WL 1650774, at *36 (internal quotation marks omitted). No party in this case suggests that the legislature acted with discriminatory intent when it enacted the reasonable impediment exception.

The majority maintains, however, that the reasonable impediment exception does not fully remedy the impact of the photo ID requirement. Perhaps not. But, by its terms, the exception totally excuses the discriminatory photo ID requirement.[1] Of course, in practice, it may not do so. But on this record, I believe we cannot assess whether, or to what extent, the reasonable impediment exception cures the unconstitutional 2013 photo ID requirement.

---

[1] Recently, a court considering a similar reasonable impediment exception suggested that the exception could remedy an otherwise problematic photo ID requirement. See South Carolina v. United States, 898 F. Supp. 2d 30, 35-38 (D.D.C. 2012). In South Carolina, a three-judge panel precleared a photo ID requirement with a reasonable impediment exception after finding that it would not "disproportionately and materially burden racial minorities" as compared to the then-existing identification requirement. Id. at 38. Here, North Carolina's reasonable impediment exception "is effectively a codification of th[at] three-judge panel's holding." N.C. State Conf., 2016 WL 1650774, at *12. See also Veasey v. Abbott, Civil Action No. 2:13-cv-193 (S.D. Tex. July 23, 2016).

81

Because the district court failed to find discriminatory intent, it did not consider whether any unconstitutional effect survived the 2015 amendment.  Instead, it focused on whether the law, as amended in 2015, burdened voters _enough_ to sustain claims under a § 2 results or an _Anderson_-_Burdick_ analysis.  _Id._ at *122, *156.  Of course, this is not the standard that controls or the findings that bear on whether a court should enjoin an unconstitutional racially discriminatory, but subsequently amended, law.[2]

Moreover, additional information now exists that goes directly to this inquiry.  For after trial in this case, the State implemented the reasonable impediment exception in primary elections in March and June of 2016.  The parties and amici in this case have urged on us anecdotal extra-record information concerning the implementation of the exception during the March election.  For example, Amicus supporting the Plaintiffs reports that, in the March 2016 primary election, poll workers gave reasonable-impediment voters incorrect ballots and County Boards

---

[2] This contrasts with our ability to assess, without remand, whether the State demonstrated that SL 2013-381 would have been enacted without considerations of race.  _See_ _supra_, Part IV.  Although the district court did not shift the burden to the State under _Arlington Heights_, it had already made extensive findings of the relevant foundational facts regarding the State's proffered justifications.  We lack the equivalent findings regarding what discriminatory impact less than a "material burden" may survive the reasonable impediment exception.

82

of Elections were inconsistent about what they deemed a "reasonable" impediment. See Br. of Amicus Curiae Democracy North Carolina in Support of Appellants at 8-32, N.C. State Conf., ___ F.3d ___ (4th Cir. 2016) (No. 16-1468). In response, the State maintains that "the vast majority" of these criticisms "are inaccurate or misleading," in part because Amicus completed its report before the State conducted its final vote count. Appellee's Resp. in Opp'n. to Mot. for Stay of J. and Inj. Pending Appeal at 3-5, N.C. State Conf., ___ F.3d ___ (4th Cir. 2016) (No. 16-1468). Of course, these submissions as to the March election do not constitute evidence and we cannot consider them as such. Witters v. Washington Dep't of Servs. for the Blind, 474 U.S. 481, 488 n.3 (1986). And for the June election, we do not even have anecdotal information.

Thus, we are faced with a statute enacted with racially discriminatory intent, amended before ever implemented in a way that may remedy that harm, and a record incomplete in more than one respect. Given these facts, I would only temporarily enjoin the photo ID requirement and remand the case to the district court to determine if, in practice, the exception fully remedies the discriminatory requirement or if a permanent injunction is necessary. In my view, this approach is that most faithful to Supreme Court teaching as to injunctive relief.

83